# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIGHTON PARK NEIGHBORHOOD
COUNCIL,
    4477 S. Archer Ave.
    Chicago, IL 60632,

AMERICAN FEDERATION OF TEACHERS,
    555 New Jersey Ave. NW
    Washington, DC 20001,

                *Plaintiffs*,

    v.

LINDA MCMAHON, in her official capacity as
Secretary of the United States Department of
Education,
    400 Maryland Ave. NW
    Washington, DC 20202,

UNITED STATES DEPARTMENT OF
EDUCATION,
    400 Maryland Ave. NW
    Washington, DC 20202

RUTH RYDER, in her official capacity as Acting
Assistant Secretary, Office of Elementary and
Secondary Education,
    400 Maryland Ave. NW
    Washington, DC 20202,

OFFICE OF ELEMENTARY AND SECONDARY
EDUCATION,
    400 Maryland Ave. NW
    Washington, DC 20202

                *Defendants*.

Case No. _____

**COMPLAINT**

## INTRODUCTION

1.    Within the amended Elementary and Secondary Education Act (ESEA), Congress codified the Full-Service Community Schools (FSCS) program. The FSCS program supports public elementary or secondary schools in providing coordinated, accessible wraparound services for children and families, particularly for children attending high-poverty schools, including in rural areas. Under the program, the Department of Education must award grants to provide comprehensive academic, social, and health services for students, students' family members, and community members that result in improved educational outcomes for children.

2.    Congress has consistently provided funding for the FSCS program, including appropriations of $150 million for the program in each of the last three years, which the Department must obligate by December 31 of each year.

3.    FSCS grants are multi-year grants, which enable grantees to run programs that support schools and students over time with the consistent provision of services. For decades, and by regulation, the Department has treated continuation awards for such multi-year grants as the norm, not the exception—issuing annual continuation funding based on grantee performance and according preference to continuation awards, rather than subjecting grantees to renewed competition or shifting policy preferences.

4.    On December 12, 2025, the Department made the abrupt and unlawful decision to discontinue 19 different multi-year FSCS grants, mid-project. The Department had budgeted more than $60 million of FSCS appropriations to commit to these 19 grants in 2025, and on information and belief, the Department has not obligated those funds to other awards and does not plan to do so before the funds expire in two days, on December 31, 2025.

1

5. Thus, absent judicial relief, the Department is set to impound more than $60 million, rendering the funds forever unavailable to use for community schools as Congress mandated. This failure to obligate appropriated funds constitutes clear unlawful agency action.

6. In addition, the Department's decision to break from its settled framework for issuing continuation awards, without adequate explanation or lawful basis, violates the Administrative Procedure Act and governing grant regulations. The Department's letters discontinuing these awards were unlawfully based on newly articulated priorities and policy preferences that were never promulgated through notice-and-comment rulemaking. The Department also ignored regulations requiring that continuation awards be based on performance, failed to give continuation awards priority over new grants, and abandoned the Department's longstanding representation that non-continuation is "extremely rare."

7. Plaintiffs Brighton Park Neighborhood Council (BPNC) and the American Federation of Teachers (AFT) are among the entities that will suffer immense harm from the Department's unlawful actions. BPNC provides wraparound services at eight schools in the Chicago area. Its largest program is at Curie Metro High School, the third-largest public school in Chicago, where it provides afterschool programs for students and adults such as STEM clubs, workforce development, college mentoring, and academic tutoring, as well as summer worksites for high-school students. This program depends on $500,000 in anchor funding from the FSCS program that BPNC receives from a subgrantee, which BPNC uses to pay for the staff and infrastructure needed for such activities. AFT represents educators working in school districts across the country that operate programs funded by multi-year FSCS awards.

8. The consequences of the Department's unlawful actions on the education system more broadly are profound. The schools – students, families, teachers, and staff – that rely on

these funds will lose key financial support for programs half-way through the academic year at a time when it is most difficult to reorganize resources. The low-income students and parents that BPNC serves at Curie, for example, will suddenly lose access to tutoring and mentoring, financial literacy programs, adult nutrition classes, and workforce preparedness opportunities. In discontinuing five-year plans partway through execution, Defendants are cutting off funding for this important work just as the groundwork has been laid to fulfill the FSCS program's goals and as successes are being reported.

9.     To avert these extraordinary harms, Plaintiffs bring this suit to preliminarily set aside and enjoin Defendants' unlawful actions and to prevent this crucial funding from being lost.

## PARTIES

10.     Plaintiff Brighton Park Neighborhood Council is a 501(c)(3) nonprofit organization founded in 1997 to support the underserved residents of Chicago's southwest side, which includes many of the most impoverished neighborhoods in Chicago. Its mission is to improve the quality of life for the residents of these communities. One of its main tools for carrying out that mission is providing free and accessible programming at neighborhood public schools to meet the complex needs of children and adults in low-income families, such as workforce preparedness, education, and mental and physical health.

11.     Plaintiff the American Federation of Teachers is a membership organization representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.

3

12.     AFT's headquarters is in Washington, D.C. Its 1.8 million members belong to more than 3,000 locals across all fifty states.

13.     AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities. It meets this mission by ensuring their members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients, and all those who use public services. Helping children and students, and ensuring the economic security and dignity of AFT's members and their families, is at the core of this mission.

14.     Defendant Linda McMahon is the Secretary of the United States Department of Education, the highest-ranking official at the Department of Education, and is responsible for the decisions of the Department. She is sued in her official capacity.

15.     Defendant the United States Department of Education is an executive department of the United States federal government, headquartered in Washington, D.C.

16.     Defendant Ruth Ryder is the Acting Assistant Secretary, Office of Elementary and Secondary Education (OESE), the highest-ranking official at the OESE, and is responsible for its decisions. She is sued in her official capacity.

17.     Defendant the Office of Elementary and Secondary Education is an operating division of the Department of Education, headquartered in Washington, DC.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

23.     This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

24.     Venue is appropriate under 28 U.S.C. § 1391(e) in the District of Columbia because Plaintiff AFT resides in this district.

## FACTUAL AND LEGAL BACKGROUND

### A. *Congress's Creation and Funding of Full-Service Community Schools*

25.     The Elementary and Secondary Education Act (ESEA) provides the primary source of federal funding for elementary and secondary education. Rebecca R. Skinner, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer*, CRS Report No. R45977 (Feb. 12, 2024), https://perma.cc/LPR9-RUF2. First enacted by Congress in 1965 (P.L. 89-10), the ESEA was most recently comprehensively amended and reauthorized by the Every Student Succeeds Act (ESSA; P.L. 114-95). *Id.*

26.     The ESEA requires the Department of Education to administer the Full-Service Community Schools program, which is designed to provide support for the "planning, implementation, and operation of full-service community schools that improve the coordination and integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." 20 U.S.C. § 7271(2).

27.     More specifically, under the FSCS program, the Department provides grants to entities including Historically Black Colleges and Universities (HBCUs), institutes of higher education, non-profits, and Local Educational Agencies (LEAs) (the public authorities that maintain administrative control for public elementary or secondary schools) to participate in community-based efforts to coordinate and integrate educational, developmental, family, health,

and other comprehensive services through community-based organizations and public and private partnerships. 20 U.S.C. §§ 7272(1)(B), (2); U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)*, OESE (July 16, 2025) https://perma.cc/V9VT-K3Y7. Schools provide "pipeline services," which deliver a "continuum of coordinated supports, services, and opportunities" to children in distressed communities, including through high-quality early childhood education programs, high-quality school and out-of-school-time programs and strategies; social, health, nutrition, and mental health services and supports; and more. 20 U.S.C. § 7272(3).

28.     Congress first created the FSCS program, along with the "Promise Neighborhoods" initiative, using authority previously available in the ESEA's Title V-D-1 to create programs of national significance as a demonstration program through the Department of Education Appropriations Act in 2008. *See* Consolidated Appropriations Act, 2008, Pub. L. 110-161, 121 Stat 1844, Div. G, Title III (2007); Rebecca R. Skinner, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer*, CRS Report No. R45977 (Feb. 12, 2024), https://perma.cc/LPR9-RUF2.

29.     Congress subsequently amended the ESEA to codify the FSCS program in subpart 2 of part F of the ESEA. *See* Every Student Succeeds Act, Pub. L. 114–95, § 4601, 129 Stat. 1802 (2015) (*codified at* U.S.C. § 7271 *et seq*).

30.     In codifying the FSCS program, Congress mandated that the Secretary of Education "*shall use* not less than 95 percent of the amounts made available under section 7251(b)(2)(B) of this title to award grants, on a competitive basis and subject to subsection (e), to eligible entities" for the Promise Neighborhoods and FSCS programs. 20 U.S.C. § 7273(a)(1) (emphasis added).

31.     Congress further mandated that "in awarding grants" under the FSCS program, "the Secretary shall give priority to eligible entities that—(1)(A) will serve a minimum of 2 or more full-service community schools eligible for a schoolwide program under section 6314(b) of this title, as part of a community- or district-wide strategy; or (B) include a local educational agency that satisfies the [certain] requirements . . .; (2) are consortiums comprised of a broad representation of stakeholders or consortiums demonstrating a history of effectiveness; and (3) will use funds for evidence-based activities." 20 U.S.C. § 7275(b).

32.     Congress has consistently directed the Department to spend appropriated money on FSCS programs, authorizing additional appropriations through the General Educational Provisions Act (GEPA) and the regular appropriations process. *See* 20 U.S.C. § 1226a (extending appropriations authorizations for applicable programs through 2021); Consolidated Appropriations Act 2022, Pub. L. 117-103, 136 Stat. 49, 477 (2022); Consolidated Appropriations Act 2023, Pub. L. 117-328, 136 Stat. 4459, 4625 (2023); Further Consolidated Appropriations Act 2024, Pub. L. 118-47, 138 Stat. 460, 684 (2024). Congress has continuously increased the FSCS funding that the Secretary is required to spend—from $25 million in 2020, to $30 million in 2021, $75 million in 2022, and $150 million per year for 2023, 2024, and 2025. *See id.*

33.     As relevant here, in the Consolidated Appropriations Act of 2024 (the "2024 Appropriations Act"), Congress appropriated $457,000,000 "[f]or carrying out activities authorized by subparts 2 and 3 of part F of title IV of the ESEA, . . . to remain available through December 31, 2024." Pub. L. 118-47, 138 Stat. 684. Congress then specified that, of this amount, "$150,000,000 shall be available for section 4625," which is the FSCS program. *Id.* In enacting

this appropriation, Congress directed the Department to obligate $150 million for the FSCS program by December 31, 2024.

34.    The 2025 Full-Year Continuing Appropriations and Extensions Act replicated the exact same appropriation for 2025, meaning Congress appropriated the same amount for FSCS, to remain available through December 31, 2025. *See* Pub. L. 119-4, 138 Stat. et. seq.

35.    The FSCS program is an "applicable program" under the General Education Provisions Act (GEPA) and is therefore subject to Congress's mandate that the Department require grant applicants to address equity issues. GEPA Equity Directive, 20 U.S.C. §§ 1221, 1228a(b). The FSCS program is also governed by statutory notice-and-comment rulemaking requirements. *See* 20 U.S.C. 1232(a), (d).

### B.   *The Department Awards Continuation Grants Non-Competitively, Based on Performance*

36.    The Department has long represented that a discontinuation of multi-year award funding like the FSCS grants at issue is "extremely rare in practice." Direct Grants Programs, 59 Fed. Reg. 30258-01, 30259 (June 10, 1994). As the Department recently explained, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." Educ. Dep't Gen. Admin. Regul. and Related Regul. Provisions, 89 Fed. Reg. 70300-01, 70316 (Aug. 29, 2024).

37.    GEPA and the Department's own financial assistance regulatory framework govern the Department's administration of the FSCS program funds. With exceptions not relevant here, GEPA requires that rules affecting the Department's provision of financial assistance—including grant programs—go through the APA's notice and comment process. *See* 20 U.S.C. § 1232(a), (d).

38.    The Department's financial assistance regulations fulfill these statutory requirements by publicly setting the rules for: (1) the Department's competitive grantmaking selection process for new grants; and (2) its process for determining whether to continue a grantee's multi-year project—a process that does not involve competition with other current or potential grantees.

39.    When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things: how to apply for a new grant, 34 C.F.R. § 75.100 (1994); whether the Secretary plans to approve multi-year projects, and if so, the project period the Secretary will approve, 34 C.F.R. § 75.101 (2024); the priorities established for the selection of new grants for the program that year, including any competitive preference priorities for which an application could receive bonus points; the selection criteria and factors used to decide which applications will be awarded new grants, and how these criteria will be weighed; and any program performance measurement requirements, including whether the application should propose project-specific performance measures and explain how the proposed measures would accurately measure project performance.

40.    The Department then scores the quality of each application using the selection criteria and competitive preferences, ranks the applications based on their quality according to the selection criteria and preferences, and selects grant recipients in the order in which their applications were ranked. *See* 34 C.F.R. § 75.217 (2024); U.S. Department of Education, *Discretionary Grantmaking at ED (Discretionary Grantmaking)*, 26–27 (2024), https://www.ed.gov/media/document/grantmaking-ed-108713.pdf. The selection criteria are given point values up to the "total possible score for all of the criteria for a program" that the

Department announced for that year's grant competition. 34 C.F.R. § 75.201(b)(1)-(2) (2024); *Discretionary Grantmaking* at 26-27. Applicants may earn additional points if they meet competitive preference priorities. *See* 34 C.F.R. § 75.105(c); *Discretionary Grantmaking* at 27.

41.    Unlike the Department's process governing the selection of new grant awards, the Department's procedures for determining whether to continue multi-year grants is not competitive. *See Discretionary Grantmaking* at 31–32, 45.

42.    When awarding multi-year projects, the Department "[m]akes a grant to the project for the initial budget period"—usually 12 months—and indicates its "intention to make continuation awards to fund the remainder of the project period." *See* 34 C.F.R. § 75.251 (2024).

43.    The Department is required to base decisions about whether to continue to fund subsequent years of multi-year awards on information relevant to a grantee's performance, which includes performance reports, performance measures, and certain financial information. *See* 34 C.F.R. §§ 75.118(b), 75.253(b) (2024); *see also Discretionary Grantmaking* at 32 ("[t]he program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); Direct Grant Programs, 59 Fed. Reg. 30258-01, 30259 (June 10, 1994) ("the continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application").

44.    Finally, in selecting applicants for funding under a program, the Department is required under its own regulations and policies to "give[] priority to continuation awards over new grants." 34 C.F.R. § 75.253(c) (2024). The Department assigns a multi-year project priority in receiving funds over new grants. 34 C.F.R. § 75.253(c); *Discretionary Grantmaking* at 45 ("A

grantee does not have to compete with other applicants to receive [a continuation] award.");
EDGAR 45 Fed. Reg. 22544, 22559 (Apr. 3, 1980) (explaining that each "continuation award
will be judged on the basis of the criteria in [§ 253(a)] and will not be subject to competition
with other applications.").

### C.   *The Department Reviews and Selects FSCS Applicants Based on Published Priorities*

45.     In 2022, the Department engaged in its statutorily required rulemaking to set new
priorities for FSCS competitions. In accordance with statutory requirements, the Department
published a notice of proposed priorities, requirements, and definitions, and invited the public to
comment. Proposed Priorities, Requirements, Definitions, and Selection Criteria - Full Services
Community Schools Program, 87 Fed. Reg. 1709-01 (Jan. 12, 2022).

46.     The Department then published a notice announcing the "final priorities,
requirements, and definitions" for future FSCS grant competitions and addressing the public
comments. 87 Fed. Reg. 41675-02 (July 13, 2022). The notice announced final priorities
including the following: (1) for Capacity Building and Development Grants, "[p]rojects that
propose to (a) conduct initial development and coordination activities, including extensive
community engagement, that leverage the findings of their needs assessment—which may be
completed during or before the grant period—to develop the infrastructure, activities, and
partnerships to implement full-service community schools in two or more schools, and (b) gather
data on performance indicators;" (2) for Multi-Local Educational Agency Grants, "[p]rojects that
propose to implement and sustain full-service community schools in two or more LEAs;" (3) for
FSCS State Scaling Grants, applications that "include a written commitment of the SEA to
participate in the partnership and to sustain the program beyond 2 years after the term of the
grant," and identify or establish a State steering committee. *Id.* at 41683.

47.     The notice also provided that each priority would be listed through another Federal Register notice as either: an absolute priority, under which the Department considers only applications that meet the priority, 34 CFR 75.105(c)(3); a competitive preference priority, under which the Department gives preference to an application by (1) awarding additional points based on the extent the application meets the priority or (2) selecting an application that meets the priority over one of comparable merit that does not, 34 CFR 75.105(c)(2)(ii); or an invitational priority, under which the Department is "particularly interested in applications that meet the priority" but does not give an application that meets it a preference, 34 CFR 75.105(c)(1). *Id.* at 41685

48.     In 2023, the Department published a notice of an additional final priority for participation in a national evaluation of effectiveness using a randomized control trial design. Final Priority and Requirements – Full-Service Community Schools, 88 Fed. Reg. 37218-01 (June 7, 2023).

49.     The Department of Education published a notice inviting applications for the Fiscal Year 2023 FSCS grant competition on June 7, 2023. *See* Applications for New Awards; Full-Service Community Schools Program, 88 Fed. Reg. 37222-01 (June 7, 2023). The notice included three Absolute Priorities from the July 13, 2022 notice of final priorities, requirements, definitions, and selection criteria (Absolute Priorities 3, 4, and 5) as well as two Absolute Priorities from other sections of the ESEA (Absolute Priority 1 from section 4625(b)(1)(A) of the ESEA, and Absolute Priority 2 is from section 4625(b)(1)(A) and (B) of the ESEA). The notice also included "Competitive Preference Priorities 1 and 2, [which] are from the Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs published in the Federal Register on December 10, 2021 (86 FR 70612)." *Id.* at 37223-4. These priorities identify

requirements that applicants either must meet, in the case of absolute priorities, or can optionally address for a preference advantage, in the case of competitive preference priorities.

50.     Of the five listed "absolute priorities," the notice required that applicants meet two: Absolute Priority 1, which required that "applicants must propose to serve a minimum of two or more full-service community schools eligible for a schoolwide program (as defined in this notice) under section 1114(b) of the ESEA, as part of a community- or district-wide strategy," and Absolute Priority 2, which required that applicants "must propose to: (1) serve a minimum of two or more full-service community schools eligible for a schoolwide program. . . , as part of a community- or district-wide strategy; and (2) include an LEA that satisfies the requirements of the Small Rural School Achievement program . . . or the Rural and Low-Income School program" as defined in the ESEA.  *Id.* at 37224.  Applicants were also required to meet one additional Absolute Priority from a list of three options: Absolute Priority 3, for Capacity Building and Development Grants; Absolute Priority 4, for Multi-Local Educational Agency Grants; or Absolute Priority 5 for FSCS State Scaling Grants. *Id.* The notice also included "two competitive preference priorities, and one invitational priority." *Id.* at 37223.

51.     Against this backdrop, entities including non-profits, institutes of higher education, and school districts employing Plaintiff AFT's members applied for FSCS grants, designing their proposed projects to align with the Department's announced priorities for that funding cycle in order to strengthen their applications. After selecting grantees for multi-year FSCS awards, the Department funded the initial budget period and provided for four additional 12-month budget periods.

**D.   *The Department Reviews and Selects FSCS Applicants Based on Published Priorities***

52.     Beginning December 12, 2025, the Department discontinued, on information and belief, at least 19 multi-year FSCS grants out of a total of ~70 grants. Plaintiffs are not aware of any of these grantees being terminated for performance reasons.

53.     At least some grantees were offered an option to request reconsideration if they did so within 7 calendar days of the notice. They were also informed that they would not be offered no-cost extensions. On December 29, 2025, the Department began issuing denials of grantees' appeals.

54.     Among the discontinued grants were multi-year FSCS grants directly impacting Plaintiffs AFT and BPNC, AFT affiliate local unions, and AFT members.

55.     The Department issued notices that provided little to no insight into the stated basis for the noncontinuations. For instance, grantee Metropolitan Family Services, on whose FSCS grant Plaintiff BNPC's programming depends, received a notice with a boilerplate statement that the Department "determined that the grant…provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." The notice offered no factual findings, analysis, or application of these conclusory labels to Metropolitan Family Services' actual performance under the grant, and simply declared—without explanation—that the grant was therefore not in the best interests of the Federal Government.

56.    The Department's Notice also stated without elaboration that "Department staff identified that the applicant has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education," followed by a paragraph of disjointed quotations extracted from Metropolitan Family Services's 106-page application. Those quotations described Metropolitan Family Services' focus on equity and racial justice; the Full-Service Community Schools program's statutory emphasis on historically marginalized populations; Metropolitan Family Services' gender and sexuality professional development courses; and the grant-required GEPA equity statement, in which Metropolitan Family Services described its commitment to racial justice and equity. The notice did not identify any deficiency, violation, or performance failure, nor did it explain why these programmatic features—many of them expressly contemplated or required by the FSCS statute and GEPA—could justify noncontinuation of an otherwise successful grant.

57.    On this basis, Defendants discontinued Metropolitan Family Services' two grants—one serving schools in metropolitan Chicago and the other in rural Illinois counties—after two years of their five-year terms.

58.    Similarly, grants that benefit AFT's members were discontinued across the country. For example, another five-year grant in Illinois providing around $2.8 million per year to serve schools in northern Chicagoland was discontinued after three years. In Connecticut, four five-year grants to serve schools in Waterbury, Hartford, Stamford, and New Haven—each providing $400,000 to $500,000 per year—were discontinued after two or three years. In Kentucky, a five-year grant providing around $10 million per year to serve schools across the state was discontinued after three years. In Maryland, a five-year grant providing around $400,000 per year to serve Baltimore schools was discontinued after 3 years. And in the District of Columbia, two five-year

grants each providing around $500,000 per year to serve local schools were discontinued after 3 years.

59.     On information and belief, the Department has not obligated the more than $60 million in expiring funds that were budgeted for the 19 non-continued awards to other existing or new awards, or for other permissible purposes. On information and belief, the Department has decided not to obligate these funds before they expire on December 31, 2025.

**E.  *The Impact of the Department's Non-Continuation Decision on Plaintiffs, Students, Schools, and Teachers***

60.     The decision not to continue these grants has harmed Plaintiffs, AFT's local unions and members, and the students, families, schools, and communities they serve.

61.     Plaintiff BPNC's Full-Service Community School Initiative delivers wraparound services at eight neighborhood public schools on Chicago's southwest side. Brighton Park and its surrounding communities are among the most impoverished neighborhoods in Chicago, with per capita income around half of the Chicago average and more than twice as many residents lacking a high school diploma.

62.     The largest school BPNC serves is Curie Metro High School, the third-largest public school in Chicago. BPNC's program at Curie is dependent on a $500,000 contract with Chicago Public Schools that is funded by the FSCS award to Metropolitan Family Services noted above. That contract provides the anchor funding for BPNC to provide the staff and infrastructure it needs to deliver programs at Curie. Based on its expectation of continued support over the five-year length of Metropolitan Family Services's grant, BPNC entered numerous partnerships and contracts to bring services to students and families at Curie.

63.     These services include a wide variety of afterschool and summer programming: college mentoring and academic tutoring; STEM and robotics classes; civics and leadership

development programs; parent support programs such as GED, financial literacy, and adult

nutrition classes; summer employment; and workforce development programs teaching students

how to run businesses or obtain professional licenses.

64.    Defendants' decision not to obligate the FSCS appropriation and its resulting

decision to discontinue Metropolitan Family Services's grant out of the blue has already caused

chaos in BPNC's operations and will result in many if not all of these programs being canceled

in the near future. BPNC has already canceled staff and parent appreciation events and holiday

showcases for the students as it figures out how to rewrite its 2026 budget and save programs

and staff to the extent possible. It expects to cancel numerous programs midstream, such as the

Financial Literacy Club, Robotics Club, Adult Nutrition class, and tutoring and mentoring

programs. It will have to back out of contractual obligations, harming its goodwill and

reputation.

65.    This will harm not only BPNC but cause long-term damage to the students,

families, and communities that it serves. Cutting off services for low-income high-school

students in the middle of the school year will cause trauma for at-risk students who already face

inordinate challenges, alienating them from their schools and trusted adults. They will lose

workforce development opportunities, and their parents will lose assistance developing the skills

they need to provide a healthy upbringing and participate in the workforce.

66.    Moreover, the last-minute nature of the terminations prevented BPNC and Curie

from making alternate plans to find stopgap solutions that could have limited disruption of the

services they provide and salvaged some of the work that they had done over the first year and a

half of the program. Instead, Defendants' decision sent BPNC and the communities that they

serve into avoidable chaos and the exact lack of support that Congress created the FSCS to mitigate.

67.    Similar harms have impacted AFT and its affiliates in Connecticut, the District of Columbia, Illinois, Kentucky, and Maryland. FSCS funds have been directly responsible for substantial, across the board improvements to educational outcomes. For example, In Connecticut, the community schools' model has been attributed as a key factor in schools achieving positive educational outcomes. In the Hartford School District, for the 2023-24 school year, chronic absenteeism among "high-needs" students—a primary target of the FSCS grant—fell from 28.5% to 25.5%. By late 2025, statewide chronic absenteeism dropped for the third consecutive year to 17.2%, with community schools cited as a "promising approach" for this decline due to their integrated support services. The graduation rate reached over 78% for the Class of 2023, the highest recorded for the district in more than a decade. Statewide data released in late 2025 indicates an upward trend in postsecondary readiness indicators, including increased participation in Advanced Placement (AP) exams and dual enrollment programs. And 209 students earned the Seal of Biliteracy in 2024, the highest total in the district's history. These results would not be possible without the FSCS full wrap-around model, which includes mental health services, after school programs and community support programs, as well as tutoring, athletics, and health care.

68.    In Washington D.C., FSCS funds have contributed to across-the-board improvements in educational outcomes. Of students receiving intensive case management through community school partnerships, 78% of these students improved their academics and 97% improved their behavior. Sixty-five percent of case-managed students improved their attendance over a five-year period, and for students enrolled in schools utilizing home visits–a

core community engagement strategy–students missed an average of 24% fewer days of school. In addition, community school models in Washington D.C. report high success in keeping students on track; 95% of case-managed students in grades K–11 progress to the next grade, and 99% of seniors graduate. Through the OSSE Community Schools Incentive Initiative, participating schools provide access to dental and vision care, food pantries, clothing banks, and mental health counseling directly on campus, contributing to the various improvements to educational outcomes.

69.     In Illinois the community schools' model has directly contributed to significant improvements in education outcomes. Since 2023, Illinois reported a 14.8% decrease in the number of students missing 10% or more of the school year as of 2025. And the state reached a record 89.3% of ninth graders on track to graduate in 2025, an 8.6% increase since 2021, with significant gains among English learners (3.5%) and Black students (2.3%). National and regional data for the FSCS model also indicates math score gains equivalent to 43 additional days of learning and English Language Arts gains equivalent to 36 days. Schools implementing the full model saw an average 15% reduction in suspension rates, with the most significant impact at the secondary school level where restorative practices were applied. With respect to Family and Community Connectivity, approximately 94% of teachers in Illinois community schools reported that the model increased parent and family engagement; roughly 85% of parents reported feeling more closely connected to their child's school due to the presence of community services; and schools successfully increased family connections to essential community resources by over 95%. Finally, by late 2023 and into 2024, nearly every partner school had successfully hired a Full-Time Coordinator to manage these integrated services, a foundational

step that was finalized across the 32 sites. Grant-funded schools also successfully established partnerships with local employers to align student career exploration with regional workforce needs.

70.     Discontinuing funds will cause dramatic and immediate harm to this significant progress. In Illinois, 32 schools across the States in rural, suburban, and urban districts, including schools employing AFT members, will lose funding immediately, forcing the suspension of programming to approximately 19,000 students and families and the layoff of professionals statewide. Primary impacted roles include Community School Coordinators, on-site staff members who are central to the model, managing the integration of services and local partnerships; Mental Health Professionals, the grant funded school-based counselors and social workers who provided direct mental health support to student; After-School Program Staff, personnel including tutors, mentors, and program leaders for extracurricular, academic enrichment, and career training programs; Case Managers & Outreach Workers, support staff responsible for connecting families with basic needs like food assistance and housing; Specialized Instructional Personnel, staff involved in "pipeline services," such as ACT prep tutors and providers for student employment opportunities; and Early Childhood & Support Staff, which include roles such as teaching assistants and personnel managing transitions for younger students. Of these roles, several school districts have already announced the reassignment or potential loss of Community School Coordinators.

71.     In addition, across these Illinois districts, the most immediate losses include after-school tutoring, high school clubs, and K-8 enrichment programs, which parents rely on to remain in the workforce.

72.     These losses will harm students and undermine education outcomes, undoing the significant progress made across Illinois, described above, on student attendance and retention, academic and behavioral gains, family and community connectivity, and infrastructure and staffing.

73.     For example, AFT Local 809 members will be directly harmed by the discontinuation of the FSCS Grant. These members work at Quincy School District #172 in Quincy, Illinois. The district was a recipient of a five-year, five-million-dollar grant that funds a community schools' program. The grant is in the second year out of the five years, and was awarded to the district to increase student academic and social emotional achievement through the "Four Pillars of Community Schools" and to increase student supports through expanded and enriched learning time and opportunities.

74.     Local 809 is an affiliate of the Illinois Federation of Teachers and the American Federation of Teachers. Over forty-five Local 809 members will be directly harmed by the loss of the FSCS Grant. Two bargaining unit members are employed by the district as "Community School Coordinators" (RCs). These members are fully funded by this grant and will lose their jobs as a result of the discontinuation of the grant. In addition, dozens of other staff at the junior and senior high schools are paid by this grant—typically between 10% to 25% of their salary to support the Coordinators or run programming at the school level, such as tutoring, credit recovery, entrepreneurship, and career and technical education. Two other staff receive grant funding to drive buses after school or in the summertime to support the programming. When these programs end, these members will be laid off or have their pay reduced.

75.     Similarly, AFT Local 1220 members will be directly harmed by the discontinuation of the FSCS Grant. These members work at East St. Louis School District #189

in East St. Louis, Illinois. The district was a recipient of a five-year, five-million-dollar grant that funds a community schools' program in two elementary schools, who each receive around $500,000 in funding per year over the five-year period. The grant is in the second year out of the five years, and was awarded to the district to create high quality after-school programming, intervention supports such as reading tutors, Blueprint Math Fellows and i-Ready individualized tutoring. The grant also funds a kindergarten readiness program and enrichment programming like foreign language, entrepreneurship, media, financial literacy, and community garden student clubs.

76.     Local 1220 is an affiliate of the Illinois Federation of Teachers and the American Federation of Teachers. Over sixty Local 1220 members will be directly harmed by the loss of the FSCS Grant. One bargaining unit member is 100% employed by the district under the grant and will lose their job as a result of the discontinuation of the Grant. In addition, sixty of other staff at the elementary schools are partially paid by this grant—typically between 10% to 25% of their salary to run programming at the school level. When these programs end, these members will be laid off or have their pay reduced.

77.     Elsewhere, in the New Haven Public Schools, funding cuts require laying off the Resource Coordinators, which will separately require discontinuation of the mental health and afterschool programs they were coordinating.

78.     More generally, the loss of FSCS funds will require significant cuts to many programs impacting AFT and its affiliates in Connecticut, the District of Columbia, Illinois, Kentucky, and Maryland, the students, families, and communities they serve. Without the FSCS funds, it is likely that much of the forward progress these jurisdictions have made in educational

outcomes will cease, if not regress, harming tens of thousands of students, especially children attending high-poverty schools, including high-poverty rural schools.

79.     The last-minute loss of funds in the middle of the school year may result in the sudden cancellation of many critical programs across the country as school districts reallocate limited resources. This will harm not only AFT and its affiliates but cause long-term damage to the students, families, and communities that AFT serves. Cutting off services for students, especially low-income high-school students in the middle of the school year will cause trauma for at-risk students and reverse the significant progress in educational improvements FSCS funds have helped facilitate.

80.     Making matters worse, the sudden, eleventh-hour nature of the terminations undermined school districts' ability to limit the disruption of services they provide that FSCS funds support. and salvaged some of the work that they had done over the first year and a half of the program.

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act—Contrary to Law
### *Failure to Obligate Funds*

81.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

82.     A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

83.     Defendants' decision not to obligate congressionally mandated FSCS funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

84.     In the 2024 Appropriations Act, which Congress re-adopted in the 2025 Continuing Resolution, Congress appropriated $457,000,000 "[f]or carrying out activities authorized by subparts 2 and 3 of part F of title IV of the ESEA, . . . to remain available through December 31, 2024." 138 Stat. at 684. Congress then specified that, of this amount, "$150,000,000 shall be available" for the FSCS program. *Id.* Where Congress specifies that a sub-amount of a larger appropriation "shall be available for" a particular purpose or program, "those funds cannot be diverted to other purposes within the [larger] appropriation." *B-326941 - Small Business Administration—Availability of Appropriations for Loan Modernization and Accounting System*, GAO at 7 (Dec. 10, 2015), https://perma.cc/Q398-8RMJ.

85.     In the 2025 Continuing Resolution, Congress re-appropriated the same amounts on the same terms for the FSCS program, meaning Congress provided that $150 million of the broader $457 million available "shall be available for" the FCSC program, with the $150 expiring on December 31, 2025.

86.     Because the Department must spend the full $457 million appropriated in this section of the appropriations act, and cannot spend $150 million of that amount on anything but the FSCS program, the Department must spend the full $150 million on the FSCS program by December 31, 2025.

87.     Defendants' decision not to obligate the full amount that Congress appropriated for the FSCS program by December 31, 2025, is in violation of the spending command in the 2025 Continuing Resolution.

88.     In failing to obligate the funds that Congress appropriated for the FSCS program, Defendants are also violating the ESEA. Congress requires that "the Secretary shall use not less than 95 percent of the amounts" that Congress appropriates for subpart 2 of part F of the ESEA

on grants for the FSCS and Promise Neighborhood programs. 20 U.S.C. § 7273(a)(1). Congress

further directed that "[i]n awarding grants" for the FSCS program, "the Secretary shall give

priority to eligible entities that" meet specific criteria. *Id.* § 7275(b). The Department is using

less than 95% of the amounts appropriated for subpart 2 for grants for the FSCS program, and it

is not prioritizing schools that meet the statute's delineated criteria, because it is letting funds

expire unspent even though schools that meet those criteria are ready and able to receive and

perform awards.

**Count II**
**Violation of the Administrative Procedure Act—Arbitrary and Capricious**
***Failure to Obligate Funds***

89.    Plaintiffs re-allege and incorporate by reference all prior and subsequent

paragraphs.

90.    A reviewing court must "hold unlawful and set aside agency action" that is

"arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

91.    Defendants' decision not to obligate congressionally mandated FSCS funding is a

final agency action reviewable under 5 U.S.C. §§ 702 and 706.

92.    Defendants' decision not to obligate congressionally mandated FSCS funding

before it expires on December 31, 2025, is arbitrary and capricious. Defendants have failed to

adequately justify their actions; have failed to consider key aspects of the problem, reasonable

alternatives, and the substantial reliance interests at stake; have relied on factors Congress did

not authorize them to consider and failed to consider factors that Congress did direct the agency

to consider; and have failed to acknowledge or justify their change of position.

## Count III
## Violation of the Administrative Procedure Act—Agency Action Unlawfully Withheld Or Unreasonably Delayed
### *Failure to Obligate Funds*

93.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

94.     Defendants' failure to obligate funds appropriated for the FSCS program that are set to expire on December 31, 2025, constitutes agency actions "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1).

95.     The 2025 Continuing Resolution and the ESEA impose nondiscretionary duties on Defendants to obligate the full amount appropriated for the FSCS program by December 31, 2025. Defendants' continued withholding of the funds from obligation is unlawful. At a minimum, it is unreasonable for Defendants to have not obligated the funds with days remaining until they expire.

96.     The Court must "compel" the agency actions "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## Count IV
## Mandamus
### *Failure to Obligate Funds*

97.     Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

98.     If relief is not available on Plaintiffs' other claims with respect to failure to obligate congressionally mandated FSCS funds, the Court should enter a writ of mandamus.

99.     Defendants have disregarded their clear duties to spend appropriations enacted by Congress for the FCSC program.

100.    Mandamus is warranted "to correct transparent violations of a clear duty to act"
by federal officials, including specifically where federal officials refuse to spend congressionally
appropriated funds for policy reasons. *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013).

101.    Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on
their other claims with respect to Defendants' failure to obligate funds.

**Count V**
**Violation of the Administrative Procedure Act—Arbitrary and Capricious**
***Policy Change and Non-Continuation Decision***

102.    Plaintiffs re-allege and incorporate by reference all prior and subsequent
paragraphs.

103.    A reviewing court must "hold unlawful and set aside agency action" that is
"arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

104.    The decisions to change funding priorities and to not continue grants in the middle
of a multi-year performance period are final agency actions reviewable under 5 U.S.C. §§ 702 and
706.

105.    Defendants' decisions to change funding priorities and not to continue grants in
the middle of a multi-year performance period are arbitrary and capricious.

106.    Defendants have failed to adequately justify their action; have failed to consider
key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake;
have relied on factors Congress did not authorize them to consider; and have failed to
acknowledge or justify their change of position.

107.    In deciding not to continue grants for the multi-year performance period,
Defendants have failed to consider multiple important aspects of the problem. For instance,
Defendants failed to consider the serious reliance interests of beneficiaries of the grants

including Plaintiffs' educator members, the awardees, and the children, families, and communities that benefit from the grants.

## Count VI
### Violation of the Administrative Procedure Act—Contrary to Law
*Policy Change and Non-Continuation Decision*

108.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

109.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2).

110.    The decisions to change funding priorities and to not continue grants in the middle of a multi-year performance period are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

111.    Defendants may only consider "relevant information regarding grantee performance" in deciding whether to make a continuation award. 34 C.F.R. § 75.253(b). Regulations issued after notice-and-comment rulemaking have the force and effect of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 & n. 31 (1979). Defendants considered information in addition to grantee performance, so the noncontinuation notices are contrary to law.

112.    The Department is only authorized to base continuation award decisions "on the submission of [performance] reports as specified by the Secretary." Direct Grant Programs, 59 Fed. Reg. at 30259 ("[T]he continuation award decision— including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application."). And new priorities, which may only be used to evaluate *new*,

rather than continuing, grant applications, must be promulgated through notice and comment rulemaking. *See* 20 U.S.C. § 1232; *compare* 34 C.F.R. § 75.100(a) (1994) ("Each fiscal year the Secretary publishes application notices . . . for new grants[.]") *with*, § 75.118 (2024).Defendants acted contrary to law when they relied on new priorities to decide not to issue continuation awards based on new priorities.

113.    To the extent Defendants claim that they are redirecting the appropriation to new grants rather than withholding it unlawfully, Defendants failed to assign priority to continuation awards over new grants, as required by law. *See* 34 C.F.R. § 75.253(c).

114.    Defendants' conduct is contrary to law, and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

**Count VII**
**Violation of the Administrative Procedure Act—Without Observance of Procedure Required By Law**
*Policy Change and Non-Continuation Decision*

115.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

116.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

117.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

118.    Under GEPA, Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grant competitions. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

119.    Consistent with their statutory obligations, Defendants underwent the notice-and-comment rulemaking process when they changed the FSCS priorities in 2022. *See* Proposed Priorities, Requirements, Definitions, and Selection Criteria - Full Services Community Schools Program, 87 Fed. Reg. 1709 (Jan. 12, 2022); Final Priorities, Requirements, Definitions, and Selection Criteria – Full-Service Community Schools, 87 Fed. Reg 41675 (July 13, 2022).

120.    Defendants cannot discontinue multi-year grants based on changed priorities, but even if they could, they may not do so without following the proper procedures.

121.    Without having proceeded through notice-and-comment procedures, the decisions not to continue the grants and Defendants' actions in implementing it are procedurally invalid under the APA.

122.    Defendants' decisions to change funding priorities and to not continue grants has caused and is causing substantial injury, including immediate and irreparable harm.

## PRAYER FOR RELIEF

1. Declare unlawful, vacate and set aside Defendants' decisions to change funding priorities and to not continue FSCS grants;

2. Stay Defendants' decisions to change funding priorities and to not continue FSCS grants, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

3.  Temporarily restrain and preliminarily and permanently enjoin Defendants from implementing or giving effect to Defendants' decisions to change funding priorities and to not continue FSCS grants;

4.  Declare unlawful, vacate, and set aside Defendants' decision to not obligate congressionally mandated FSCS funds before their statutory expiration date;

5.  Stay Defendants' decision not to obligate congressionally mandated FSCS funds before their statutory expiration date, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

6.  Temporarily restrain and preliminarily and permanently enjoin Defendants to obligate congressionally mandated FSCS funds;

7.  If necessary, extend the period of availability for FSCS appropriations beyond their statutory expiration date, to enable the obligation of the funds for the FSCS program.

8.  Issue a writ of mandamus compelling Defendants to carry out their clear duties, if complete relief is not available under Plaintiffs' other claims;

9.  Award Plaintiffs reasonable attorneys' fees and costs; and

10. Grant such other and further relief as the Court may deem just and proper.

December 29, 2025                    Respectfully submitted,

                                    /s/ *Robin F. Thurston*
                                    Kali Schellenberg (DC Bar No. 198422)
                                    Erez Reuveni (CA Bar No. 264124)[+][^]
                                    Jeffrey B. Dubner (DC Bar No. 1013399)
                                    Victoria S. Nugent (DC Bar No. 470800)
                                    Robin F. Thurston (DC Bar No. 1531399)
                                    Democracy Forward Foundation
                                    P.O. Box 34553
                                    Washington, DC 20043
                                    (202) 448-9090
                                    kschellenberg@democracyforward.org
                                    ereuveni@democracyforward.org
                                    vnugent@democracyforward.org
                                    rthurston@democracyforward.org

                                    /s/ *Daniel F. Jacobson*
                                    Daniel F. Jacobson (DC Bar No. 1016621)
                                    Lynn D. Eisenberg (DC Bar No. 1017511)
                                    Brian C. Rosen-Shaud (ME Bar No. 006018)[+][^]
                                    Nina C. Cahill (DC Bar No. 1735989)
                                    Jacobson Lawyers Group PLLC
                                    5100 Wisconsin Ave N.W., Suite 301
                                    Washington, DC 20016
                                    (301) 823-1148
                                    dan@jacobsonlawyersgroup.com
                                    lynn@jacobsonlawyersgroup.com
                                    brian@jacobsonlawyersgroup.com
                                    nina@jacobsonlawyersgroup.com

                                    [+] *Pro hac vice* motion forthcoming
                                    [^] Not admitted in the District of Columbia. Practice
                                    supervised by members of the D.C. bar.

                                    *Counsel for Plaintiffs*