## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIGHTON PARK NEIGHBORHOOD
COUNCIL, *et al.*,

             *Plaintiffs*,

      v.

LINDA MCMAHON, in her official capacity as
Secretary of the United States Department of
Education, *et. al.*,

             *Defendants*.

Case No. 1:25-cv-4523

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE FOR A PRELIMINARY INJUNCTION, AND FOR A STAY PURSUANT TO 5 U.S.C. § 705

**INTRODUCTION**

This case concerns the Department of Education's unlawful decision to allow tens of millions of dollars in congressionally appropriated funding for the Full-Service Community Schools (FSCS) program to expire unobligated. These funds support public elementary and secondary schools that provide coordinated, accessible wraparound services for children and families, particularly for children attending high-poverty schools, including those in rural areas. Qualified grantees with multi-year grants funded by this program stand ready to continue their work helping children arrive in class warm, fed, healthy, and ready to learn, and providing support like tutors, mentors, and out-of-school and summer programming to help these students succeed. Congress directed the Department to spend $150 million on this work through an appropriation expiring December 31, 2025. Contrary to this command and without justification, absent court intervention, the Department will not do so.

Plaintiffs Brighton Park Neighborhood Council (BPNC) and the American Federation of Teachers (AFT) are among the entities that will suffer immense harm from the Department's unlawful actions. BPNC provides wraparound services at eight schools in the Chicago area. Among its work, it uses FSCS funds to provide afterschool programs for students and adults such as STEM clubs, workforce development, college mentoring, and academic tutoring, as well as summer worksites for high-school students. AFT represents educators working in school districts across the country operating programs funded by multi-year FSCS awards.

On December 12, 2025, Defendants issued "non-continuation notices" declining to continue the multi-year grants of a substantial portion of existing FSCS grantees, including those funding BPNC's work and impacting the school districts in which AFT educators work. Defendants have taken no steps to obligate the remaining funds to other eligible awards. Unless this Court intervenes immediately, those funds will lapse in a matter of days—permanently

1

nullifying Congress's spending decision and inflicting irreparable harm on Plaintiffs and the communities they serve.

Given the imminent expiration of the period of availability for the funds at issue, Plaintiffs principally request that the Court order Defendants to obligate those funds prior to their expiration. Although the D.C. Circuit has correctly held for decades that the Court may extend the period of availability for appropriations, the Department of Justice recently disputed that long-standing doctrine before the Supreme Court, and Plaintiffs thus request that relief only in the alternative, should the Court decline to enter the principal relief requested.

## BACKGROUND

### A.  Congress's Creation and Funding of Full-Service Community Schools

The ESEA requires the Department of Education to administer the Full-Service Community Schools (FSCS) program. Congress created this program to provide support for the "planning, implementation, and operation of full-service community schools that improve the coordination and integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." 20 U.S.C. § 7271(2). Under the FSCS program, the Department provides grants to entities including Historically Black Colleges and Universities (HBCUs), institutes of higher education, non-profits, and Local Educational Agencies (LEAs) to participate in community-based efforts to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organizations and public and private partnerships. 20 U.S.C. § 7272(1)(B), (2); U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)*, OESE (July 16, 2025) https://perma.cc/V9VT-K3Y7. Schools provide "pipeline services," which deliver a "continuum of coordinated supports, services, and

opportunities" to children in distressed communities, including through high-quality early childhood education programs; high-quality school and out-of-school-time programs and strategies; social, health, nutrition, and mental health services and supports; and more. 20 U.S.C. § 7272(3).

In codifying the FSCS program, Congress mandated that the Secretary of Education "*shall use* not less than 95 percent of the amounts made available under section 7251(b)(2)(B) of this title to award grants, on a competitive basis and subject to subsection (e), to eligible entities" for the Promise Neighborhoods and FSCS programs. 20 U.S.C. § 7273(a)(1) (emphasis added). And Congress additionally mandated that "in awarding grants" under the FSCS program, the Secretary should give priority to certain entities, including eligible entities that "will serve a minimum of 2 or more full-service community schools eligible for a schoolwide program under section 6314(b) of this title, as part of a community- or district-wide strategy;" or that (1) include a local educational agency that satisfies certain requirements, (2) are consortiums comprised of a broad representation of stakeholders or consortiums demonstrating a history of effectiveness; and (3) will use funds for evidence-based activities. 20 U.S.C. § 7275(b).

Congress has consistently directed the Department to spend appropriated money on FSCS programs, authorizing additional appropriations through the General Educational Provisions Act (GEPA) and the regular appropriations process. *See* 20 U.S.C. § 1226a (extending appropriations authorizations for applicable programs through 2021); Consolidated Appropriations Act 2022, Pub. L. 117-103, 136 Stat. 49, 477 (2022); Consolidated Appropriations Act 2023, Pub. L. 117-328, 136 Stat. 4459, 4625 (2023); Further Consolidated Appropriations Act 2024,  Pub. L. 118-47, 138 Stat. 460, 684 (2024). Congress has continuously increased the FSCS funding that the Secretary is required to spend—from $25 million in 2020, to $30 million in 2021, $75 million in

2022, and \$150 million per year for 2023, 2024, and 2025. Further Consolidated Appropriations Act 2024,  Pub. L. 118-47, 138 Stat. 460, 684 (2024).

As relevant here, in the Consolidated Appropriations Act of 2024 (2024 Appropriations Act), Congress appropriated \$457,000,000 "[f]or carrying out activities authorized by subparts 2 and 3 of part F of title IV of the ESEA,  . . . to remain available through December 31, 2024." Pub. L. 118-47, 138 Stat. 460, 684. Congress then specified that, of this amount, "\$150,000,000 shall be available for section 4625," the FSCS program. *Id.* Through this appropriation, Congress directed the Department to obligate \$150 million for the FSCS program by December 31, 2024. The 2025 Full-Year Continuing Appropriations and Extensions Act replicated the exact same appropriation for 2025, meaning Congress appropriated the same amount for FSCS, to remain available through December 31, 2025. *See* Pub. L. 119-4, 138 Stat. et. seq (the "2025 Continuing Resolution").

### B.  The Department Discontinued Grants

Beginning December 12, 2025, the Department discontinued a substantial part of its multi-year FSCS grants, totalling, on information and belief, at least 19 grant discontinuations out of a total of about 70 grants. Among the discontinued grants were multi-year FSCS grants directly impacting Plaintiffs AFT and BPNC, AFT affiliate local unions, and AFT members. The Department issued notices that provided little to no insight into the basis for non-continuations, stating that the grants funded programs that conflicted with the "policies and priority preferences" of the current Administration letter for broad, unexplained reasons, and finding them "not in the best interests of the Federal Government." The notices offer no factual findings, analysis, or application of these conclusory labels to grantees' actual performance under the grant, instead including disjointed quotations from plaintiffs' initial grant applications that

describe, for instance, racial justice and equity initiatives that are expressly contemplated or required by the FSCS statute and GEPA.

On information and belief, the Department has not obligated more than $60 million in funds that were budgeted for the 19 non-continued awards to other existing or new awards, or for other permissible purposes. On information and belief, the Department has decided not to obligate these funds before they expire on December 31, 2025.

### C.  Impact of the Department's Failure to Obligate Funds on Plaintiffs

Defendants' decision to withhold the appropriation has had and will continue to have devastating effects on Plaintiffs AFT and BPNC and AFT's members, as well as the students, families, schools, and communities that they serve.

Plaintiff Brighton Park Neighborhood Council (BPNC) is a nonprofit organization dedicated to improving the lives of residents of the southwest side of Chicago, which includes some of the most impoverished neighborhoods in Chicago. Brosnan Decl. ¶¶ 3-4. BPNC offers services at eight neighborhood public schools as part of a Full Service Community School Initiative, providing programming on education, employment and workforce preparedness, and mental and physical health to students and families. *Id.* ¶¶ 4-5. This school year, they began providing services at their largest school, Curie Metro High School, the third-largest public school in Chicago, which depends on anchor funding that comes from an FSCS grant to Metropolitan Family Services. *Id.* ¶ 6. The sudden withholding of FSCS appropriations means that they and Curie will likely have to abruptly cancel numerous programs, such as tutoring, mentoring, and academic support for at-risk students; financial literacy and STEM clubs; adult nutrition classes; a summer employment program; and even Curie's new Student Council. *Id.* ¶¶ 15-20, 22. It expects to lay off as many as 14 full-time employees or contract staff if Defendants'

decision stands. *Id.* ¶¶ 15, 24. It will be in breach of contractual obligations with partners and uncompetitive for grant applications it was intending to compete for as soon as January 15, further harming its reputation, goodwill, and ability to fulfill its mission. *Id.* ¶¶ 21-22.

All of this happened with virtually no notice, in the middle of the school year, making it harder "to wind down programs in an orderly fashion or find stopgap solutions." *Id.* ¶ 25. And because Defendants are withholding the funds altogether, rather than redirecting them to other grantees, Plaintiffs cannot even seek to replicate their programs through other grantees. *Id.* ¶ 23.

As a result, Defendants' decision will work incalculable harm on the students and families for whom Congress created the FSCS program. Rather than providing the services that Congress intended, the decision will tear those services away midstream, causing "avoidable chaos and disruption of support." *Id.* ¶ 25. As BPNC's executive director explained, "[c]utting off services for at-risk high-school students in the middle of the school year will cause trauma for students who already face inordinate challenges, alienating them even more from any trust we had helped them develop in schools and community institutions." *Id.* ¶ 24.

Plaintiff American Federation of Teachers (AFT) is a national union with almost 3,500 local unions and over 1.8 million members across the United States whose mission is "to champion fairness, democracy, and economic opportunity in and through high-quality public education, as well as healthcare and public services for students, their families, and communities their members serve." McNeil Decl. ¶¶ 5-7. "AFT members occupy a broad range of positions in education, including but not limited to: pre-K through 12th-grade teachers, early childhood educators, classroom aides, counselors, school nurses, paraprofessionals, and other school-related personnel; higher education faculty and professional staff at community colleges, colleges and universities." *Id.* ¶ 10. AFT members work in school districts—including in

Connecticut, District of Columbia, Kentucky, Illinois, and Maryland—that benefit from FSCS funds, which "allow schools to provide students and teachers who support them with critical support that they often would not be able to receive elsewhere." *Id.* ¶¶ 17, 21-22. "Data has shown that students who attend community schools and who receive services, supports and enrichments consistently experience improved academic performance, increased graduation rates, and better attendance, as well as increased motivation and engagement in learning." *Id.* ¶¶ 15, 17.

With little warning or explanation, Defendants have refused to spend tens of millions dollars in FSCS funding to school districts where AFT members work. *Id.* ¶¶ 17, 21-23. This impoundment will cause immediate harm to the substantial progress in educational outcomes FSCS-funded programs have achieved across the country, potentially requiring significant cuts to many programs impacting AFT and its affiliates' members in Connecticut, the District of Columbia, Illinois, Kentucky, and Maryland, and the students, families, and communities they serve. *Id.* ¶¶ 14-15, 17, 19-23. Without FSCS funds, it is likely that much of the forward progress these jurisdictions have made in educational outcomes will cease, if not regress, harming tens of thousands of students, especially children attending high-poverty schools, including high-poverty rural schools. *See id.* Some positions will be terminated, and funding for other positions will be significantly cut, causing many additional critical staff to be laid off or have their pay reduced, and also requiring ending critical programs no longer receiving funds. *Id.* ¶¶ 22-23.

## LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public

interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009).

## ARGUMENT

This Court has jurisdiction over Plaintiffs' claims, and Plaintiffs are likely to prevail on their claims that the Defendants' decision not to obligate the full amounts of expiring appropriations that Congress mandated is unlawful and arbitrary and capricious. Defendants' failure to obligate those funds poses imminent irreparable harm to the Plaintiffs identified above, who rely on FSCS funding to provide critical education programming for students and adults. With the December 31 expiration date for the funds approaching, absent relief, tens of millions of dollars that Congress directed the Department to spend to help students across the country will be lost forever. The balance of equities and public interest weighs decisively against that result.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.  This Court Has Jurisdiction Over Plaintiffs' Claims

The government has argued in various other cases relating to federal grants that the Tucker Act precludes district court jurisdiction over those plaintiffs' APA claims and requires the plaintiffs to instead proceed in the Court of Federal Claims. To the extent the government raises that argument here, it would be plainly without merit.

The Tucker Act categorically does not apply to the claims at issue in this motion because, unlike in most of the other cases this year where the government has raised the Tucker Act, Plaintiffs do not challenge the termination of any grant with these claims, and do not ask the Court order the government to restore or issue a grant to any particular entity. Plaintiffs seek only the obligation of funds, without regard to a particular contract or contractor.

These claims are not "founded . . . upon any express or implied contract with the United States," which is a textual predicate to the Court of Federal Claims' jurisdiction. 28 U.S.C. §

8

1491(a)(1). Given its plain text, the Tucker Act simply does not apply where a claim does not involve an "actual contract[]." *Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460, 463, 465 n.5 (1980). The claims here do not involve any actual contract. They do not challenge the lawfulness of terminating or not continuing any particular grant, do not seek to restore or extend any particular grant, and do not seek payments under any grant agreement. Rather, Plaintiffs seek in this motion only to require the Department to obligate the unspent, expiring funds to *some* new or existing grant under the FSCS program, which is likely to benefit Plaintiff BPNC and AFT's members. Plaintiffs could not assert these claims in the Court of Federal Claims.[1]

Similarly, the Tucker Act cannot preclude this Court's jurisdiction where Plaintiffs are third-party beneficiaries—not direct grantees—who could not assert claims in the Court of Federal Claims. "Under the Tucker Act, the Court of Federal Claims has jurisdiction only if there is privity of contract between plaintiffs and the government." *Park Properties. Assocs., L.P. v. United States*, 916 F.3d 998, 1002 (Fed. Cir. 2019). Unlike in *Department of Education v. California*, 604 U.S. 650, 650 (2025), and *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025), the Plaintiffs in this action are not parties to any contract with the Department of Education. Because Plaintiffs are not in privity of contract with Defendants, they could not bring claims in the Court of Federal Claims, and the Tucker Act does not apply. *Park Props. Assocs., L.P.*, 916 F.3d at 1002. Other courts, including in this District, have concluded the same in cases involving grant beneficiaries. *See Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 101 (D.D.C. 2025), *appeal dismissed sub nom. Cabrera v. United*

---

[1] The Tucker Act also affords the Court of Federal Claims jurisdiction to hear claims founded upon "money-mandating" statutes, meaning statutes that require the payment of particular sums of money to particular entities. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). None of the statutes here are money-mandating, since they do not mandate that the Department issue awards to any particular entity.

*States Dep't of Lab.*, No. 25-5340, 2025 WL 3635881 (D.C. Cir. Dec. 15, 2025) (finding that the Tucker Act did not apply where the plaintiffs were program beneficiaries, not grantees, and the government "has not made a contractual promise to the plaintiffs"); *see also Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 155 F.4th 1099, 1100 (9th Cir. 2025).

The D.C. Circuit has indeed squarely held that the Tucker Act cannot strip district courts of jurisdiction over claims that cannot be brought in the Court of Federal Claims. In *Tootle v. Secretary of Navy*, 446 F.3d 167 (D.C. Cir. 2006), the court "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Id.* at 176. "[T]he Court of Federal Claims can have exclusive jurisdiction," the court explained, "*only* with respect to matters that Congress has proclaimed are within its jurisdictional compass." *Id.* at 176-77 (emphasis in original). Simply put, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Id.* at 177. Here, both because the claims at issue in this motion do not involve any particular contract, and because Plaintiffs are not parties to any contracts with the government that do exist in relation to the relevant program, Plaintiffs' claims do not fall within the Court of Federal Claims' "jurisdictional compass," and "[t]here cannot be exclusive jurisdiction under the Tucker Act." *Id.* [2]

---

[2] The government has in fact conceded in recent cases, including in a D.C. Circuit appeal this year, that the Tucker Act does not apply to claims that only seek to compel an agency to spend its appropriations. Specifically, in the D.C. Circuit appeal of an order requiring the United States Agency for International Development and the State Department to spend its appropriations, the government did not raise the Tucker Act at all on appeal, and instead noted that it would have made that argument if the court had ordered that awards be given to the plaintiffs specifically. Appellants' Br. at 58-59, *Global Health Council v. Trump*, No. 25-5097 (D.C. Cir. May 9, 2025). The Tucker Act is equally inapplicable here.

Because the Tucker Act categorically cannot strip jurisdiction here, there is no need for the Court to apply the two-part test in *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982). *See Tootle*, 446 F.3d at 177 ("[T]o determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act." (quoting *Randall v. United States,* 95 F.3d 339, 346 (4th Cir. 1996)).

But even if the Court were to apply that test, the analysis would be straightforward. The "source of the rights" upon which Plaintiffs base their claims is not any grant or contract, but instead the provisions of the appropriations acts and the ESEA. "Plaintiffs do not cite to the text of [any] agreements as a basis for their claims," and "there is an independent statutory basis for Plaintiffs' claims." *Child Trends, Inc. v. United States Dep't of Educ.*, 795 F. Supp. 3d 700, 717, 719 (D. Md. 2025) (finding jurisdiction over similar claims); *see also Nat'l Fair Housing Alliance v. United States Dep't of Housing and Urban Dev.*, Case No. CV 25-1965 (SLS), 2025 WL 2105567, *9 (D.D.C. July 28, 2025) (same). The claims are not "based on" a contract in any way. *Nat'l Insts. of Health*, 145 S. Ct. at 2660 (quotations omitted).

Nor is the relief sought "designed to enforce any obligation to pay money" to Plaintiffs under any existing or particular contract. *Id.* at 2659. Plaintiffs do not seek any contractual remedy or anything else that resembles money damages. "[T]hey ask only that [the Department] complete its grantmaking process for the current fiscal year as it is statutorily required to do." *Nat'l Fair Housing Alliance*,  2025 WL 2105567 at *9.

### B.  Plaintiffs Are Likely to Succeed on Their Contrary to Law and Arbitrary and Capricious Claims

Defendants' decision not to obligate the full amounts of expiring appropriations that Congress mandated be used for the FSCS program is reviewable final agency action under the APA, and is both contrary to law and arbitrary and capricious. 5 U.S.C. § 706(2)(A).

11

### 1. Defendants' Decisions Are Final Agency Actions

An agency decision constitutes "final agency action" where it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations … from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). "An agency action is deemed final if it is definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (cleaned up).

Defendants' decision not to obligate the funds Congress appropriated for the FSCS program meets these criteria. In the 2025 Continuing Resolution, Congress appropriated $150 million for the Department to fund grants to carry out the FSCS program pursuant to 20 U.S.C. §§ 7273 and 7275, and those funds are available to obligate only until December 31, 2025. *Supra* p.4. In mid-December, the Department alerted 19 grantees that they would not be receiving continuation awards. The Department had budgeted for these grantees to receive more than $60 million in collective funding in 2025 to continue their awards. Given the Department's usual practice of announcing FSCS awards, the absence of such an announcement makes it appear that the Department has not taken action to obligate those funds to other FSCS awards before the funds expire on December 31, and the Department has not publicly stated any intent to do so in the next two days. The Department thus has made a final decision to let the funds expire unspent on December 31.

Relatedly, the Department has decided not to award grants of the type that Congress has directed the Department to "prioritize" under the FSCS program, 20 U.S.C. § 7275(b), even

though funds remain available and potential awardees that would meet the criteria for prioritization are ready and able to carry out awards under the program.

These decisions have legal effect. Absent judicial relief, if the FCSC appropriations are not obligated by the December 31, 2025 deadline, the funds will be forever unavailable to use for the purposes Congress intended. As a result, the funds will not be made available for grantees to carry out the FSCS program in locations where Plaintiffs operate or where Plaintiffs' members work and benefit from the program. The "concrete consequences" of the decision are already being felt by Plaintiffs and Plaintiffs' members, *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020) (citation omitted). Grantees and their beneficiaries around the country, including in Connecticut, the District of Columbia, Kentucky, Illinois, and Maryland have lost access to a total of tens of millions of dollars in funds allotted to multi-year projects mid-project. This has resulted in such "concrete" consequences as school districts and non-profits having to cut programs critical to the success of Full-Service Community Schools, laying off or reassigning staff in those programs, and otherwise cutting critical resources central to the success of the FSCS program. *See infra* Part II.

Thus, as other courts have recently concluded for similar claims, Defendants' decision not to obligate the funds is reviewable final agency action. 5 U.S.C. § 704; *see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 2537200, at *9 (D.D.C. Sept. 3, 2025) (holding that decisions by USAID and the State Department not to obligate funds before they expired constituted final agency actions); *Child Trends*, 795 F. Supp. 3d at 714-15, 720 (concluding same for decision not to obligate funds prior to expiration for two Department of Education programs).

### 2. Defendants' Decisions Are Contrary to Law

The Executive Branch "may not act contrary to the will of Congress when exercised within the bounds of the Constitution." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 233 (1986); *see United States v. Trucking Mgmt., Inc.*, 28 Fed. R. Serv. 2d 839, *9 (D.D.C. 1979) ("[T]he executive branch may not exercise its authority, derived from Congress, in a manner inconsistent with the implied or expressed will of Congress."), *aff'd*, 662 F.2d 36 (D.C. Cir. 1981); *Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 5 (D.D.C. 2008) ("The Executive must comply with the duly enacted commands of Congress.").

Defendants' decision not to obligate the full amount that Congress appropriated for the FSCS program is contrary to the 2025 Continuing Resolution, which funds FSCS grant activities to be carried out in calendar year 2026, and the ESEA. Both of these acts of Congress require Defendants to spend substantially all of the funds appropriated, a command Defendants are violating.

With respect to the 2025 Continuing Resolution, the D.C. Circuit has held, consistent with long-settled precedent on the meaning of appropriations laws, that an appropriation is a mandate that an agency spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Neither the President nor any agency has "unilateral authority to refuse to spend the funds." *Id.*; *accord Child Trends*, 795 F. Supp. 3d at 721 ("It is black letter appropriation law that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend the full amount appropriated by Congress for a particular project or program." (cleaned up)).

Because appropriations carry this default presumption, when Congress intends for an agency to have discretion to spend less than the full appropriated amount, Congress uses

14

hallmark permissive language, such as appropriating "up to," "not more than," or "sums not exceeding" specific amounts. Examples of such language "abound in our history." *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring) (quotations omitted). Since the Founding, Congress has made "appropriation[s] of 'sums not exceeding' a specified amount," which do not "mandate that the Executive spend that amount," but "instead provide[] the Executive discretion over how much to spend up to a cap." *Id.* at 432 (majority op.). Congress has consistently used this type of clear language when it intends to allow the Executive Branch to spend less than the full amount appropriated. In the 2024 Appropriations Act alone, for example, the phrase "not to exceed" appears over 200 times. Congress thus "[knows] how to give agencies discretion not to spend the entire amount" when it wishes, *AIDS Vaccine Advoc. Coal.*, 2025 WL 2537200, at *11, and when Congress does not do so, no such discretion exists.

Here, Congress did not give the Department discretion to spend less than the full amount appropriated in 2025 for the FSCS program. In the 2024 Appropriations Act, which Congress replicated in the 2025 Continuing Resolution, Congress appropriated $457,000,000 "[f]or carrying out activities authorized by subparts 2 and 3 of part F of title IV of the ESEA, . . . to remain available through December 31, 2024." 138 Stat. at 684. Congress then specified that, of this amount, "$150,000,000 shall be available for section 4625," which is the FSCS program. *Id.* Where Congress specifies that a sub-amount of a larger appropriation "shall be available for" a particular purpose or program, "those funds cannot be diverted to other purposes within the [larger] appropriation." *B-326941 - Small Business Administration—Availability of Appropriations for Loan Modernization and Accounting System*, GAO at 7 (Dec. 10, 2015), https://perma.cc/Q398-8RMJ. Because the Department must spend the full $457 million

appropriated in this section of the appropriations act, and cannot spend $150 million of that amount on anything but the FSCS program, the Department must spend the full $150 million on the FSCS program by December 31, 2025. By deciding not to obligate that full amount, the Department is violating the 2025 Continuing Resolution.[3]

In not spending the funds that Congress gave for the FSCS program, Defendants are violating the ESEA as well. Congress requires that "the Secretary shall use not less than 95 percent of the amounts" that Congress appropriates for subpart 2 of part F of the ESEA on grants for the FSCS and Promise Neighborhood programs. 20 U.S.C. § 7273(a)(1). Moreover, Congress has directed that "[i]n awarding grants" for the FSCS program, "the Secretary shall give priority to eligible entities that" meet specific criteria. *Id.* § 7275(b). The Department is not using 95% of the amounts appropriated for subpart 2 for grants for the FSCS program, and it is not prioritizing schools that meet the statute's delineated criteria. On the latter front, the Department is allowing appropriations for the program to expire unspent even though eligible entities that meet these criteria, such as the grantees funding BPNC's program and the programs operating in AFT members' school districts, are willing and able to continue performing under their multi-year grants.

In sum, the Department's actions violate multiple statutory provisions and are therefore contrary to law in multiple ways. 5 U.S.C. § 706(2).

---

[3] Congress rejected the Administration's recent proposal to eliminate Fiscal Year 2026 funding for the FSCS programs, choosing to preserve funding for FSCS programs. *See U.S. Dep't of Educ., Fiscal Year 2026 Budget Summary*, at 20, https://www.ed.gov/media/document/fiscal-year-2026-budget-summary-110043.pdf; S. 2587, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/senate-bill/2587. The Administration's hasty, unexplained noncontinuations of 2025 funds suggest an attempt to contravene Congress's decision.

### 3.   *Defendants' Decision Not to Obligate the Funds Is Arbitrary and Capricious*

The Department's decision not to obligate the FSCS program funds before they expire on December 31 is also arbitrary and capricious.

The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

To be reasonably explained, an agency must "identif[y] and explain[] the reasoned basis for its decision." *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). A reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted)). Agency action is also arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And the agency must analyze and account for the "serious reliance interests" that may be affected by its decision. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted).

Regardless of whether the appropriation and the ESEA require the Department's decision not to spend the full $150 million in expiring funds on the FSCS program (and they do), the

Department's decision not to spend the funds is arbitrary and capricious. It has not provided any explanation at all for allowing at least forty percent of the funds to expire, failing to meet the most basic requirement of agency decisionmaking under the APA. The Department's failure is especially glaring given its prior characterization of the FSCS program as an "evidence-based strategy to [r]aise the [b]ar in education and to deliver on our commitment to support students, families, and whole communities." *Biden-Harris Administration Announces Nearly $74 Million to Expand Full-Service Community Schools*, Dep't of Educ. (Nov. 28, 2023), https://perma.cc/Y7N8-925J. The Department's failure to acknowledge or explain the basis for its decision to allow funds to expire unspent suffices to render that decision arbitrary and capricious. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 n.35 (D.C. Cir. 1983) (citing *State Farm*, 463 U.S. 29 at 48); *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022). Explanations regarding the non-continuation of individual grants, even if valid, do not address the Department's decision not to obligate the money at all, whether to other existing grantees or to new grantees, making its decision substantively unreasonable as well as not reasonably explained. The Department did not appear to consider, for example, whether it could issue new or modified grants for existing projects, or substantially similar ones, without any purportedly problematic aspects of the current awards. *See State Farm*, 463 U.S. 29 at 48-51.

The Department's decision not to use the available funds to issue awards for grants that Congress has directed the Secretary to prioritize under the FSCS program is arbitrary and capricious for the same reasons. At no point—whether in issuing the non-continuation letters to the 19 grantees or in any other context—has the Department addressed the fact that Congress directed it to prioritize certain grants for the program, let alone explained why it was not issuing

such awards where recipients are ready and able to perform them. In this regard, the Department not only failed to explain its actions, but "it [has] failed to consider factors made relevant by Congress," rendering its actions arbitrary and capricious in this way as well. *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 284 (D.C. Cir. 2000)

The Department's decision not to obligate expiring funds is also arbitrary and capricious because the Department failed to account for and address the substantial reliance interests impacted by its decisions. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020). The Department has nowhere considered the investments that Plaintiffs and similarly situated entities have made in reliance on the FSCS program's funding. *See, e.g.*, Brosnan Decl. ¶ 20; McNeil Decl. ¶¶ 22-23 (explaining that school districts have relied on funding to staff programs and pay salaries and that grant cuts will cause layoffs, cuts in salaries, and termination in programs).  Nor have Defendants given any indication that they considered the reliance interests of beneficiaries of the funds, such as AFT's members, BPNC, and the students, families, and schools they serve. *See, e.g.*, Brosnan Decl. ¶ 17 ("BPNC will need to suddenly cancel numerous programs that it started just two or three months ago, such as the Financial Literacy Club, Robotics Club, Student Council, Adult Nutrition class, and numerous tutoring and mentoring programs … depriving students and parents of important activities for their personal and educational development."); *id.* ¶ 24 ("Cutting off services for at-risk high-school students in the middle of the school year will cause trauma for students who already face inordinate challenges, alienating them even more from any trust we had helped them develop in schools and community institutions."). Defendants' complete failure to consider reliance interests alone renders their actions arbitrary and capricious. *Regents*, 591 U.S. at 30.

19

### C. Plaintiffs Are Likely to Succeed on Their § 706(1) Claims

Even if Defendants' decision to not spend funds appropriated for the FSCS program were not an unlawful final agency action under 5 U.S.C. § 706(2), Plaintiffs still would be entitled to relief under 5 U.S.C. § 706(1), which requires courts to "compel agency action unlawfully withheld." Claims under § 706(1) are available when an agency has failed to take a "discrete agency action that it is required to take." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (emphasis removed)). Courts accordingly apply § 706(1) to compel agencies to comply with "specific statutory requirement[s]" that they have failed to heed. *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015); *see also Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024) (explaining that a plaintiff can challenge agency inaction under § 706(1) or § 706(2) when an agency is "under an unequivocal statutory duty to act").

In recent months, several courts in this District have held that an agency's withholding of funds that were set to soon expire constituted agency action unlawfully withheld or unreasonably delayed. In *National Fair Housing Alliance*, the court found the plaintiffs likely to succeed on their claim that HUD had unreasonably delayed issuing new grants with appropriated funds that would soon expire. The court held that the funding could not "reasonably be expected to be doled out by the appropriations deadline," even where several months remained until the money expired. 2025 WL 2105567, at *7, *10-11. Similarly, in *AIDS Vaccine Advocacy Coalition*, the district court held that the plaintiffs were likely to succeed on their § 706(1) claims, regardless of whether they were characterized as claims for agency action unlawfully withheld or unreasonably delayed, where it was clear about a month before the funds' expiration that the agencies would not carry out their "nondiscretionary duty to comply with the statutory

commands in the appropriations acts by obligating the relevant funds." 2025 WL 2537200, at *13.[4]

Here, too, the Department has unlawfully withheld the expiring appropriations for the FSCS program. Congress imposed a nondiscretionary duty on the Department to obligate the funds by December 31, 2025, just two days from now. Courts routinely find agency actions "unlawfully withheld" where the agency refuses to act by a deadline set by Congress. *See, e.g.*, *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015); *see also Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024). The Department has done just that here in refusing to obligate FSCS funds by the statutory deadline. The Department's withholding of appropriated FSCS funds is "unlawful[]," warranting relief under § 706(1).

Even if the Court analyzed the issue as one of action "unreasonably delayed" rather than "unlawfully withheld," Plaintiffs are still entitled to relief under § 706(1). The D.C. Circuit applies six "*TRAC* factors" in determining whether an agency's delay is unreasonable. *See Telecomms. Rsch. & Action Ctr.* (*TRAC*) *v. Fed. Commc'ns Comm'n*, 750 F.2d 70 (D.C. Cir.

---

[4] In *AIDS Vaccine Advocacy Coalition*, the district court's preliminary injunction required the agencies to obligate roughly $11 billion in expiring funds. The President had submitted a rescission proposal to Congress under the Impoundment Control Act for nearly $4.5 billion of these funds, but not for the remaining $6.5 billion. The Solicitor General subsequently sought, and the Supreme Court granted, a stay pending appeal only with respect to the $4.5 billion in the rescission proposal. The Solicitor General argued that the Impoundment Control Act precluded the plaintiffs from bringing APA claims specifically with respect to funds included in a rescission proposal under the Impoundment Control Act. *See* Gov't Br., *Trump v. Global Health Council*, No. 25A269 (U.S. Sept. 8, 2025). The Supreme Court's "preliminary view" agreeing with that argument was limited to "the appropriations at issue here," meaning funds in that unique posture of being included in a pending rescission proposal. 2025 WL 2740571, at *1 (U.S. Sept. 26, 2025). Here, the President has not proposed rescinding any of the appropriations at issue, and thus the Supreme Court's order has no bearing.

21

1984); *see Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 815-6 (D.C. Cir. 2024). Those factors

warrant a finding of unreasonable delay here.[5]

 *First*, the "rule of reason" counsels strongly in favor of relief. *TRAC*, 750 F.2d at 80

(citation omitted). It is now December 29. The Department's delay is unrelated to any effort to

effectively spend the funds as Congress required. The delay reflects an intent not to spend the

funds at all. There is nothing reasonable about the Department's refusal to spend the funds that

Congress appropriated for the FSCS program.

 *Second*, Congress's explicit "timetable" here—in the form of appropriations with

specified expiration dates—supplies additional "content for this rule of reason." *TRAC*, 750 F.2d

at 80.

 *Third*, as discussed in the context of Plaintiffs' irreparable harm and the public interest,

there is overwhelming evidence of serious "human health and welfare … at stake"—the harm

here is not merely "economic." *Id. See infra* Part II.

 *Fourth*, requiring obligation now would not displace "activities of a higher or competing

priority," *TRAC*, 750 F.2d at 80, given that Congress has required the appropriations at issue to

be spent for this single priority. Indeed, it would not even be "expediting" the Department's

required obligation of funds, given the imminent and mandatory deadline. *Id. Fifth*, "the nature

and extent of the interests prejudiced by" Defendants' delay are substantial, harming not just

---

[5] The D.C. Circuit does not appear to have directly resolved whether relief for agency action "unlawfully withheld," as opposed to "unreasonably delayed," is conditioned on the *TRAC* factors. *Compare In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991) (applying *TRAC* to a claim against an agency that had missed a statutory deadline, but analyzing the claim as one of "unreasonabl[e] delay[]"), *with South Carolina v. United States*, 907 F.3d 742, 756-59 (4th Cir. 2018) (distinguishing between "unlawfully withheld" and "unreasonably delayed" claims, which are "separate statutory claims"). But even assuming *TRAC* applies to both varieties of § 706(1) claims, these same factors would support relief under § 706(1)'s "unlawfully withheld" prong.

students, parents, and teachers but also infringing on Congress's exclusive constitutional power of the purse. *See Nat'l Fair Housing Alliance*, 2025 WL 2105567, at *10.

And *sixth*, while "impropriety" is not necessary for a delay to be unreasonable, *TRAC*, 750 F.2d at 80, the sequence of events here suggest an intentional effort to withhold the funds and provide little opportunity to challenge that action. The Department waited until mid-December to notify 19 grantees, with awards amounting to at least 40 percent of the total FSCS funds, that their awards would not be continued, less than three weeks before the funds that would have gone to those awards will expire. In any event, even if this factor were "neutral" if the Court did not find impropriety, *Nat'l Fair Housing Alliance*, 2025 WL 2105567, at *10, the remaining factors uniformly weigh toward finding unreasonable delay.

### D. Plaintiffs Are Likely to Succeed on Their Mandamus Claim

Alternatively, if APA relief is not available, Plaintiffs would be entitled to a writ of mandamus requiring the Department to obligate funds as required. The Department's leaders have violated a "clear duty" to obligate these funds; their actions are "so egregious as to warrant mandamus" (as confirmed by the *TRAC* factors discussed above); and assuming Plaintiffs are not entitled to APA relief, Plaintiffs have "no other adequate means to attain the relief [they] desire[]." *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (quotations omitted); *see* 28 U.S.C. § 1361.

The D.C. Circuit in *Aiken County* granted mandamus in a similar posture. There, the Nuclear Regulatory Commission had appropriated funds remaining to carry out statutory duties to consider and issue a final decision on a licensing application. *Aiken Cnty.*, 725 F.3d at 257–58 (quoting 42 U.S.C. § 10134(d)). When the agency failed to resolve the license application by the statutory deadline, two states, as well as "entities and individuals in those States," sought a writ of mandamus. *Id.* at 258. These petitioners were injured by the Commission's delay because

23

"[n]uclear waste [was] currently stored in those States in the absence of a long-term storage site such as Yucca Mountain." *Id.* The D.C. Circuit "grant[ed] the petition for writ of mandamus," ordering the agency to carry out its duties using the available appropriate funds. The court held that "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *id.* at 260, including a mandate to spend "the full amount appropriated by Congress for a particular project or program." *Id.* at 261 n.1.

*Aiken* is part of a longer tradition. Nearly 200 years ago, in *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838), the Supreme Court approved a writ of mandamus compelling an agency to release appropriated funds. A company had sought a writ of mandamus directing the Postmaster General to make the full payment of a contractual settlement that Congress had authorized. 37 U.S. at 608–09, 626. In affirming the circuit court's issuance of the writ, this Court rejected the Postmaster's argument that the judiciary would improperly "infringe[] upon the executive department of the government" in adjudicating the claim. *Id.* at 610. The Court further rejected the Postmaster's contention that he had constitutional authority to refuse to release the funds, as part of taking care that the laws be faithfully executed. *Id.* at 613. So too here, if relief were not available under the APA, mandamus would be appropriate to require compliance with Congress's clear commands.

Here, the Department has "a clear, long-recognized duty to spend the funds Congress appropriates for specific purposes—that duty is and always has been clear, and it is mandatory." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 2537200, at *14. "As then-Judge Kavanaugh explained in *Aiken County*: 'where previously appropriated money is available for an agency to perform a statutorily mandated activity,' there is 'no basis for a court to excuse the agency from that statutory mandate.'" *Id.* (quoting *Aiken Cnty.*, 725

F.3d at 260). Indeed, "Plaintiffs have an even more direct connection to the statutory mandate" in this case than did the petitioners in *Aiken County*, "given their dependence on appropriated [] funds" for the FSCS program. *Id.*

Accordingly, if the Court concludes that relief is unavailable under the APA for any reason, the Court should issue a writ of mandamus compelling the Department to obligate the unspent expiring funds by December 31, 2025.

## II.    PLAINTIFFS WILL BE IRREPARABLY INJURED WITHOUT EMERGENCY RELIEF

Absent immediate relief, Plaintiffs and their members will suffer irreparable harm that cannot be remedied upon a final judgment.

Without an injunction, the expiring funds that Congress appropriated for the FSCS program will be forever lost. When Congress prescribes that appropriations are "available until" a particular date, the window in which agencies may lawfully obligate the funds is known as the "period of availability." 31 U.S.C. § 1502(a). The Appropriations Clause of the Constitution and myriad federal statutes generally prohibit agencies from obligating funds beyond their period of availability. *Id.*; *see also id.* §§ 1341(a)(1), 1501(a)(1)(B). Here, the period of availability for the FSCS funds appropriated under the 2025 Continuing Resolution ends on December 31, 2025. Accordingly, unless the period of availability is extended as described below, the Department must obligate the remaining FSCS funds on or before December 31, in order for the funds to be used as Congress mandated.

Under D.C. Circuit precedent, this Court possesses equitable authority to extend the period of availability. The D.C. Circuit has held in a series of cases dating to the 1970s that federal courts have "the power . . .  to order that funds be held available beyond their statutory lapse date if equity so requires." *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982)

25

(quoting *Nat'l Ass'n of Reg'l Councils v. Castle*, 564 F.2d 583, 588 (D.C. Cir. 1977)). Where equity so requires, a court may "suspend the operation of a lapse provision and extend the term of already existing budget authority." *City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (quoting *Castle*, 564 F.2d at 588).

However, the Supreme Court has never addressed this doctrine, and the federal government has recently suggested to the Supreme Court that the government believes the doctrine is legally unsound. *See* Gov't Br. at 35-36, *Trump v. Global Health Council*, No. 25A269 (U.S. Sept. 8, 2025) (citing *Goodluck v. Biden*, 104 F.4th 920,  927 (D.C. Cir. 2024)). To be clear, the *Castle* doctrine remains binding precedent in this Court, and it reflects a legally correct view of this Court's power under both the Court's inherent equitable authority and its ability to issue "all writs necessary or appropriate in aid of [its] jurisdiction[]" under the Writs Act, 28 U.S.C. § 1651(a). But unless Defendants disclaim any argument in this case that the Court lacks authority to extend the period of availability, the only way to ensure that the FSCS appropriations will not be impounded is for the Court to order the Department to obligate the expiring funds by December 31. Such relief is feasible on this timeframe given Defendants' multiple avenues for quickly obligating the funds, whether by issuing standard continuation awards for existing multi-year grants that have not yet received continuations, adding funds to other existing grants, or other options that do not require running a new grant competition.

However, if the Court declines to order such relief, it should at minimum issue an order extending the period of availability for the appropriations until at least the disposition of this case. Accordingly, Plaintiffs' primary request in their proposed order is a temporary restraining order requiring Defendants to obligate the full amount appropriated by Congress in the 2025 Continuing Resolution for the FSCS program. The proposed order also includes alternate

requested relief that orders that the period of availability of those funds be extended pending further order of the Court.

Ensuring that the FSCS appropriations do not expire unspent is necessary to prevent immense irreparable harm to Plaintiffs and Plaintiffs' members. Plaintiffs and their members are already suffering and will continue to suffer several compounding injuries from the unavailability of the funds. FSCS funding is necessary for BPNC's mission-critical work at its largest school, and the loss of any chance of obtaining FSCS funding (whether through continuation of the existing awards or the opportunity to compete for subgrants and contracts if Defendants obligate the money through other awards) will be devastating to BPNC. Brosnan Decl. ¶¶ 15-23. If BPNC has no possibility of obtaining a portion of the expiring funds, it will imminently need to lay off multiple staff and close numerous programs for students and families, from financial literacy and robotics clubs to adult nutrition classes and academic tutoring. Brosnan Decl. ¶¶ 7, 15-18, 24. Plaintiff AFT's members are experiencing similar harms. In the New Haven Public Schools, for example, funding cuts require laying off the resource coordinators, which will separately require discontinuation of the mental health and afterschool programs that they coordinate. McNeil Decl. ¶ 22(e). Likewise, in Illinois, multiple school districts will have to layoff numerous AFT members or significantly cut their salaries as well as end programs absent funding. *Id.* ¶¶ 23.

These are all well-recognized forms of irreparable harm. *See, e.g., Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 219 (D.D.C. 2025) (irreparable harm shown where Plaintiffs' declarations "explain[ed] why the loss of federal funding continues to force them to lay off employees, cut public-health programming, and suspend other operations that the grants were intended to promote"); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1458,

2025 WL 1865971, at *25 (D. Md. July 7, 2025) (clear showing of irreparable harm where plaintiffs "have had to, or will imminently have to, terminate or scale back [programs] that are central to their primary missions" and "must lay off staff, without whom they will be unable to carry out critical activities"); *Washington v. United States Dep't of Educ.*, No. C25-1228-KKE, 2025 WL 3004675, at *9 (W.D. Wash. Oct. 27, 2025) (finding irreparable harm because of, among other things, "the immediate cessation of mental health services to students in rural and underserved parts of Plaintiff States" and "staff layoffs in Grantee programs"); *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 924-25 (N.D. Cal. 2025) (finding a likelihood of irreparable harm where plaintiffs demonstrated that the interruption of funding would cause a "non-speculative loss of substantial funding" that would require plaintiffs to "issue layoff notices and threaten[ ] to require them to dismiss their specialized and seasoned attorneys").

Furthermore, Plaintiffs and multiple school districts employing AFT members have had to make mission-disruptive changes to their operations mid-year and mid-grant cycle. *See, e.g.*, Brosnan Decl. ¶ 16 (BPNC has had to "rewrit[e] [its] 2026 budget and figur[e] out which, if any, programs [it] might somehow be able to save for next semester," forcing it to cancel "staff and parent appreciation events and showcases for the students"); McNeil Decl. ¶ 23 ("32 schools across the State in rural, suburban, and urban districts, including schools employing AFT members, will lose funding immediately, forcing the suspension of programming to approximately 19,000 students and families and the layoff of professionals statewide."); *id.*, ¶ 23 (describing significant salary cuts and loss of personnel due to program cuts). More generally, school districts will be unable to continue supporting their FSCS-funded programs, undermining their core mission of improving educational outcomes for tens of thousands of students, and

28

requiring cancellation of critical aspects of FSCS programs at the last minute. *Id*. ¶¶ 22-23, *see id.* ¶ 17. This, too, causes irreparable harm.[6] And because the Department is not obligating the funds to other grantees, contractors such as BPNC are unable to compete for those funds through other subawards or contracts, which would allow them to redress some of these harms. Brosnan Decl. ¶ 23.

Plaintiffs also "face serious injuries to their reputations and to working relationships and contracts with other organizations." *Elev8 Baltimore*, 2025 WL 1865971, at \*26; *see also, e.g., E. Tenn. Nat. Gas. Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004) (irreparable injury where plaintiff would be "forced to breach … contracts," thereby causing "negative impacts on [the plaintiff's] customers and the consumers they serve"); *Jones v. Dist. of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) ("[B]ecause '[i]njury to reputation and goodwill is not easily measured in monetary terms,' it is 'often viewed as irreparable.'" (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. 2013 & 2015 Supp.))). For example, BPNC now cannot "fulfill [its] existing contractual obligations," forcing it to back out

---

[6] *See, e.g., League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission ... provide injury for purposes . . . [of establishing] irreparable harm"); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (having to take "mitigating steps" due to funding uncertainty "cause[s] … irreparable harm"). Indeed, the relevant grantees all received grants to be paid out over a five-year period, and based their planning decisions on their expectation of receiving funds over that period of time. *See Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 328 F. Supp. 3d 1133, 1150 (E.D. Wash. 2018) (finding irreparable harm three months before grant termination became effective because "Plaintiffs based their programs, budgeting, staffing, and partnerships with communities on th[e] understanding" of grant's five-year term). Defendants' actions have thus had "an immediate impact on [Plaintiffs' and their members] ability to provide critical resources to the public, causing damage that [will] persist" beyond repair absent an injunction. *See United States v. North Carolin*a, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016); *see Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 247 (D.D.C. 2025) (finding irreparable harm in similar circumstances).

of programs and breach contracts. Brosnan Decl. ¶ 20. As a result, "[s]chools, non-profits, and

businesses that contracted with [BPNC] or relied on [its] services will question whether [it is] a

reliable partner and whether they can confidently make plans around [its] commitments." *Id*. ¶

21.

 Finally, the longer that Defendants' unlawful withholding of appropriations continues,

the greater Plaintiffs' injuries will become even if their funding is ultimately restored. For

example, BPNC needs to begin identifying, recruiting, and contracting with potential worksites

for its One Summer Chicago program, which provides summer employment for high school

students, in order to launch the program on time; "[t]he longer [BPNC] go[es] without funding,

the less this work will be possible, forcing [BPNC] to substantially shrink or entirely cancel the

program even if [Plaintiffs] ultimately succeed in getting the funding restored." Brosnan Decl. ¶

19. Similarly, Plaintiffs have upcoming grant applications due for programs that they will be

unable or uncompetitive to apply for without the anchor funding provided by FSCS, such as a

program BPNC has planned with Curie and a local community college to run a light

manufacturing licensing program for high school students to help prepare them for productive

employment after graduation. *Id*. ¶ 22.[7]

---

[7] For much the same reason, Plaintiffs have standing to bring the claims at issue in this motion. *See In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 125 (D.D.C. 2007) ("In the bulk of cases, a finding of an irreparable injury a fortiori signals the existence of an injury-in-fact sufficient to confer standing."). These irreparable harms are injuries-in-fact that are traceable to Defendants' unlawful decision not to comply with Congress's commands. The D.C. Circuit has repeatedly reaffirmed that losing the *opportunity* to potentially obtain or compete for funds gives rise to Article III standing. *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015 (D.C. Cir. 2022) (Plaintiffs have standing where they are "'ready, willing and able' to compete for" funds but are deprived of that opportunity). And AFT's members' injuries are appropriate for associational standing, because their interests here are germane to AFT's mission and neither the claim asserted nor the relief requested requires their individual participation. *Ctr. for Sustainable Econ. v. Jewell,* 779 F.3d 588, 596–97 (D.C. Cir. 2015) (finding associational standing where the

### III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST SUPPORT GRANTING RELIEF

Finally, the balance of equities and public interest weigh sharply in Plaintiffs' favor. *See Nken v. Holder,* 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party.").

The hardships faced by Plaintiffs and similarly situated educators and programs, whose schools and programs depend on federal funding to achieve the goals of the Full-Service Community Schools Program, far outweigh any hardship to the government in not disbursing funds Congress has required them to disburse. Simply put, whatever interest the federal government may have in cutting off school funding to students attending some of our nations' most rural and low-income schools during the pendency of this case is negligible compared to the harm caused to students and their families across the country who rely on services provided by these funds. *See, e.g.*, Brosnan Decl. ¶ 24 ("Cutting off services for at-risk high-school students in the middle of the school year will cause trauma for students who already face inordinate challenges, alienating them even more from any trust we had helped them develop in schools and community institutions."); McNeil Decl. ¶ 23 ("Discontinuing the FSCS funds will only make it more difficult for school districts that rely on these funds to adequately staff schools. Students would also be harmed as they would likely experience disruptions in access to highly qualified Title I teachers and their skills, thereby exacerbating, rather than addressing as the FSCS program was intended to do, existing equity issues and deepening disparities in academic outcomes by income.").

---

case "turns entirely on whether [the agency] complied with its statutory obligations, and the relief [Plaintiffs] seek[] is invalidation of agency action").

Likewise, the public is served by requiring the Government to provide reasoned explanations and to consider reliance interests when changing a position via agency actions and by setting aside agency decisions that fail to do so. *See Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). In contrast to the irreparable harms faced by Plaintiffs' schools and students, preliminary relief would not harm the Federal Government at all, but merely require the Department to spend appropriated funds as clearly directed by Congress.

The balance of harms and the public interest thus weigh decidedly in the Plaintiffs' favor.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motion for a temporary restraining order requiring Defendants to obligate the remaining funds appropriated by Congress for the FSCS program before the appropriation expires on December 31, 2025, or, in the alternative, to extend the period of availability of those funds pursuant to this Court's inherent authority.

December 29, 2025                    Respectfully submitted,

                                     /s/ *Robin F. Thurston*
                                     Kali Schellenberg (DC Bar No. 198422)
                                     Erez Reuveni (CA Bar No. 264124)[+][^]
                                     Jeffrey B. Dubner (DC Bar No. 1013399)
                                     Victoria S. Nugent (DC Bar No. 470800)
                                     Robin F. Thurston (DC Bar No. 1531399)
                                     Democracy Forward Foundation
                                     P.O. Box 34553
                                     Washington, DC 20043
                                     (202) 448-9090
                                     kschellenberg@democracyforward.org
                                     ereuveni@democracyforward.org
                                     vnugent@democracyforward.org
                                     rthurston@democracyforward.org

                                     /s/ *Daniel F. Jacobson*
                                     Daniel F. Jacobson (DC Bar No. 1016621)
                                     Lynn D. Eisenberg (DC Bar No. 1017511)
                                     Brian C. Rosen-Shaud (ME Bar No. 006018)[+][^]
                                     Nina C. Cahill (DC Bar No. 1735989)
                                     Jacobson Lawyers Group PLLC
                                     5100 Wisconsin Ave N.W., Suite 301
                                     Washington, DC 20016
                                     (301) 823-1148
                                     dan@jacobsonlawyersgroup.com
                                     lynn@jacobsonlawyersgroup.com
                                     brian@jacobsonlawyersgroup.com
                                     nina@jacobsonlawyersgroup.com

                                     [+] *Pro hac vice* motion forthcoming
                                     [^] Not admitted in the District of Columbia. Practice
                                     supervised by members of the D.C. bar.


                                     *Counsel for Plaintiffs*

33