## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIGHTON PARK NEIGHBORHOOD
COUNCIL,
    4477 S. Archer Ave.
    Chicago, IL 60632,

AMERICAN FEDERATION OF TEACHERS,
    555 New Jersey Ave. NW
    Washington, DC 20001,

NATIONAL EDUCATION ASSOCIATION,
    1201 16th Street, NW,
    Washington, DC 20036,

PATERSON PUBLIC SCHOOLS,
    90 Delaware Avenue,
    Paterson, NJ 07503,

PATERSON EDUCATION FOUNDATION,
    422 Broadway,
    Paterson, NJ 07501,

SODUS CENTRAL SCHOOL DISTRICT,
    6375 Robinson Rd,
    Sodus, NY 14551,

THE PRICHARD COMMITTEE FOR
ACADEMIC EXCELLENCE, INC.,
    2285 Executive Drive, Suite 120,
    Lexington, KY 40505,

                *Plaintiffs*,

      v.

LINDA MCMAHON, in her official capacity as
Secretary of the United States Department of
Education,
    400 Maryland Ave. NW
    Washington, DC 20202,

UNITED STATES DEPARTMENT OF
EDUCATION,
    400 Maryland Ave. NW

Case No. 1:25-cv-04523

Washington, DC 20202

KIRSTEN BAESLER, in her official capacity as
Assistant Secretary, Office of Elementary and
Secondary Education,
    400 Maryland Ave. NW
    Washington, DC 20202,

OFFICE OF ELEMENTARY AND SECONDARY
EDUCATION,
    400 Maryland Ave. NW
    Washington, DC 20202,

          *Defendants*.

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1.      The Full-Service Community Schools (FSCS) program represents Congress's decision to boost the chances for disadvantaged students to succeed in school by directly addressing in-school and out-of-school barriers to learning. For students, FSCS grants provide expanded and enriched learning time and support a variety of social and health services so that lack of access to basic medical and dental care, food, clean and suitable clothing, and unstable housing are not impediments to school attendance and attention in the classroom. Beyond that, the FSCS program is intended to promote family and community engagement in schools, strengthen parenting skills, and reduce household obstacles to student success caused by job insecurity and language and literacy barriers.

2.      To effectuate these goals, the FSCS program supports public elementary or secondary schools in providing coordinated, accessible wraparound services for children and families, particularly for children attending high-poverty schools, including in rural areas. Under the program, the Department of Education awards grants to provide comprehensive academic, social, and health services for students, students' family members, and community members that result in improved educational outcomes for children.

3.      FSCS programs work and have made a world of difference to the students, families, and schools they serve. For example, at Joseph A. Taub School in Paterson, New Jersey, participants in FSCS programming were 16% less likely to be chronically absent, missed six fewer days of school, and earned 18% higher math and English Language Arts (ELA) grades than non-participants. In Wayne County, New York, FSCS food pantries provided monthly support to thousands of children and adults, chronic absenteeism decreased by over seven percentage points across the County, and 85% of grantee schools experienced a decrease in the

proportion of students who reported feeling unsafe in school. In Kentucky, nearly all participating schools in an FSCS initiative showed lower levels of chronic absenteeism, on average, dropping by 8.24% year-over-year, and made major gains in academic achievement, including average gains of 10.79% in math and 9.24% in reading compared to prior years.

4.      Congress has consistently provided funding for the FSCS program, including appropriations of $150 million for the program this year and in each of the last three years, which the Department must obligate by December 31 of each year.

5.      FSCS grants are multi-year grants, which enable grantees to develop longer-term programs that support schools and students over time with the consistent provision of services. For decades, and by regulation, the Department has treated continuation awards for such multi-year grants as the norm, not the exception—issuing annual continuation funding based on grantee performance and according preference to continuation awards, rather than subjecting grantees to renewed competition or shifting policy preferences.

6.      On December 12, 2025, the Department made the abrupt and unlawful decision to non-continue 19 different multi-year FSCS grants, mid-project. Not only did this decision result in loss of funds for the current funding period, it made grantees ineligible for future funding as part of the multi-year grant. The Department's decision to break from its settled framework for issuing continuation awards, without adequate explanation or lawful basis, violates the Administrative Procedure Act and governing grant regulations. The Department ignored regulations requiring that continuation awards be based on performance, failed to give continuation awards priority over new grants, and abandoned the Department's longstanding representation that non-continuation is "extremely rare."

7.     The Department's stated reasons for non-continuing these awards—newly articulated priorities and policy preferences—cannot justify the Department's actions because those priorities and policy preferences were not promulgated and made applicable to the FSCS program through notice-and-comment rulemaking or otherwise publicly incorporated into the FSCS program prior to notice of non-continuation. But even if the Department's new priorities and policy preferences had been adequately communicated to the FSCS grantees, circumstances suggest that the Department's stated reasons were pretextual and intended to hide impermissible purposes that defy Congress's directions and constitutional rights.

8.     Plaintiffs are grantees, sub-grantees, and beneficiaries of the FSCS program. The grantees and sub-grantees coordinate and provide wraparound services including school-based health clinics, mental-health counseling, food distribution and pantries, after-school and summer enrichment programs, college and career readiness supports, parent engagement workshops, and early-childhood screenings in Illinois, Kentucky, New Jersey, and New York. AFT and NEA represent educators working in school districts across the country that operate programs funded by multi-year FSCS awards.

9.     The consequences of the Department's unlawful actions on the education system more broadly are profound. The schools—including students, families, teachers, and staff—that rely on these funds have lost key financial support for programs halfway through the academic year at a time when it is most difficult to reorganize resources. This has resulted in the cancellation of programming and critical supports that help reduce absenteeism and improve student well-being, including mentoring, tutoring, and after-school club programs, as well as broader programmatic opportunities enhancing financial literacy, adult nutrition, family engagement, and workforce development. Schools and partners will lose staff, mentors, and site

coordinators, and some will shut down essential operations such as food banks and supply closets, cutting off hundreds of families from basic necessities and students from mental health care, field trips, and peer tutoring support.

10.     In non-continuing five-year plans partway through execution, Defendants are cutting off funding for this important work just as the groundwork has been laid to fulfill the FSCS program's goals and as successes are being reported. To avert these extraordinary harms, Plaintiffs bring this suit to hold unlawful and set aside Defendants' unlawful actions and to restore the grantees' status and eligibility for FSCS grant funds.

## PARTIES

11.     Plaintiff Brighton Park Neighborhood Council (BPNC) is a 501(c)(3) nonprofit organization founded in 1997 to support the underserved residents of Chicago's southwest side, which includes many of the most impoverished neighborhoods in Chicago. Its mission is to improve the quality of life for the residents of these communities. One of its main tools for carrying out that mission is providing free and accessible programming at neighborhood public schools to meet the complex needs of children and adults in low-income families, such as workforce preparedness, education, and mental and physical health.

12.     Plaintiff the American Federation of Teachers (AFT) is a membership organization representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. AFT's headquarters is in Washington, D.C. Its 1.8 million members belong to more than 3,000 locals across all fifty states. AFT's mission is to promote fairness, democracy, economic opportunity, and high quality public education, healthcare, and public

services for students, their families, and communities. It meets this mission by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients, and all those who use public services. Helping children and students, and ensuring the economic security and dignity of AFT's members and their families, is at the core of this mission.

13.    Plaintiff National Education Association (NEA) is a 501(c)(5) nonprofit organization headquartered in Washington, D.C. NEA is the nation's oldest and largest professional association of educators and represents approximately three million members who work at every level of education—from pre-school to university graduate programs. NEA's members include individuals training to become educators, classroom teachers, education support professionals, higher education faculty and staff, and other current and former educators. NEA has affiliate organizations in every state and in more than 14,000 communities across the nation. NEA's mission is to advocate for education professionals and to ensure that public education prepares every student to succeed in a diverse and interdependent world. To further that mission, NEA and its members have supported the development and implementation of community school programs, including the FSCS grant program, which provide students with critical supports for their educational success.

14.    Plaintiff Paterson Public Schools (PPS) is a public school district located in Passaic County, New Jersey. It employs approximately 1,974 full-time teachers and serves approximately 19,612 students at its 43 schools. PPS received two FSCS awards: a five-year capacity building and development grant award (Prime Award No. S215J220151) in 2022 for $2,499,795, and a five-year Multi-LEA grant award (Prime Award No. S215J230159) in 2023 for $11,349,762. PPS's awards were continued by the Department in 2023 and 2024. Due to the

Department's 2025 non-continuation determination, PPS will not receive over $7.9 million in FSCS funds.

15.    Plaintiff Sodus Central School District (Sodus CSD) is a public school district located in Wayne County, New York. It employs approximately 112 full-time teachers and serves approximately 1,058 students at its three schools. Sodus CSD received a five-year Multi-LEA grant (Prime Award No. S215J220168) in 2022 for $15,000,000. Sodus CSD's award was continued by the Department in 2023 and 2024. Due to the Department's 2025 non-continuation determination, Sodus CSD will not receive over $6 million in FSCS funds.

16.    Plaintiff Prichard Committee for Academic Excellence, Inc. (Prichard Committee or Prichard) is a 501(c)(3) non-profit organization established in 1983 and headquartered in Lexington, Kentucky. The Prichard Committee's mission is to realize a path to a larger life for Kentuckians with education at the core. To that end, the Prichard Committee launched the Kentucky Community Schools Initiative—an evidence-based initiative to provide a continuum of services needed to support student and family well-being. Prichard Committee received a FSCS five-year state-scaling grant award (Prime Award No. S215J220173) in 2022 for $47,254,772.00 for the Kentucky Community Schools Initiative. The Prichard Committee's award was continued by the Department in 2023 and 2024. Due to the Department's 2025 non-continuation determination, the Prichard Committee will not receive over $21.8 million in funds—$19 million that was expected for the remainder of the grant term, and over $3 million in remaining funds from the 2025 calendar year that would have remained available if provided a no-cost extension.

17.    Plaintiff Paterson Education Foundation (PEF) is a 501(c)(3) organization founded in 1983, to advance educational equity and strengthen public education in Paterson, New Jersey. PEF's mission is to stimulate community action for change so that Paterson Public

Schools can improve outcomes for Paterson's students. PEF achieves this mission by engaging a broad range of stakeholders and participating in statewide and national education coalitions to bring evidence-based models, best practices, and innovative teaching and learning strategies to Paterson—resources that would otherwise be inaccessible to students, parents, schools, and the local community.

18.   Collectively, Plaintiffs' interests have been injured by non-continuation of the following 13 FSCS grants, amounting to over $134 million in lost funding:

  a.   Award No. S215J220203: A Capacity Building and Development grant awarded in 2022 to United Way California Capital Region. The initial year's funding was $498,603.00, with a total expected funding of $2,488,998.00. Due to the non-continuation, over $1 million in funding was lost.

  b.   Award No. S215J230086: A Capacity Building and Development grant awarded in 2023 to Oakland Promise in California. The initial year's funding was $401,345.00, with a total expected funding of $2,500,000.00. Due to the non-continuation, nearly $1.6 million in funding was lost.

  c.   Award No. S215J220100: A Capacity Building and Development grant awarded in 2022 to District of Columbia Public Schools. The initial year's funding was $492,623.00, with a total expected funding of $2,490,867.00. Due to the non-continuation, nearly $1 million in funding was lost.

  d.   Award No. S215J230148: A Capacity Building and Development grant awarded in 2023 to District of Columbia Public Schools. The initial year's funding was $474,346.00, with a total expected funding of $2,429,230.00. Due to the non-continuation, over $1.45 million in funding was lost.

e.  Award No. S215J230147: A State Scaling grant awarded in 2023 to Metropolitan Family Services in Illinois. The initial year's funding was $9,420,400.00, with a total expected funding of $47,102,000.00. Due to the non-continuation, over $28 million in funding was lost.

f.  Award No. S215J230149: A State Scaling grant awarded in 2023 to Metropolitan Family Services in Illinois. The initial year's funding was $9,420,400.00, with a total expected funding of $47,102,000.00. Due to the non-continuation, over $28 million in funding was lost.

g.  Award No. S215J230215: A Multi-LEA grant awarded in 2023 to University Center of Lake County in Illinois. The initial year's funding was $2,792,150.00, with a total expected funding of $13,866,750.00. Due to the non-continuation, over $8 million in funding was lost.

h.  Award No. S215J220173: A State Scaling grant awarded in 2022 to the Prichard Committee for Academic Excellence in Kentucky. The initial year's funding was $9,605,136.00, with a total expected funding of $47,254,772.00. Due to the non-continuation, over $19 million in funding was lost.

i.  Award No. S215J220024: A Capacity Building and Development grant awarded in 2022 to University of Maryland, Baltimore in Maryland. The initial year's funding was $385,507.00, with a total expected funding of $1,924,982.00. Due to the non-continuation, over $770,000 in funding was lost.

j.  Award No. S215J230049: A State Scaling grant awarded in 2023 to Duke University in North Carolina. The initial year's funding was $9,928,245.00, with a

total expected funding of $49,837,443.00. Due to the non-continuation, over $29

million in funding was lost.

k.  Award No. S215J220151: A Capacity Building and Development grant awarded

in 2022 to Paterson Board of Education in New Jersey. The initial year's funding

was $499,959.00, with a total expected funding of $2,499,795.00. Due to the non-

continuation, nearly $1 million in funding was lost.

l.  Award No. S215J230159: A Multi-LEA grant awarded in 2023 to Paterson Board

of Education in New Jersey. The initial year's funding was $2,097,165.00, with a

total expected funding of $11,349,762.00. Due to the non-continuation, over $6.9

million in funding was lost.

m.  Award No. S215J220168: A Multi-LEA grant awarded in 2022 to Sodus Central

School District in New York. The initial year's funding was $2,618,374.00, with a

total expected funding of $15,000,000.00. Due to the non-continuation, over $6

million in funding was lost.

19.     Defendant Linda McMahon is the Secretary of the United States Department of

Education, the highest ranking official at the Department of Education, and is responsible for the

decisions of the Department. She is sued in her official capacity.

20.     Defendant the United States Department of Education is an executive department

of the United States federal government, headquartered in Washington, D.C.

21.     Defendant Kirsten Baesler[1] is the Assistant Secretary, Office of Elementary and

Secondary Education (OESE), the highest ranking official at the OESE, and is responsible for its

decisions. She is sued in her official capacity.

---

[1] Plaintiffs have removed Ruth Ryder, former Acting Assistant Secretary, OESE as a Defendant, and replaced her
with Kristen Baesler, Acting Secretary, OESE.

22.     Defendant the Office of Elementary and Secondary Education is an operating division of the Department of Education, headquartered in Washington, D.C.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

24.     This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

25.     Venue is appropriate under 28 U.S.C. § 1391(e) in the District of Columbia because Defendants and Plaintiffs AFT and NEA reside in this district.

## FACTUAL AND LEGAL BACKGROUND

### A.  *Congress's Creation and Funding of Full-Service Community Schools*

26.     The Elementary and Secondary Education Act (ESEA) provides the primary source of federal funding for elementary and secondary education. Rebecca R. Skinner, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer*, CRS Report No. R45977 (Feb. 12, 2024), https://perma.cc/LPR9-RUF2. First enacted by Congress in 1965 (P.L. 89-10), the ESEA was most recently comprehensively amended and reauthorized by the Every Student Succeeds Act (ESSA; P.L. 114-95). *Id.*

27.     The ESEA requires the Department of Education to administer the Full-Service Community Schools program, which is designed to provide support for the "planning, implementation, and operation of full-service community schools that improve the coordination and integration, accessibility, and effectiveness of services for children and families, particularly

for children attending high-poverty schools, including high-poverty rural schools." 20 U.S.C. § 7271(2).

28.     More specifically, under the FSCS program, the Department provides grants to entities including Historically Black Colleges and Universities (HBCUs), institutes of higher education, non-profits, and Local Educational Agencies (LEAs) (the public authorities that maintain administrative control for public elementary or secondary schools) to participate in community-based efforts to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organizations and public and private partnerships. 20 U.S.C. § 7272(1)(B), (2); U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)*, OESE (July 16, 2025), https://perma.cc/V9VT-K3Y7. Schools provide "pipeline services," which deliver a "continuum of coordinated supports, services, and opportunities" to children in distressed communities, including through high-quality early childhood education programs, high-quality school and out-of-school-time programs and strategies; social, health, nutrition, and mental health services and supports; and more. 20 U.S.C. § 7272(3).

29.     Congress first created the FSCS program, along with the "Promise Neighborhoods" initiative, using authority previously available in the ESEA's Title V-D-1 to create programs of national significance as a demonstration program through the Department of Education Appropriations Act in 2008. *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat 1844, Div. G, Title III (2007); Skinner, *supra* ¶ 25.

30.     Congress subsequently amended the ESEA to codify the FSCS program in subpart 2 of part F of the ESEA. *See* Every Student Succeeds Act (ESSA), Pub. L. No. 114–95, § 4601, 129 Stat. 1802 (2015) (codified at U.S.C. § 7271 *et seq*). As a Senate Committee Report to

the ESSA explained, the bill's "purpose is to enable States and local communities to improve and support our Nation's public schools and to ensure that every child has an opportunity to achieve, including categories of historically disadvantaged students, such as low-income students, students of color, students with disabilities, and English learners." S. Rep. No. 114-231, at 2 (2016).

31.    Congress further mandated that "in awarding grants" under the FSCS program, "the Secretary shall give priority to eligible entities that—(1)(A) will serve a minimum of 2 or more full-service community schools eligible for a schoolwide program under section 6314(b) of this title, as part of a community- or district-wide strategy; or (B) include a local educational agency that satisfies the [certain] requirements . . . ; (2) are consortiums comprised of a broad representation of stakeholders or consortiums demonstrating a history of effectiveness; and (3) will use funds for evidence-based activities." 20 U.S.C. § 7275(b).

32.    Congress has continuously increased the FSCS funding that the Secretary is required to spend—from $25 million in 2020, to $30 million in 2021, $75 million in 2022, and $150 million per year for 2023, 2024, 2025, and 2026.

33.    Relevant to the Plaintiffs' claims, in the Consolidated Appropriations Act of 2024, Congress appropriated $457,000,000 "[f]or carrying out activities authorized by subparts 2 and 3 of part F of title IV of the ESEA, . . . to remain available through December 31, 2024." Pub. L. No. 118-47, 138 Stat. 684. Congress then specified that, of this amount, "$150,000,000 shall be available for section 4625," which is the FSCS program. *Id.* In enacting this appropriation, Congress directed the Department to obligate $150 million for the FSCS program by December 31, 2024.

34.     The 2025 Full-Year Continuing Appropriations and Extensions Act replicated the exact same appropriation for 2025, meaning Congress appropriated the same amount for FSCS, to remain available through December 31, 2025. *See* Pub. L. No. 119-4, § 1101, 1101(8), 139 Stat. 9, 10-11.

35.     Congress again appropriated funding for the FSCS program in 2026. In the Consolidated Appropriations Act of 2026 enacted into law on February 3, 2026, Congress appropriated $431,000,000 "[f]or carrying out activities authorized by subparts 2 and 3 of part F of title IV of the ESEA," of which it specified that "$150,000,000 shall be available for [the FSCS program]." Consolidated Appropriations Act of 2026, Pub. L. No. 119-75, 140 Stat. 173, 296. Those funds are to remain available until expended and must be obligated by December 31, 2026.

36.     Congress mandated that certain grant applications, including FSCS grant applications, address equity issues and placed the responsibility for ensuring that equity is a core consideration of the FSCS program on the Department. General Education Provisions Act (GEPA) Equity Directive, 20 U.S.C. §§ 1221, 1228a(b).

**B.  *The Department Awards Continuation Grants Non-Competitively, Based on Performance***

37.     The Department has long represented that a non-continuation of multi-year award funding like the FSCS grants at issue is "extremely rare in practice." Direct Grants Programs, 59 Fed. Reg. 30258, 30259 (June 10, 1994). As the Department recently explained, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." Educ. Dep't Gen. Admin. Regul. and Related Regul. Provisions, 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024).

38. GEPA and the Department's own financial assistance regulatory framework govern the Department's administration of the FSCS program funds. With exceptions not relevant here, GEPA requires that rules affecting the Department's provision of financial assistance—including grant programs—go through the APA's notice and comment process. *See* 20 U.S.C. § 1232(a), (d).

39. The Department's financial assistance regulations fulfill these statutory requirements by publicly setting the rules for: (1) the Department's competitive grantmaking selection process for new grants; and (2) its process for determining whether to continue a grantee's multi-year project—a process that does not involve competition with other current or potential grantees.

40. When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things: how to apply for a new grant, 34 C.F.R. § 75.100; whether the Secretary plans to approve multi-year projects, and if so, the project period the Secretary will approve, 34 C.F.R. § 75.101; the priorities established for the selection of new grants for the program that year, including any competitive preference priorities for which an application could receive bonus points; the selection criteria and factors used to decide which applications will be awarded new grants, and how these criteria will be weighed; and any program performance measurement requirements, including whether the application should propose project-specific performance measures and explain how the proposed measures would accurately measure project performance.

41. The Department then scores the quality of each application using the selection criteria and competitive preferences, ranks the applications based on their quality according to the selection criteria and preferences, and selects grant recipients in the order in which their

14

applications were ranked. *See* 34 C.F.R. § 75.217; U.S. Department of Education, *Discretionary Grantmaking at ED (Discretionary Grantmaking)*, 26–27 (2024), https://perma.cc/A48L-56FH. The selection criteria are given point values up to the "total possible score for all of the criteria for a program" that the Department announced for that year's grant competition. 34 C.F.R. § 75.201(b)(1)-(2); *Discretionary Grantmaking* at 26-27. Applicants may earn additional points if they meet competitive preference priorities. *See* 34 C.F.R. § 75.105(c); *Discretionary Grantmaking* at 27.

42.    Unlike the Department's process governing the selection of new grant awards, the Department's procedures for determining whether to continue multi-year grants is not competitive. *See Discretionary Grantmaking* at 31–32, 45.

43.    When awarding multi-year projects, the Department "[m]akes a grant to the project for the initial budget period"—usually 12 months—and indicates its "intention to make continuation awards to fund the remainder of the project period." *See* 34 C.F.R. § 75.251.

44.    The Department is required to base decisions about whether to continue to fund subsequent years of multi-year awards on information relevant to a grantee's performance, which includes performance reports, performance measures, and certain financial information. *See* 34 C.F.R. §§ 75.118(b), 75.253(b); *see also Discretionary Grantmaking* at 32 ("[t]he program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); Direct Grant Programs, 59 Fed. Reg. 30258, 30259 (June 10, 1994) ("the continuation award decision— including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application."). Based on the information included in

grantees' annual performance reports, the program officer makes a determination as to whether to issue a continuation award. *Id.*

45.    Finally, in selecting applicants for funding under a program, the Department is required under its own regulations and policies to "give[] priority to continuation awards over new grants." 34 C.F.R. § 75.253(c). The Department assigns a multi-year project priority in receiving funds over new grants. 34 C.F.R. § 75.253(c); *Discretionary Grantmaking* at 45 ("A grantee does not have to compete with other applicants to receive [a continuation] award."); EDGAR 45 Fed. Reg. 22544, 22559 (Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [§ 253(a)] and will not be subject to competition with other applications").

### C. The Department Reviewed and Selected the 2022-2023 FSCS Applicants Based on Published Priorities

46.    In 2022, the Department engaged in its statutorily-required rulemaking to set new priorities for FSCS competitions. In accordance with statutory requirements, the Department published a notice of proposed priorities, requirements, and definitions, and invited the public to comment. Proposed Priorities, Requirement, Definitions, and Selection Criteria - Full-Service Community Schools Program, 87 Fed. Reg. 1709 (Jan. 12, 2022).

47.    The Department then published a notice announcing the "[f]inal priorities, requirements, definitions, and selection criteria" for future FSCS grant competitions and addressing the public comments. 87 Fed. Reg. 41675, 41675 (July 13, 2022). The notice announced final priorities including the following: (1) for Capacity Building and Development Grants, "[p]rojects that propose to (a) conduct initial development and coordination activities, including extensive community engagement, that leverage the findings of their needs assessment—which may be completed during or before the grant period—to develop the

infrastructure, activities, and partnerships to implement full-service community schools in two or more schools, and (b) gather data on performance indicators;" (2) for Multi-Local Educational Agency Grants, "[p]rojects that propose to implement and sustain full-service community schools in two or more LEAs;" (3) for FSCS State Scaling Grants, applications that "include a written commitment of the SEA [State Education Agency] to participate in the partnership and to sustain the program beyond 2 years after the term of the grant," and identify or establish a State steering committee. *Id.* at 41684.

48.     The notice also provided that each priority would be listed through another Federal Register notice as either: an absolute priority, under which the Department considers only applications that meet the priority, 34 C.F.R. § 75.105(c)(3); a competitive preference priority, under which the Department gives preference to an application by (1) awarding additional points based on the extent the application meets the priority or (2) selecting an application that meets the priority over one of comparable merit that does not, 34 C.F.R. § 75.105(c)(2)(ii); or an invitational priority, under which the Department is "particularly interested in applications that meet the priority" but does not give an application that meets it a preference, 34 C.F.R. § 75.105(c)(1); 87 Fed. Reg. at 41685.

49.     In 2023, the Department published a notice of an additional final priority for participation in a national evaluation of effectiveness using a randomized control trial design. Final Priority and Requirements – Full-Service Community Schools, 88 Fed. Reg. 37218 (June 7, 2023).

50.     The Department of Education published a notice inviting applications for the Fiscal Year 2023 FSCS grant competition on June 7, 2023. *See* Applications for New Awards; Full-Service Community Schools Program, 88 Fed. Reg. 37222 (June 7, 2023). The notice

included three Absolute Priorities from the July 13, 2022 notice of final priorities, requirements, definitions, and selection criteria (Absolute Priorities 3, 4, and 5) as well as two Absolute Priorities from other sections of the ESEA (Absolute Priority 1 from section 4625(b)(1)(A) of the ESEA, and Absolute Priority 2 is from section 4625(b)(1)(A) and (B) of the ESEA). The notice also included "Competitive Preference Priorities 1 and 2, [which] are from the Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs published in the Federal Register on December 10, 2021 (86 FR 70612)." *Id.* at 37223-24. These priorities identify requirements that applicants either must meet, in the case of absolute priorities, or can optionally address for a preference advantage, in the case of competitive preference priorities. The notice also broadly characterized FSCS programs as "strategies that advance educational equity and excellence for all students," and included as one competitive preference priority criterion the creation of "education or work-based settings that are supportive, positive, identity-safe, and inclusive with regard to race, ethnicity, culture, language, and disability status." *Id.* at 37222-23, 37225.

51.    Of the five listed "absolute priorities," the notice required that applicants meet two: Absolute Priority 1, which required that "applicants must propose to serve a minimum of two or more full-service community schools eligible for a schoolwide program (as defined in this notice) under section 1114(b) of the ESEA, as part of a community- or district-wide strategy," and Absolute Priority 2, which required that applicants "must propose to: (1) serve a minimum of two or more full-service community schools eligible for a schoolwide program. . . , as part of a community- or district-wide strategy; and (2) include an LEA that satisfies the requirements of the Small Rural School Achievement program . . . or the Rural and Low-Income School program" as defined in the ESEA. *Id.* at 37224. Applicants were also required to meet one

additional Absolute Priority from a list of three options: Absolute Priority 3, for Capacity Building and Development Grants; Absolute Priority 4, for Multi-Local Educational Agency Grants; or Absolute Priority 5 for FSCS State Scaling Grants. *Id.* The notice also included "two competitive preference priorities, and one invitational priority." *Id.* at 37223.

52.     Against this backdrop, Plaintiffs PPS, the Prichard Committee, and Sodus CSD, as well as entities including non-profits, institutes of higher education, and school districts employing AFT and NEA members nationwide, applied for FSCS grants, designing their proposed projects to align with the Department's announced priorities for that funding cycle in order to ensure eligibility and strengthen their applications. After selecting grantees for multi-year FSCS awards, the Department funded the initial budget period and provided for four additional 12-month budget periods.

53.     In accord with GEPA's equity directive, applicants were required to submit a form in Grants.gov identifying barriers that could prevent equitable access to or participation in their federal grant projects, including but not limited to "barriers based on economic disadvantage, gender, race, ethnicity, color, national origin, disability, age, language, migrant status, rural status, homeless status or housing insecurity, pregnancy, parenting, or caregiving status, and sexual orientation." OMB Control Number 1894-0005, Notice to All Applicants: Equity for Students, Educators, and Other Program Beneficiaries (exp. 2/28/2026).

### D. The Department's Determination to Non-continue Grants

54.     Early in the Trump administration, temporary government employees working under the supervision of Elon Musk and his Department of Government Efficiency (DOGE) appeared at the Department of Education. Their mission was to eliminate personnel, programs, and grants.

55.     Upon information and belief, the DOGE team, or others working under similar parameters, searched grant applications and awards for ideas disfavored by the administration—using terms like diversity, equity, inclusion—and concepts associated with those values—like race, culturally responsive teaching, social emotional learning, and restorative justice.

56.     Upon information and belief, this process produced a spreadsheet of FSCS grants that included brief excerpts from each FSCS grant application that contained DEI-related search terms. Upon information and belief, program staff members were told to review the spreadsheet as part of their review in making continuation award assessments.

57.     This DEI-related review was conducted around the same time as the program office was reviewing grants for continuation based on the process outlined by Congress and federal regulations. As part of that process, grantees submitted an initial report in March and an Annual Performance Report in August. Together, these reports included detailed financial information, as well as information concerning the grantee's progress against performance measurements, effectiveness, and measured effects on program participants. *See* 34 C.F.R. §§ 75.118, 75.590. The reports were specifically focused on furthering the purposes of the FSCS program, including whether the grant was "improv[ing] the coordination and integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." 20 U.S.C. § 7271; *see also id.* § 7275(g). To assist grantees in developing these reports, the Department of Education issued a guidance document in 2024. *See* Peter Tatian, Karin Scott, Ariella Meltzer, Travis Reginal, and Megan Gallagher, *Data Collection and Reporting Guidance for the Full-Service Community Schools Program*, U.S. Department of Education (Dec. 31, 2026),

https://perma.cc/E5GN-YZTK. The document provides detailed instructions on required and optional performance indicators to include in each grantee's annual report.

58.    Upon information and belief, after reviewing the grantees' reports and confirming that the grantees met the substantial progress conditions necessary for continuation under 34 C.F.R. § 75.253, FSCS program staff recommended continuation of awards for all 72 grantees in early autumn.

59.    By custom, the Department would typically announce FSCS continuation decisions and disburse funds in December. If the Department had concerns about a grantee's performance or use of funds, the grantee would be advised of any concerns well in advance of December and given an opportunity to respond to them as well receive assistance from the Department to overcome problems in implementing their grant plans. *See* Discretionary Grantmaking at 37 ("If . . . ED's staff identify areas of weakness or noncompliance, discover that the grantee is not making substantial progress, or have suggestions for how the grantee might better achieve the program objectives, they will provide technical assistance to help bring the project back on track. Unresolved monitoring findings can result in such actions as . . . a decision to not award a continuation grant . . . .").

60.    Upon information and belief, the Secretary's office decided to non-continue a quarter of the grants, representing more than one-third of the FSCS funds.

### E. The Department Issued Non-Continuation Notices and Denied Grantees' Appeals

61.    On December 12, 2025, the Department notified 19 recipients of multi-year FSCS grants—out of a total of approximately 72 grants—that their funding would not be continued, that they could not continue to expend the prior year's funding in support of their awards after

December 31 (called a no-cost extension), and that any unobligated funds that were paid out but not authorized to be retained would need to be "promptly" refunded to the government.

62.    The non-continuation notices issued to grantees by the Department provided little to no insight into the stated basis for the non-continuations. Upon information and belief, all grantees received a notice with the same boilerplate statement that the Department "determined that the grant . . . provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds."

63.    Upon information and belief, none of the notices reflected factual findings or analysis by the agency of the grantee's actual performance under the grant. Instead, the letters quoted language from grant applications—sometimes unrelated to project proposals themselves—that included DEI-related terms as support for the Department's conclusions.

64.    Grantees were advised that they could request reconsideration, but they were only given seven calendar days to do so.

65.    On December 29, 2025, the Department began issuing denials of grantees' appeals. All grantee reconsideration requests were formally denied. However, the Department reversed course for an Idaho grantee, ultimately determining to continue its funding. In total, 18 grants, representing over $257 million in funding, were non-continued.

66.    Overall, the reasons provided for not continuing these 18 grants were spurious and not supported by published priorities from the Department or consideration of how the

grantees were actually using their FSCS funds. And concerningly, the reasons given for non-continuation were based on the viewpoint and expressive association of the grantees, their partners, and their beneficiaries, in violation of the First Amendment. Additionally, the reconsideration process was shambolic, as the Department did not actually reckon with the information provided by the grantees. Instead, the Department doubled down by pulling additional quotations from grant applications, many of which were also general statements with the same First Amendment implications. The following examples from grants at issue in this litigation are illustrative.

*Metropolitan Family Services*

67.     Grantee Metropolitan Family Services, the fiscal sponsor of Afterschool for Children and Teens Now (ACT Now), on whose two FSCS grants Plaintiff BNPC's programming depends, received a notice with a paragraph of disjointed quotations extracted from ACT Now's two over 100-page applications. Those quotations capture ACT Now's responses to a competitive preference priority in place at the time of the grant competition; the Full-Service Community Schools program's statutory emphasis on historically marginalized populations; ACT Now' gender and sexuality professional development courses; and the grant-required GEPA equity statement. The notice also referenced ACT Now's statements about their organizational values and activities unrelated to ongoing FSCS programming. The notice did not identify any deficiency, violation, or performance failure, nor did it explain why these programmatic features—many of them expressly contemplated or required by the FSCS statute and GEPA—could justify non-continuation of an otherwise successful grant.

68.     On December 18, 2025, Metropolitan Family Services submitted a request for reconsideration of the Department's non-continuation decision. Its request noted that

Metropolitan Family Services had "never provided access to professional development courses of gender or sexuality as part of the FSCS grant" and had "never provided access to . . . racial equity curriculum as part of the FSCS grant." Likewise, it explained that Metropolitan Family Services had not implemented the racial equity, cultural competency, and implicit bias trainings identified by the Department and "never incorporated them into the grant curriculum." As to the Department's allegation that Metropolitan Family Services had used poverty rates and equity factors like race and ethnicity to identify school districts with the most need, the letter pointed out that Metropolitan Families Services was "statutorily required to address factors such as equitable participation and barriers to access." Moreover, the request letter explained that it chose how to allocate resources using a comprehensive process involving consideration of many factors, as well as regular review of surveys and other data; focus groups; and individual interviews with students, parents, and staff.

69.    Metropolitan Family Services' request for reconsideration went on to explain how its FSCS grant had both made "meaningful progress to date" and established "a credible pathway toward sustained, measurable improvements in student outcomes and community well-being." The letter also laid out how the organization's use of FSCS funds aligned with administration priorities.

70.    On December 29, 2025, the Department denied Metropolitan Family Services' request for reconsideration. The denial letter did not respond to Metropolitan Family Services' arguments for why its grant should continued. It also did not acknowledge that none of the supposedly problematic activities identified had been carried out as part of the FSCS grant, much less identify any performance issues.

71.    Instead, the Department justified its denial by again quoting, without any additional analysis, language from Metropolitan Family Services' grant application. Specifically, the Department faulted Metropolitan Family Services for stating that its "mission has equity and racial justice at its core," that preparing children for success "requires an intentional focus on historically marginalized popularizations," and that Metropolitan Family Services is committed to "incorporat[ing] diverse voices into our leadership and feedback on our work."

*Prichard Committee*

72.    The Prichard Committee received a notice identifying the following language in its original grant application as a reason for the non-continuation: "Kentucky will host several targeted trainings . . . which focused on recognizing and addressing disparities (racial, ethnic, geographic, able-ness, etc.)" and that "the project leads . . . will facilitate a review of tools to help address equity in policymaking, such as the Race Equity Impact Assessment." The Department's notice failed to mention how or whether Prichard had implemented these aspects of its proposal, even though Prichard had submitted annual performance reports to the Department.

73.    On December 17, 2025, the Prichard Committee submitted a request for reconsideration of the Department's non-continuation decision. The appeal explained that "[t]he trainings referenced in the grant application were never implemented, and no federal funds were ever used for the component of the proposal that the Department has determined is in conflict with Department policy and priorities." The activities highlighted by the Department, the letter went on, "were examples of potential activities" that were "not integral to achieving the project's objectives" and "were never implemented, funded, or incorporated into the project's scope of work." As evidence for its claim, Prichard observed that, if it had engaged in the activities the

Department objected to, those activities "would necessarily have been reflected in required programmatic reporting or budget documentation," such as annual performance reports, budget narratives, and expenditure summaries. But "[t]hey were not."

74.    Prichard's request also laid out in detail why its "activities affirmatively advance the Department's stated priorities." For example, it explained that it had produced measurable program outcomes, empowered parents to become more involved in their children's education, and prepared students for the workforce.

75.    On December 29, 2025, the Department of Education denied the Prichard Committee's request for reconsideration. The Department's denial letter did not respond to Prichard's claim that it had not engaged in the activities to which the government objected. Nor did it address Prichard's explanation for why its project advanced the Department's priorities. Instead of responding to Prichard's objections, the Department affirmed its denial decision by again pointing to statements taken from Prichard's grant application. Specifically, the Department faulted the Prichard Committee's "commitment to equity, inclusion, and diversity" and its plan to hire in accordance with its mission. The Department also highlighted that the State Steering Committee would "provide guidance on the various aspects of diversity which should be incorporated into the project (e.g., race, ethnicity, location, etc.)." Finally, the Department expressed its disagreement with Prichard's goal of "[m]ak[ing] space for communities of color to lead and participate in conversations about policy decisions." Again, the Department failed to object to any specific actions taken by Prichard other than its inclusion of language in the original grant application.

76.    The Department went on to claim that "the information in your request for reconsideration was not sufficient to refute these findings"—i.e., statements it identified in Prichard's grant application.

*Paterson Public Schools*

77.    Paterson Public Schools received two letters notifying the school district that both of its grants had been non-continued. The letters quoted passages from PPS's original grant applications. On December 18, 2025, PPS submitted an appeal of both of the Department's non-continuation determinations. PPS pointed out that the application language quoted by the Department was responsive to application requirements existing at the time. PPS also explained that the language quoted by the Department was unrelated to any of PPS's planned FSCS projects or expenditures. Rather, the language referenced activities that are PPS frameworks and statements of values. Indeed, PPS never used FSCS funds for the activities referenced by the Department in either of the letters.

78.    The Department's December 29, 2025 denial and responses to the reconsideration requests did not address the points raised by PPS in either of its appeals. Instead, it continued to quote from PPS's original grant applications.

*Sodus CSD*

79.    Sodus CSD received a notice quoting just three sentences from its original grant application, which was submitted on September 12, 2022. The Department's quote referenced only one out of Sodus CSD's nearly twenty proposed partner organizations and was not an accurate reflection of the school district's current grant program activities. Indeed, the Letter did not contain any information from the multiple status reports that Sodus CSD had submitted since 2022, describing the programming and usage of FSCS funds.

80.     On December 19, 2025, Sodus CSD submitted an appeal of the Department's non-continuation determination, pointing out the inaccuracy and inadequacy of the government's letter and providing supporting documentation for Sodus CSD's use of FSCS funds.

81.     Notably, the specific concern identified by the Department related to an activity that was not funded with FSCS funds. Moreover, the quoted language from the application was reflective of organizational values that Sodus CSD thought necessary to include to be responsive to certain competitive preference priorities that were established through notice-and-comment rulemaking and were in effect at the time of its application.

82.     The Department's December 29, 2025 denial and response to the reconsideration request did not address the points raised by Sodus CSD in its appeal. Instead, it continued to quote from Sodus CSD's 2022 grant application.

### F. The Department Arbitrarily Obligates Remaining Funds

83.     On December 29, 2025, the same day as the Department began notifying grantees of its denial of their requests for reconsideration, Plaintiffs BPNC and AFT filed this lawsuit to challenge the Department's unlawful actions. Shortly after, the Department notified counsel for Plaintiffs that it intended to obligate all of the more than $60 million in expiring funds that were budgeted for the 18 non-continued awards to other existing or new awards, or for other permissible purposes. No public announcement explained how the funds would be re-allocated or on what basis. Public information now available shows increased funding was provided on December 31, 2025, to 50 out of the 54 continuing FSCS grantees and money was added to a contract relating to evaluation of the program.

84.     Upon information and belief, the Department did not undertake an appropriate process for determining how to obligate the funds available due to the non-continuations. Upon information and belief, the Department did not take any of the customary steps to oversee the

grant program in a fiscally responsible way—they did not conduct outreach to grantees to determine need, ability to expend additional funds, or how such funds would be used to support program goals. As a result, the new obligations were sudden and arbitrary.

85.     On average, continued-grantees received additional funds amounting to approximately 66% of their first-year award—meaning their yearly funding substantially increased. Some grantees received even more money, with one grantee's yearly award increasing over 260%, two getting increases in the 90% range, and nine receiving an over 70% increase. On the other hand, two grantees received increases of 38% and 35% respectively, and one got 6.4% additional funding. Four continued grantees—Boys & Girls Club of Puerto Rico, Communities in Schools of Nevada, Cutler-Orosi Joint Unified School District in California, and United Way of Treasure Valley, Inc., in Idaho—did not receive any additional funding.

86.     Additionally, the Department gave four new awards to grantees that were not previously a part of the FSCS program, but had been grantees under a separate program, Promise Neighborhood: Keweenaw Bay Indian Community (Award No. S215N220049) for $513,980; Partners for Rural Impact - Lecher, Promise Neighborhood (Award No. S215N220008) for $657,744; University of Evansville (Award No. S215N230018) for $657,744; and Urban Strategies (Award No. S215N230015) for $462,314.

### G. The Impact of the Department's Non-Continuation Decisions on Plaintiffs, Students, Schools, and Teachers

87.     The decision not to continue these grants has harmed Plaintiffs, AFT's and NEA's local unions and members, and the students, families, schools, and communities they serve.

*Brighton Park*

88.     Plaintiff BPNC's Full-Service Community School Initiative delivers wraparound services at eight neighborhood public schools on Chicago's southwest side. Brighton Park and its

29

surrounding communities are among the most impoverished neighborhoods in Chicago, with per capita income around half of the Chicago average and more than twice as many residents lacking a high school diploma.

89.    The largest school BPNC serves is Curie Metro High School, the third-largest public school in Chicago. BPNC's program at Curie is dependent on a $500,000 contract with Chicago Public Schools that is funded by the FSCS award to Metropolitan Family Services noted above. That contract provides the anchor funding for BPNC to provide the staff and infrastructure it needs to deliver programs at Curie. Based on its expectation of continued support over the five-year length of Metropolitan Family Services' grant, BPNC entered into numerous partnerships and contracts to bring services to students and families at Curie.

90.    These services include a wide variety of after-school and summer programming: college mentoring and academic tutoring; STEM and robotics classes; civics and leadership development programs; parent support programs such as GED, financial literacy, and adult nutrition classes; summer employment; and workforce development programs teaching students how to run businesses or obtain professional licenses.

91.    Defendants' decision to non-continue Metropolitan Family Services' grant out of the blue has already caused chaos in BPNC's operations and will result in many if not all of these programs being canceled in the near future. Thus far, BPNC has had to cut 50% of its full-time staff and 100% of its part-time staff/student mentors at Curie. BPNC has also had to end 75% of student and parent programs that were paid through the grant. As a result, BPNC has had to back out of contractual obligations, harming its goodwill and reputation.

92.    This will not only harm BPNC but will cause long-term damage to the students, families, and communities that it serves. Cutting off services for low-income high-school

students in the middle of the school year will cause trauma for at-risk students who already face inordinate challenges, alienating them from their schools and trusted adults. They will lose workforce development opportunities, and their parents will lose assistance developing the skills they need to provide a healthy upbringing and participate in the workforce.

93.     Moreover, the last-minute nature of the non-continuations prevented BPNC and Curie from making alternate plans to find stopgap solutions that could have limited disruption of the services they provide and salvaged some of the work that they had done over the first year and a half of the program. Instead, Defendants' decision sent BPNC and the communities that they serve into avoidable chaos and the exact lack of support that Congress created the FSCS to mitigate.

*Sodus Central School District*

94.     Plaintiff Sodus CSD's Full-Service Community School Initiative expanded the number of and effectiveness of full-service community schools that provide critical services to students and families in Wayne County. With funding from FSCS, Sodus CSD spearheaded the Wayne County Community Schools Expansion and Engagement Project (Wayne County Project), in support of 16 schools across 8 high-need rural school districts.

95.     These services include a wide variety of extracurricular programs for students, such as after-school and summer programs, art and theater programs, and work internship programs. They also include services that ameliorate nonacademic barriers to student achievement through the provision of nutritional support, mental health resources, early childhood screenings, and food.

96.     With FSCS federal funding, Sodus CSD has significantly expanded Wayne County Project's reach. During the 2024-2025 school year, the Get Ready to Grow early

childhood screening program screened 341 children, a 144% increase from the 2022-2023 school year. Infant Toddler Book Clubs reached 648 children through 37 events. Key community partners were also able to grow their impact. Peaceful Schools provided social emotional support to 1,380 students, a 19% increase since the 2022-2023 school year. Pop Up Pantries provided food to 890 children and 1,101 adults per month on average. Finger Lakes Community College provided college courses to 922 Wayne County high schoolers. Optimal Health Coordinators provided nutrition lessons to 852 students, hygiene lessons to 565 students, and dental lessons to 264 students. Approximately 18% of public-school students in Wayne County received individual or group counseling from co-located partners.

97.    Sodus CSD and the Wayne County Project now face a $6 million funding shortfall over the next two years. Without this funding, essential programs will face immediate hardship, threatening the improvements Wayne County Schools has made in increasing student opportunities and reducing chronic absenteeism rates and youth risk factor engagement.

98.    Specifically, Wayne County Community Schools will lose in-school coordinators at Lyons, Newark, and Williamson school districts. These coordinators work alongside school administrators, teachers, counselors, and nurses to provide students with opportunities in experiential learning, career exploration, early learning, and family and community engagement. They are dedicated to building relationships with students, staff, families, organizations, and service providers in the community in furtherance of these objectives.

99.    Wayne County Community Schools has also ended contracts with key partners. For example, it ended its contract with NYS Network with Youth Success to support Wayne M.O.S.T. (Maximizing Out-of-School Time), a program that provides after-school learning and enrichment opportunities for students. It also ended its contract with Literacy Volunteers of

Wayne County, a partner that supported Wayne County's Family and Community Engagement Office (FACE) in providing literacy training for parents, grandparents, and caregivers, among other programs.

100.    Wayne County Community Schools also lost approximately $400,000 in funding for Steady Work, a program that provides youth with employment opportunities, job coaching, and on-the-job training. The loss of funds will increase mentor case management loads and reduce internship hours for students. It will also affect the program's ability to partner with Wayne County's Pre-Trial, a program that specifically engages at-risk and justice-involved youth.

101.    In addition, Wayne County Community Schools has immediately limited its nutrition support services to only one school district, eliminating nutrition services for all but the youngest students.

102.    The non-continuation of funding will harm the substantial progress the Wayne County Project has made in improving student outcomes. Since 2023, 77% of grantee schools report decreases in the proportion of students who are unwilling to ask for help; 77% of grantee schools report lower proportions of students who are food insecure; 85% of grantee schools experienced a decrease in the proportion of students who reported feeling unsafe in school. In addition, chronic absenteeism across Wayne County has decreased from 29.9% to 22.1%. Absenteeism rates for students that receive free or reduced lunch and who were chronically absent decreased from 30.4% to 24.6%.

103.    Sodus CSD expects it will be forced to reduce its staff and staffing support from community partners. During the next school year, five community partner positions cannot continue without a new funding source, impacting over 500 children in two Sodus CSD school

buildings. In addition, Sodus CSD will no longer be able to replace its Grant Administrator, among other positions.

104.    For Sodus CSD, the impact of the non-continuation has also meant that planned increases in services supporting students can no longer happen. For example, Sodus CSD can no longer benefit from planned staffing and service increases from partners. In particular, partners will no longer be able to add four full-time staff to support early childhood work focused on screening and supporting Kindergarten Readiness across the county, three full-time staff to support youth in the juvenile justice systems across the county, and four full-time staff to support capacity building to prepare for long-term sustainability. Planned partnership expansions will also no longer be possible. With its funding, Sodus CSD would have increased support from Syracuse University and Wayne County Pre-Trial. It also would have implemented and bolstered one-on-one career navigation coaching, health and well-being screening, and case management support for students. Such case management programs not only help students achieve their goals and address mental health barriers, but also alleviate burdens on Sodus CSD educators to address nonacademic barriers to student success and engagement.

105.    Staff at Sodus CSD have also had to devote significant time and resources to attempting to close this newfound funding gap. After the sudden non-continuation of its grant, Sodus CSD staff have worked tirelessly to schedule meetings with local private foundations, seek support from regional Board of Cooperative Educational Services (BOCES), communicate with ongoing grant projects to seek flexibility, and implement creative solutions to transition its leadership and ameliorate any disruptions to programming. Altogether, staff at Sodus CSD and other partners of the Wayne Community Schools Projects have devoted more than one hundred

working hours to address the fallout from the loss of funds. The distress and uncertainty caused by the loss of funds has also negatively affected Sodus CSD staff.

*Paterson Public Schools*

106.    Plaintiff Paterson Public Schools received two FSCS grants to support the implementation of full-service community school programming across six PPS schools.

107.    PPS's 2022 FSCS Grant was a five-year award with an annual allocation of approximately $500,000 that served two schools with exceptionally high-need student populations. This grant funded a coordinated, school-embedded continuum of services at Public School 16 (serving Pre-K-8 students) and Alonzo "Tambua" Moody Academy (serving grades 9-12).

108.    PPS's 2023 FSCS Grant was also a five-year award with an annual allocation of approximately $2.3 million. The grant funded a coordinated, school-embedded continuum of services across four PPS schools: Eastside High School, Joseph A. Taub School, International High School, and School No. 10. With FSCS grant funding, these schools provided the students with school-based health clinics, integrated behavioral-health services, extended-day and after-school academic programming, family engagement, and college- and career-readiness supports.

109.    The 2023 grant also funded services at two schools at PPS's partner district, Passaic Public Schools. This grant enabled Passaic Public Schools to establish FSCS-funded programs for the first time, enrolling 231 students in health clinics and reaching 1,323 students through FSCS-funded activities.

110.    Across their six FSCS-funded schools, PPS provided medical, behavioral health, and prevention services to 1,048 students enrolled in school-based health clinics, and PPS engaged 525 students in after-school programming and 3,065 students in other FSCS-funded

activities, such as academic enrichment, tutoring, mentoring, and other extracurricular programming. For example, FSCS funds were used to distribute food at schools, provide resources for teen parents to prevent chronic absenteeism, implement summer bridge programs for kindergarten and sixth and ninth grades, and implement programs for crime prevention and anti-bullying. Funds were also used to provide structured family engagement programming and improve program staffing, coordination, and data tracking to ensure accountability and measurable outcomes. For example, PPS used FSCS funds to provide workshops to teach parents basic skills, technology education, and parenting techniques, and it used funds to expand mindfulness, professional development programming, and advanced course options for teachers.

111.    Student participation in these activities was associated with measurable academic and attendance gains, including reduced chronic absenteeism, improved academic performance, increased likelihood of earning passing grades, and reduced suspensions. At Joseph A. Taub School, for example, students whose families participated in FSCS events were 16% less likely to be chronically absent, missed six fewer days on average, earned 18% higher math and ELA grades, and were 7% less likely to receive a suspension. At Alonzo T. Moody Academy, students enrolled in the health center were 22% less likely to be chronically absent and achieved 11% higher math grades. At Eastside High School, students enrolled in the health center earned 17% higher math grades and 11% higher ELA grades, and were 6% less likely to receive a suspension. At both School No. 10 and International High School, students participating in FSCS after-school and mentoring programs were 9% less likely to be chronically absent, missed three fewer days on average, and were 5 to 6% less likely to receive a suspension, as compared to non-participants.

112.    PPS now faces a $7.9 million shortfall over the next three years. As a result of the non-continuation of funding, PPS plans to reduce or eliminate after-school and mentoring slots for students, reduce student access to school-based health centers, and scale back parent outreach and family engagement programming. PPS will also be forced to reduce the number of mentors available for students, as well as staffing for after-school programming. In particular, PPS expects to lose two of its employees who serve as site coordinators at Alonzo T. Moody Academy and Eastside High School.

113.    The loss of funding will abruptly withdraw essential services, directly harm hundreds of Paterson students and their families, and reverse the demonstrated progress made in attendance, academic achievement, and suspension reduction.

*Prichard Committee*

114.    Plaintiff Prichard Committee relied on grant funding from FSCS as the sole source of funding for its Kentucky Community Schools Initiative. Under that initiative, Prichard provides technical assistance and other support to schools across Kentucky. The initiative coordinates health, social services, education, and other services; empowers families to become more involved in their children's education; and uses evidence-backed practices to improve efficiency and drive positive, measurable outcomes. Forty schools across 20 districts in the Commonwealth participate in the initiative.

115.    Through the Kentucky Community Schools Initiative, FSCS funding has been used to create the infrastructure for assessing and fulfilling local needs in individual school districts. The grant supports the employment and training of a Community Schools District Director in each school district who oversees the implementation of the initiative. These directors work collaboratively with families, community members, and educators to decide how best to

use funds to remove non-academic barriers and to extend learning beyond the classroom and school year. School districts have, for instance, used those funds to pay for after-school clubs, transportation, health care, tutoring, programs to reduce chronic absenteeism, and other critical services.

116.    With FSCS support, Prichard's Kentucky Community Schools Initiative was working. Nearly all participating schools—34 out of 36 reporting—showed lower levels of chronic absenteeism during the 2024–2025 school year than in the prior year. Chronic absenteeism has, on average, dropped by 8.24 percentage points year-over-year. Participating schools reported major gains in academic achievement, too: Assessments show average gains of 10.79% in math and 9.24% in reading in 2024–2025 compared to 2023–2024. The initiative has also succeeded in connecting schools to partners in the community, with participating sites experiencing a 46% increase in community partnerships.

117.    The sudden non-continuation of the Prichard Committee's FSCS grant in the middle of the school year has destabilized proven student supports in 20 school districts in Kentucky, harming students and schools. Because the grant was the only source of funding for the Kentucky Community Schools Initiative, programs funded by the initiative either found another source of funding—potentially diverting funds away from other educational priorities— or else were forced to terminate. Even programs that managed to secure funding through the end of the 2025–26 school year are at risk of not continuing in future years. Some school districts will be forced to eliminate critical services and positions, including their Community Schools District Director. At least six district directors have already been reassigned to other roles—such as "Assistant Director of Preschool"—that may not support community school work.

118.    The non-continuation of Prichard's grant in the middle of the five-year grant period has disrupted its long-term plan to build sustainable community schools in Kentucky. Schools, families, and communities were planning on funding being available over that period, and the non-continuation of the grant midstream has halted the momentum that Prichard and the Kentucky Community Schools Initiative were building. Local stakeholders have expressed confusion about why beneficial services funded by the grant have been eliminated. Without FSCS funding, the responsibility of removing non-academic barriers will fall on overextended staff—fragmenting the impact of community schools and jeopardizing the quantifiable progress that the initiative has achieved.

119.    The non-continuation of the Prichard Committee's FSCS grant has also caused concrete harm to Prichard itself. Without FSCS funds, Prichard has been forced to lay off nine staff members. Prichard's remaining staff have also had to devote significant hours to advising school districts on how to maintain progress in community schools without FSCS funding, identifying new sources of revenue, and other steps to compensate for the loss of FSCS funds.

*Paterson Education Fund*

120.    Beginning in 2023, plaintiff PEF has served as a contracted lead community partner to the Paterson Public Schools (PPS) at Alonzo "Tambua" Moody Academy (ATMA), supporting PPS's implementation of the FSCS Initiative by providing technical assistance and managing funds for parent and student initiatives at ATMA.

121.    Moody Academy is an alternative high school for students who do not thrive in a traditional setting. Many of the students are court-referred, some are recovering credits for failed or missed courses, and others choose the school for their current needs. Currently, there are 150 students at Moody Academy.

122.     PEF receives a $10,000-per-year stipend from PPS that is funded by FSCS. With these funds, PEF has provided technical assistance to Moody Academy in support of the school's health clinic, school-based enrichment, and after-school programming for students and families. For example, PEF has designed and implemented professional learning workshops to help ATMA school staff learn evidence-based practices and understand adverse childhood experiences, trauma-informed care, healing-centered engagement, relationship-building, restorative practices, and mindfulness. In addition, PEF has administered and overseen funding for student- and family-centered activities that support family engagement and capacity building, including cultural celebrations, culinary arts programming, financial planning workshops, FAFSA completion support, and skill-building activities.

123.     Collectively, these services have strengthened school climate, deepened family engagement, supported student well-being, and improved student outcomes, in alignment with the FSCS framework. During the most recent school year, more than 96% of students at ATMA participated in at least one FSCS-supported activity and 58.3% of ATMA students participated in the school-based health center. Students enrolled in the ATMA health center were substantially less likely to be chronically absent than their non-enrolled peers and achieved higher average math grades. In addition, family engagement and student participation in FSCS activities at ATMA were associated with higher grades and improved academic indicators.

124.     As a consequence of Defendants' decision to not continue PPS's grant, PEF will no longer be able to provide Moody Academy with services intended to remove non-academic barriers to learning, and these evidence-based programs will cease. This loss of funds will not only harm PEF, but it will also harm Moody Academy students and families. Without PEF's coordinated programming, outreach, and supported engagement activities, students will no

longer be able to access essential health, social-emotional, and community services, and parents will no longer have access to structured opportunities for involvement in their children's education. In turn, academic outcomes will suffer.

125.    Moreover, the abrupt non-continuation of funding inflicted serious distress on the ATMA community. Three days before the Christmas break, PEF was forced to inform school leadership, families, and community partners that FSCS-supported activities would be non-continued due to the loss of funding. This abrupt withdrawal disrupted ongoing parent and student initiatives and undermined the community's trust and confidence in ATMA.

*Educator Unions*

126.    AFT, NEA, and their affiliates have also been harmed by the Department of Education's non-continuation determinations. Together, AFT and NEA have affiliates in eight states affected by the Department's actions: California, the District of Columbia, Illinois, Kentucky, Maryland, North Carolina, New York, and New Jersey.

*California*

127.    In California, the United Way of California Capital Region was awarded a five-year FSCS grant (Prime Award No. S215J220203) in 2022 for a total of $2,488,988 to implement Full-Service Community Schools within the Washington Unified School District.

128.    NEA has 425 members within the Washington Unified School District, including members at River City High School and Riverbank Elementary School.

129.    Another California FSCS recipient, Oakland Promise, was awarded a five-year FSCS grant (Prime Award No. S215J230086) in 2023 for a total of $2,500,000 to implement Full-Service Community Schools in East Oakland.

130.    NEA has members in the Oakland Unified School District, where East Oakland Pride Elementary, Elmhurst United Middle School, and Castlemont High School were benefiting from the non-continued FSCS grant to Oakland Promise.

131.    In Washington Unified School District, the FSCS grant provided after-school programming and extracurricular activities, as well as academic, tutoring, and mental health support. These programs were implemented after students, parents, and teachers were surveyed about the services students needed to be successful in school. Because teachers and staff recommended that the funding be used to ensure that students' basic needs were met, Washington Unified set up community partnerships to provide students with access to vaccines, hair cuts, eye exams, dental cleanings, and food banks, among other essential services. At River City High School, the funds supported a food pantry that fed about 300 families per month. Rotating food banks set up at the other community schools in the district fed 200 families per week.

132.    The non-continuation of funds has resulted in the termination of the United Way Capital Region's implementation of the Full-Service Community School program in Washington Unified School District in West Sacramento. As a result, essential student support services will be cut.

133.    At River City High School, for example, the school's food bank as well as the rotating food banks at other schools throughout the district will be forced to shut down, resulting in 500 families losing access to food each month. River City High School also will not be able to stock its supply closet, which provides basic essentials like school supplies, clothing, shampoo, conditioner, and menstrual products to students in need. In addition to cutting off student access to basic necessities, River City High School will also no longer be able to afford grant-funded

extracurricular opportunities and support for its students. The school will no longer be able to afford educational field trips and it will not be able to pay its peer tutors, who provide tutoring services to the local elementary school. The school will also lose mental health support for its students as the school will no longer be able to afford its contracts with the local colleges in the area that have provided mental health services to River City High students.

*District of Columbia*

134.    In the District of Columbia, D.C. Public Schools (DCPS) were awarded two five-year FSCS grants, one in 2022 (Prime Award No. S215J220100), and another in 2023 (Prime Award No. S215J230148). Each grant provided close to $500,000 per year, together amounting to over $4.9 million over five years.

135.    AFT affiliate Washington Teachers' Union (WTU) has approximately 4,690 members, including members working in schools that were receiving benefits from the non-continued FSCS grants.

136.    DCPS used its FSCS grants to fund four schools through its Connected Schools Initiative. With FSCS funding, those schools have become resource hubs for their communities, helping to connect students and families with health services, housing, and more. FSCS funds were also used to address food security, including by connecting families with cooking classes and aligning those classes with food pantry offerings.

137.    The FSCS funds have contributed to across-the-board improvements in educational outcomes for D.C. students. For example, of students receiving intensive case management through community school partnerships, 78% improved their academics and 97% improved their behavior. Sixty-five percent of case-managed students improved their attendance

43

over a five-year period, and for students enrolled in schools utilizing home visits—a core community engagement strategy—students missed an average of 24% fewer days of school.

138.    The non-continuation of funds has threatened the progress DCPS had made with the FSCS program and put FSCS-funded student support and family engagement programs at risk as some programs may no longer be able to function without FSCS funding.

*Illinois*

139.    In Illinois, Metropolitan Family Services was awarded two five-year state-scaling FSCS grants. Each grant provided $9,420,400 per year, together amounting to over $94.2 million in over five years (Prime Award No. S215J230149, Prime Award No. S215J230147).

140.    AFT and NEA have members across multiple districts and schools that benefited from the Metropolitan Family Services' award. For example, AFT has members in the Chicago Public School System, the Quincy School District #172, and the East St. Louis School District #189.

141.    NEA, through its local affiliate, Unit Five Education Association (Unit 5 EA), represents approximately 1,000 certified educators in the McLean County Unit Five School District (Unit 5) in Illinois. The non-continuation of the Metropolitan Family Services' FSCS grant may result in the loss of $3 million in funding to Unit 5 School District. NEA represents an additional 154 certified educators in Herrin Community Unit School District No. 4, through its local affiliate in rural southern Illinois, Herrin Education Association (HEA).

142.    Additionally, the University Center of Lake County received a five-year FSCS grant (Prime Award No. S215J230215) in 2023 for a total of $13,866,750.

143.    The Lake County Federation of Teachers, an AFT affiliate, has 5,501 members—which includes members at schools that were receiving benefits from the non-continued Lake County, Illinois FSCS grant.

144.    With the two Metropolitan Family Services' grants, Illinois was able to provide full-service community school services to approximately 19,000 students and families statewide. FSCS funds were used to hire essential professionals to provide needed support to students. For example, the grant funded Community School Coordinators, on-site staff members, to manage the integration of services and local partnerships. The grant also funded mental health professionals, including school-based counselors and social workers who provided direct mental health support to students; after-school program staff, including tutors, mentors, and program leaders for extracurricular, academic enrichment, and career training programs; case management and outreach workers who are responsible for connecting families with basic needs like food assistance and housing; specialized instructional personnel staff involved in "pipeline services," such as ACT prep tutors and providers for student employment opportunities; and early childhood and support staff, including teaching assistants and personnel managing transitions for younger students.

145.    The University Center of Lake County's FSCS grant program, El Centro, connects University Center teaching students and staff and community service providers from 14 area universities with five local schools from the Diamond Lake School District #76 and the North Chicago School District #187 in Lake County, Illinois, to provide services and programming to nearly 1,700 K-12 students, including many from families associated with the nearby Naval training center. Programming includes: after-school services with tutoring and academic support; enrichment opportunities (culinary, soccer, clubs, ultimate ninjas, and

robotics); field trips (apple orchards and agricultural trips for urban students, experiential learning opportunities); summer school; and speakers for in- and after-school community events. Services include family and community engagement assistance, and social, health, nutrition, and mental health services and support. The grant program also includes professional development opportunities for teachers centered on addressing different learning skills and development of effective teaching plans.

146.    The community schools model has directly contributed to significant improvements in education outcomes in Illinois. Since 2023, Illinois reported a 14.8% decrease in the number of students missing 10% or more of the school year as of 2025. And the state reached a record 89.3% of ninth graders on track to graduate in 2025, an 8.6% increase since 2021, with significant gains among English learners (3.5%) and Black students (2.3%). National and regional data for the FSCS model also indicates math score gains equivalent to 43 additional days of learning and English Language Arts gains equivalent to 36 days.

147.    The non-continuation of funds will cause dramatic and immediate harm to this significant progress being made in the state's schools. The Lake County grant has resulted in El Centro staff terminations and cuts to many of the programs and services provided directly by University Center and its community partners. The Metropolitan Family Services' non-continuation threatens thirty-two schools across the State in rural, suburban, and urban districts, including schools employing AFT and NEA members. These schools are at risk of losing funding that could force the suspension of programming and the potential layoff of essential professionals statewide. In addition, across these Illinois districts, the most immediate losses may include after-school tutoring, high school clubs, and K-8 enrichment programs, which parents rely on to remain in the workforce.

*Kentucky*

148.    In Kentucky, NEA has over 7,000 members employed in districts where some schools were benefiting from the Prichard Committee grant, including in Jefferson County Public Schools, Owensboro Independent School District, Rowan County Public Schools, and Fayette County Public Schools.

149.    Through the Kentucky Community Schools Initiative in Fayette County, the FSCS grant supported two high-poverty schools with large populations of high-need students. The grant paid for after-school programming, enrichment activities, special education, professional development, and other needed services—services that were not being funded prior to the grant award.

150.    FSCS funds have been directly responsible for substantial, across the board improvements to educational outcomes. The benefits of the FSCS programs in Kentucky are described above. *Supra* at ¶¶ 114-116.

151.    As soon as the Department announced it was non-continuing the FSCS grant, projects funded by FSCS at the Kentucky Community Schools Initiative in Fayette County came to an immediate halt. Grant-funded efforts to increase fathers' engagement in schools, buy adaptive equipment for students with special needs, and pay for snacks for children in after-school programs stopped. The district also had to end contracts with third parties that were financed by the grant, like contracts for after-school programming and enrichment.

*Maryland*

152.    Maryland, through the University of Maryland, Baltimore, received a FSCS five-year capacity-building and development grant award (Prime Award No. S215J220024) in 2022 for $1,924,982. Maryland's award was continued by the Department in 2023 and 2024.

153.    AFT affiliate AFT-Maryland represents over 18,000 members in the state who work as K-12 teachers, paraprofessionals and other school-related personnel, higher education faculty and staff, state and local government employees, and nurses and other healthcare professionals. Nearly all of AFT's Maryland members working in K-12 schools (both as teachers and as paraprofessionals and school-related personnel) are members of the Baltimore Teachers Union, which has a membership of over 10,500.

154.    Maryland's FSCS grant supports community school projects at two public high schools in Baltimore: Renaissance Academy and Augusta Fells Savage School of Visual Arts. Funding has been used to transform these schools into community hubs—connecting schools, service organizations, and families. The grant has funded snacks and meals for students and families, emergency housing stabilization, and tutoring for struggling students.

155.    With FSCS funding, the two schools in Maryland's program have experienced striking success. Attendance is up at both schools. More than 700 students have received integrated academic enrichment, attendance interventions, and support for college and career readiness. At Augusta Fells Savage School, 74% of families say that the school is preparing students academically, and 79% believe the school is a supportive and safe learning environment.

156.    In Maryland, the elimination of grant funding has harmed students and families in Baltimore. As soon as the Department non-continued the grant, students lost access to critical services needed for academic and non-academic success—supports like coordinated food distribution and short-term emergency assistance. Moreover, Maryland was counting on continued funding as part of a long-term plan, and the abrupt non-continuation of the grant disrupted years of progress in infrastructure- and partnership-building. Maryland projects that the

loss of grant funding will "revers[e]" the "progress that the federal investment was designed to achieve," including gains in attendance and college and career readiness.[2] The grant non-continuation will disproportionately affect disadvantaged students and families, including those facing housing and food insecurity.

*North Carolina*

157.    The North Carolina Community School Coalition (NCCSC), a network of public-school districts and local and statewide partners in North Carolina, received a FSCS five-year state-scaling grant award (Prime Award No. S215J230049) in 2023 for $49,837,443. NCCSC's award was continued by the Department in 2024.

158.    AFT represents 210 members across districts impacted by the non-continuation of NCCSC's FSCS grant, including 13 members at the following participating community schools: Asheville City School, Enka Middle School, North Buncombe Middle School, WB Wicker Elementary School, Central Elementary School, Salemburg Elementary School, and Vance County High School.

159.    NCCSC's grant supports approximately 23,000 students in mostly rural and low-income communities. Many of the affected schools are in counties impacted by Hurricane Helene. The grants support students in rural and under-resourced areas by expanding learning opportunities, addressing issues that affect student development and success, strengthening and retaining effective elementary and middle school educators, and improving student achievement. The funds also go to early childhood education and literacy initiatives, family programming, and college and career exposure opportunities, including college tours and presentations from trade

---

[2] *State of MD et al. v. U.S. Dep't of Educ. et al.*, Case No. 25-cv-04298 (D.Md.), Complaint ¶ 76, Dkt. No. 1.

programs. NCCSC had been showing results. For example, one participating elementary school in Elizabeth City, increased its school performance grade from an F to a C in just two years.

160.    The non-continuation of FSCS funding threatens the progress and opportunities achieved by the NCCSC. After the non-continuation, several Superintendents released public statements about the effect. The Superintendent for Hyde County Schools noted that the program had effected "real improvements in student attendance and readiness to learn," and that "[w]hen funding like this is canceled, it hits rural communities hardest . . . pull[ing] resources from communities that already have the fewest options and the greatest needs."[3] Similarly, the Superintendent for Sampson County Schools stated that they "had seen firsthand how this work strengthens student outcomes by addressing barriers beyond the classroom," and that the "abrupt cancellation of this funding disrupts proven, student-centered systems that were already making a difference for our schools and families."[4]

*New York*

161.    In New York, NEA and AFT jointly have over 1,000 members working in districts where some schools were benefiting from the FSCS Wayne County Community Schools program, including Sodus CSD, Lyons CSD, Marion CSD, Red Creek CSD, Newark CSD, Clyde-Savannah CSD, Palmyra Macedon CSD, and Williamson CSD.

162.    FSCS funds have been directly responsible for substantial, across the board improvements to educational outcomes. The benefits of the FSCS programs in New York are described above. *Supra* at ¶¶ 94-96.

*New Jersey*

---

[3] Nazneen Ahmed, *Attorney General Jeff Jackson Sues to Stop Unlawful Cut of Nearly $50 Million from Rural North Carolina Schools,* NCDOJ (Dec. 31, 2025), https://perma.cc/8C55-2P97.
[4] *Id.*

163.    In New Jersey, NEA has members in schools located in Paterson and Passaic that were benefiting from FSCS funds. For example, over 500 NEA members across Paterson Public Schools work at Public School No. 10, Joseph A. Taub School, Eastside High School, International High School, Alonzo "Tambua" Moody Academy, and Public School No. 16, while an additional 200 NEA members in the Passaic Public Schools work at Dr. Martin Luther King, Jr. School No. 6 and Passaic High School.

164.    FSCS funds have been directly responsible for substantial, widespread improvements to educational outcomes. The benefits of the FSCS programs in New Jersey are described above. *Supra* at ¶¶ 107-111.

*Effect of the Non-Continuation Determinations on AFT and NEA Members*

165.    Across the board, the loss of FSCS funds will harm students and undermine education outcomes, undoing the significant progress made across the states, as described above, on student health and well-being, attendance and retention, academic and behavioral gains, family and community connectivity, and infrastructure and staffing. More concretely, students will not be able to learn and perform in school if they are hungry or don't have access to basic necessities like menstrual hygiene products. As such, test scores will decrease, there will be lower graduation rates, and absenteeism will go up. Meanwhile, without mental health support, students' mental health will be impacted and there will be an increase in negative student behavior as students act out for help.

166.    In turn, the loss of support from FSCS programming will harm AFT and NEA members. AFT and NEA member workload will increase significantly. The loss of community schools site coordinators and other community schools staff who provide essential support to students and families means that unmet student and family needs will likely surface in the

classroom and negatively impact student attendance, behavior, and academic performance. In turn, educators will face increased workload and stress as they will be asked to address challenges beyond the classroom, reducing their capacity to focus on teaching and student learning. This will be especially the case as AFT and NEA members in schools affected by FSCS non-continuations will lose access to community schools staff that typically provide resources, guidance, and problem-solving assistance.

167.    For example, one NEA member in River City High, where the community schools site coordinator will be cut, will have to spend extra time making up for the lack of staff support by conducting individual outreach to her students, researching potential resources, and ultimately connecting the students with these resources, if they exist at all. This NEA member has already had to do more student outreach in response to absenteeism since the noncontinuation.

168.    Similarly, an AFT member working as a first-grade teacher at Dewitt Clinton Elementary School in Chicago, expects that the end of FSCS programming may lead to the loss of three full-time positions, including a coordinator position held by another AFT member, resulting in less support for her students and an increase in her workload to compensate.

169.    Administrative work will also increase for AFT and NEA members. One dual AFT and NEA member, who serves as the Director of Family and Community Engagement for Fayette County Public Schools in Kentucky, has had to devote time and resources to fill the gap left by the absence of grant funding at the two affected schools in her district. That in turn has meant she is spending less time and resources on other schools in the district.

170.    Additional work will also result for teachers because the cutting of community activities and enrichment programs for students will decrease student focus and academic

engagement. The Herrin Education Association, for example, expects its members will be forced to take on more work to support and engage their students.

171.    Teachers will also be forced to spend their own personal funds to make up for the lack of FSCS funding. One NEA member from California, for example, has personally had to buy more menstrual products and snacks, such as granola bars, for her students to make up for the lack of food banks and community supply closets. The dual AFT and NEA member in Kentucky has also had to use her own personal resources to compensate for the lack of FSCS funding, and she knows of other AFT and NEA members who have had to do the same.

172.    As student performance and outcomes decline due to the loss of support from the FSCS program, the job of educators becomes more difficult and teacher burnout rates increase. Already, the news of the loss of funds has caused teachers great distress because they understand what the loss means for their students. One NEA member in California, a department chair whose district was benefiting from the grant to United Way of California Capital Region, has seen an increase in workload as she has taken on extra work to support her teachers struggling with their mental health as a result of the cuts.

173.    Moreover, bargaining unit members of AFT and NEA will lose pay as a result of the FSCS non-continuations. Some will lose their positions entirely.

174.    For example, two bargaining unit members of AFT Local 809 are employed by the Quincy School District #172 in Illinois as community school coordinators. These positions are fully funded by FSCS, and the members may lose their jobs as a result of the non-continuation of the grant. In addition, dozens of other staff at the junior and senior high schools in the district are paid by the FSCS grant—typically between 10% to 25% of their salary to support the Coordinators or run programming at the school level, such as tutoring, credit

recovery, entrepreneurship, and career and technical education. Two other staff receive grant funding to drive buses after school or in the summertime to support the programming. When these programs end, these members will be laid off or have their pay reduced.

175.    Similarly, members of AFT Local 1220 who work at East St. Louis School District #189 in East St. Louis, Illinois may also be laid off or have their pay reduced when FSCS programs end. One bargaining unit member employed by the district is 100% funded by the grant and may lose their job as a result of the FSCS non-continuation. Sixty other staff at the elementary schools are partially paid by this grant—typically between 10% to 25% of their salary to run programming at the school level.

176.    After the non-continuation of the United Way of California Capital Region FSCS grant, the Washington Unified School District was immediately forced to cut a bargaining-unit restorative justice coordinator position and reassign the NEA member in that role to a different position midway through the school year.

177.    Finally, NEA and AFT members will likely lose professional development support. For example, at the Unit 5 School District in Illinois, the FSCS grant allowed the district to provide NEA members with trauma-informed professional development opportunities, which have better equipped staff to support students in need. Without FSCS funding, these NEA members will lose out on beneficial training opportunities.

* * * * *

178.    Defendants' abrupt non-continuation decisions have destabilized entire ecosystems of support that Congress designed the FSCS program to strengthen. Students— particularly those in high-poverty communities—have lost access to critical academic, social-emotional, health, and family-engagement services precisely when those supports were

producing measurable gains in attendance, achievement, safety, and well-being. Families who relied on school-based food distribution, health clinics, and mentoring programs now confront renewed barriers to stability and participation in their children's education. Educators, left to absorb the fallout, face increased workloads, diminished support staff, and the erosion of collaborative, community-school structures that had improved classroom conditions and student engagement.

179.    For grantees and their community partners, Defendants' decision severed programs midstream—derailing multi-year plans, forcing layoffs, unraveling longstanding partnerships, and extinguishing the momentum that was generating sustained improvements across school communities. The consequences are not temporary disruptions but lasting setbacks that undermine the very purposes Congress mandated the Department to advance.

180.    Therefore, Plaintiffs seek to vacate Defendants' unlawful policy change and non-continuation decisions so that their FSCS programs, or the programs from which they were benefiting, are eligible for the FSCS funding that Congress has already appropriated for FY2026. Plaintiffs seek declaratory and injunctive relief to prevent unlawful application of Defendants' new policies to any forthcoming grant continuation determinations. Plaintiffs also seek to vindicate the First Amendment rights of grantees and their beneficiaries whose FSCS grants were unconstitutionally non-continued on the basis of rights protected by the First Amendment, and request all redress appropriate for those constitutional injuries.

## CAUSES OF ACTION

### Count I (All Plaintiffs)
### Violation of the Administrative Procedure Act—Arbitrary and Capricious
### *Policy Change*

181.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

182.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

183.    The decision to change funding priorities in the middle of a multi-year performance period is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

184.    Defendants' decision to change funding priorities in the middle of a multi-year performance period is arbitrary and capricious. The Department adopted the prior priorities through notice-and-comment rulemaking in 2022, whereas the new priorities appeared in non-continuation letters that state the Department has "determined that the grant . . . provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds."

185.    Defendants have failed to adequately justify their action; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position. For instance, Defendants failed to consider the serious reliance interests of grantees and other beneficiaries of the grants, including sub-grantees, educators, and the children, families, and communities that benefit from the grants.

### Count II (All Plaintiffs)
### Violation of the Administrative Procedure Act—Arbitrary and Capricious
### *Non-Continuation Decisions*

186.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

187.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

188.    The decision to not continue grants in the middle of a multi-year performance period is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

189.    Defendants' decision not to continue grants in the middle of a multi-year performance period is arbitrary and capricious.

190.    Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position. For instance, Defendants failed to consider the serious reliance interests of the grantees and other beneficiaries of the grants, including sub-grantees, educators, and the children, families, and communities that benefit from the grants.

191.    Moreover, Defendants' decision to deny non-continued grantees' requests for reconsideration including the requests for reconsideration of Plaintiffs and the prime grantees whose programs benefitted Plaintiffs BPNC, PEF, AFT, and NEA, evinced the arbitrary and capricious nature of the non-continuation decision. Defendants gave grantees only seven days to appeal the non-continuation determination, leaving the Department fewer than 10 business days to review all of the appeals before the funding was no longer available for obligation.

192.    In that timeframe, the Department did not engage in reasoned decisionmaking. Rather than substantively consider the information provided by grantees, reports on their performance, and other relevant information, the Department simply cited quotations from their original applications without regard to whether the information reflected the actual activities of the grant program.

193.    Likewise, Defendants' December 31, 2025 re-obligations show that the decision to non-continue grants was arbitrary and capricious. Defendants did not consider multiple important aspects of re-obligating funds, including determining grantee need, ability to expend additional funds, or how such funds would be used to support program goals. They also failed to consider reasonable alternatives, including continuing the non-continued grants.

194.    Had Defendants given Plaintiffs, or the prime grantees whose programs benefitted Plaintiffs BPNC, PEF, AFT, and NEA, appropriate consideration for continuation, they would have been eligible for these funds.

### Count III (All Plaintiffs)
### Violation of the Administrative Procedure Act—Contrary to Law
### *Non-Continuation Decision*

195.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

196.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

197.    The decisions to change funding priorities and to not continue grants in the middle of a multi-year performance period are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

198.    Defendants may only consider "relevant information regarding grantee performance" in deciding whether to make a continuation award. 34 C.F.R. § 75.253(b). Regulations issued after notice-and-comment rulemaking have the force and effect of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 & n.31 (1979). Defendants considered information in addition to grantee performance, so the non-continuation notices are contrary to law.

199.     The Department is only authorized to base continuation award decisions "on the submission of [performance] reports as specified by the Secretary." Direct Grant Programs, 59 Fed. Reg. at 30259 ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application."). And new priorities, which may only be used to evaluate *new*, rather than continuing, grant applications, must be promulgated through notice and comment rulemaking. *See* 20 U.S.C. § 1232; *compare* 34 C.F.R. § 75.100(a) ("Each fiscal year the Secretary publishes application notices . . . for new grants[.]"), *with id.* § 75.118. Defendants acted contrary to law when they relied on new priorities to decide not to issue continuation awards.

200.     Defendants' conduct is contrary to law, and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

## Count IV (All Plaintiffs)
### Violation of the Administrative Procedure Act—Without Observance of Procedure Required By Law
### *Non-Continuation Decision (Applying New Priorities)*

201.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

202.     The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

203.      "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v.*

*Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

204.    Under GEPA, Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grant competitions. *See* 20 U.S.C. § 1232(a)(2), (d).

205.    Consistent with their statutory obligations, Defendants underwent the notice-and-comment rulemaking process when they changed the FSCS priorities in 2022. *See* Proposed Priorities, Requirements, Definitions, and Selection Criteria - Full-Service Community Schools Program, 87 Fed. Reg. 1709 (Jan. 12, 2022); Final Priorities, Requirements, Definitions, and Selection Criteria – Full-Service Community Schools, 87 Fed. Reg. 41675 (July 13, 2022).

206.    Defendants cannot non-continue multi-year grants based on changed priorities, but even if they could, they may not do so without following the proper procedures.

207.    Without having proceeded through notice-and-comment procedures, Defendants' adoption and implementation of the changed priorities are procedurally invalid under the APA, including Defendants' decisions not to continue the grants.

208.    Defendants' decisions to change funding priorities and to not continue grants has caused and is causing substantial injury, including immediate and irreparable harm.

### Count V (Prichard Committee, BPNC, AFT, and NEA)
### Violation of the First Amendment–Viewpoint Discrimination
### *Non-Continuation Decision*

209.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

210.    Defendants violated the First Amendment in issuing non-continuation decisions based on disfavor for aspects of grantees' missions related to diversity, equity, and inclusion.

211.    The government may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

212.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The government may not "use [its] power . . . to punish or suppress disfavored expression." *Id.* at 188.

213.    Relatedly, "the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quotations omitted).

214.    Defendants' non-continuation of Plaintiffs' grants and those of the grantees from which Plaintiffs benefited constitutes adverse action that removes an otherwise available government benefit.

215.    Defendants took this adverse action because of the viewpoints expressed by certain grantees, including through their missions, public statements, advocacy, and expressive commitments to equity, racial justice, inclusion, and related values.

216.    For multiple grantees, such as Prichard Committee, Defendants justified the non-continuation decisions by expressly relying on the organizations' expressive missions and activities related to diversity and equity, rather than any alleged performance deficiencies or misuse of federal funds.

217.    Defendants' justifications were not limited to the scope of the federally funded programs but instead targeted grantees' speech and expression outside the funded activities. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013).

218.    Even where Defendants purported to rely on activities conducted with federal funds, Defendants impermissibly leveraged funding decisions to suppress disfavored viewpoints, which the First Amendment forbids. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).

219.    The government's viewpoint discrimination is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

220.    Defendants did not demonstrate in the non-continuation decisions, and cannot demonstrate now, that their actions were narrowly tailored to serve a compelling governmental interest.

221.    Beneficiary plaintiffs have third-party standing to assert the First Amendment rights of grantees. Beneficiary plaintiffs maintain close, ongoing, and mutually dependent relationships with grantees through subawards and collaborative programmatic efforts that are central to their shared expressive missions. Additionally, grantees face substantial hindrances to fully vindicate their First Amendment rights, including the chilling effect created by Defendants' funding decisions. *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004).

222.    Third-party standing is particularly appropriate in the First Amendment context, where the risk that constitutional violations will go unchallenged would result in a loss not only to the affected speakers, but to society as a whole. *See Kowalski*, 543 U.S. at 129-30.

223.    As a direct and proximate result of Defendants' unlawful viewpoint discrimination, Plaintiffs are suffering concrete injury and irreparable harm.

**Count VI (Prichard Committee, BPNC, and PEF)**
**Violation of the First Amendment–Freedom of Expressive Association**
*Non-Continuation Decision*

224.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

225.    The First Amendment protects the right to associate with others to pursue "political, social, economic, educational, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

226.    The freedom of expressive association protects not only membership decisions, but also an organization's ability to collaborate, partner, and jointly pursue shared expressive goals without government interference or penalty. *Rumsfeld v. FAIR*, 547 U.S. 47, 69 (2006).

227.    Government action that withholds benefits or imposes penalties because of an organization's associations or shared expressive commitments violates the First Amendment. *Healy v. James*, 408 U.S. 169, 187 (1972).

228.    The Prichard Committee, BPNC, and PEF are expressive organizations whose missions, programming, and collaborative activities reflect shared commitments to equity, racial justice, inclusion, and community-based service. For example, Brighton Park Neighborhood Council is an "intergenerational community-based organization dedicated to equity and racial justice."

229.    In furtherance of their expressive missions, BPNC and PEF associated with and worked alongside grantees through subawards, partnerships, advisory roles, and collaborative programmatic efforts.

230.    Defendants were aware of these associations and the shared expressive commitments underlying them.

231.    Defendants' non-continuation of grants penalized grantees, including the Prichard Committee, for their viewpoint. The non-continuations also foreseeably and intentionally burdened the expressive associational rights of BPNC and PEF which relied on their relationships with grantees to advance their own missions.

232.    The loss of funding disrupted existing partnerships, prevented ongoing and planned collaborative activities, and forced the Prichard Committee, BPNC, and PEF to curtail expressive programs and associations central to their organizational identities.

233.    As a direct and proximate result of Defendants' infringement of Plaintiffs' First Amendment rights to expressive association, Plaintiffs are suffering concrete injury and irreparable harm.

## PRAYER FOR RELIEF

234.    Declare that Defendants' decisions to change funding priorities was unlawful, in violation of the Administrative Procedure Act (Count I);

235.    Declare that Defendants' non-continuation decisions and actions to effectuate them were unlawful in violation of the Administrative Procedure Act (Counts II-IV);

236.    Declare that Defendants' non-continuation decisions were unlawful, in violation of the First Amendment (Counts V and VI);

237.    Stay Defendants' decisions to change funding priorities and to non-continue FSCS grants, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings (Counts I-IV);

238.    Vacate, pursuant to 5 U.S.C. § 706(2), the Defendants' non-continuation decisions and actions to effectuate them (Counts II-IV);

239.    Preliminarily and permanently enjoin application of the changed funding priorities to FSCS grantees from the FY2022 and FY2023 competitions and non-continuations of Plaintiffs' FSCS grants (Counts I-IV);

240.    Preliminarily and permanently enjoin Defendants to restore non-continued FSCS grants for Plaintiffs and third-parties whose First Amendment rights were violated (Counts V and VI);

241.    Preliminarily and permanently enjoin Defendants to restore non-continued grantees' eligibility for future continuations of their FSCS grants for Plaintiffs whose First Amendment rights were violated (Counts V and VI);

242.    Award Plaintiffs reasonable attorneys' fees and costs; and

243.    Grant such other and further relief as the Court may deem just and proper.

February 27, 2026                    Respectfully submitted,

/s/ *Kali Schellenberg*
Kali Schellenberg (DC Bar No. 198422)
Victoria S. Nugent (DC Bar No. 470800)
Robin F. Thurston (DC Bar No. 1531399)
Louis Katz (DC Bar No. 90003861)
Laura Aguilar (DC Bar No. 90030659)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kschellenberg@democracyforward.org
vnugent@democracyforward.org
rthurston@democracyforward.org
lkatz@democracyforward.org
laguilar@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (DC Bar No. 1016621)
Lynn D. Eisenberg (DC Bar No. 1017511)
Brian C. Rosen-Shaud (DC Bar No. 90042065)[+]
Nina C. Cahill (DC Bar No. 1735989)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com

[+] *Pro hac vice* motion forthcoming
[^] Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar.

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2026, I electronically filed the foregoing with the Clerk of the Court of the United States Court of the District of Columbia by using the CM/ECF system. I also certify that the foregoing document is being served on Defendants' counsel of record and that service will be accomplished by the CM/ECF system.


/s/ *Kali Schellenberg*
Kali Schellenberg