**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRIGHTON PARK NEIGHBORHOOD
COUNCIL, *et al.*

        *Plaintiffs*,

    v.

LINDA MCMAHON, Secretary of
Education, *et al.*

        *Defendants*.

Civil Action No. 25 - 4523 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

This case is about the Department of Education's abrupt discontinuation of grants awarded under the Full-Service Community Schools (FSCS) Program—a federal initiative that supports services for children and their families, particularly children attending high-poverty schools in rural areas. Last December, the Department discontinued funding for several FSCS grants, citing a change in the agency's policy priorities. The Plaintiffs—grantees, subgrantees, and professional organizations—sued various federal officers and agencies charged with administering the FSCS program under the Administrative Procedure Act and the First Amendment. They seek to restore their FSCS grant funding and to vacate the policies that led to the grant discontinuations in the first place. The Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks subject-matter jurisdiction. For the reasons below, the Court finds that the Plaintiffs' claims are properly before it and thus denies the Defendants' motion.

## BACKGROUND

### A.    Full-Service Community Schools Program

In 1965, Congress enacted the Elementary and Secondary Education Act, which provides federal funding for elementary and secondary education. That statute obligates the Secretary of Education to "use not less than 95 percent" of certain appropriated funds "to award grants . . . to eligible entities" for two categories of activities: Promise Neighborhoods and Full-Service Community Schools (FCSC). 20 U.S.C. § 7273(a)(1). The Promise Neighborhoods program seeks to "significantly improve the academic and developmental outcomes of children living in the most distressed communities of the United States." *Id.* §§ 7271(1), 7273(a)(1)(A). And the FSCS program seeks to "improve the coordination and integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." *Id.* § 7271(2).

Local educational agencies (LEAs) (the public authorities charged with administering public elementary or secondary education in a locality), non-profit organizations, community-based organizations, and "other public or private entities" are eligible for FSCS grants. *Id.* § 7272(1)(B); *see also id.* § 7801(5), (30)(A). FSCS grantees must provide "assistance to public elementary schools or secondary schools" to implement certain "educational, developmental, family, health, and other comprehensive services" throughout "the school year (including before- and after-school hours and weekends), as well as during the summer." *Id.* §§ 7272(2), 7273(a)(1)(B). Congress mandates certain priorities for "awarding [FSCS] grants," including favoring grantees that are "consortiums comprised of a broad representation of stakeholders or consortiums demonstrating a history of effectiveness" and grantees that "will use funds for evidence-based activities." *Id.* § 7275(b). And each FSCS grant applicant must "develop and

describe in [their] application the steps [they] propose[] to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with [federal] assistance . . . in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." *Id.* § 1228a(b).

For initial grant applications, the Department of Education publishes application notices in the Federal Register that may provide, among other things, "[a]ny priorities established by the Secretary [of Education] for the program for that year and the method the Secretary will use to implement the priorities." 34 C.F.R. §§ 75.100, 75.101(a)(4), 75.105. The Department scores initial applications based on previously provided selection criteria, which may include favoring applicants that further the Secretary's announced priorities. *See id.* §§ 75.105(c), 75.201.

If the Department awards grants to multi-year projects, it indicates its "intention to make contin[u]ation awards to fund the remainder of the project period." *Id.* § 75.251(b)(2). The Department "gives priority to continuation awards" for multi-year projects "over new grants" when allocating FSCS funding. 34 C.F.R. § 75.253(c); *cf.* Education Division General Administrative Regulations (EDGAR), 45 Fed. Reg. 22,494, 22,559 (Apr. 3, 1980) (Each "continuation award will be judged on the basis of the criteria in [the statute] and will not be subject to competition with other applications.").

Historically, the Department has "not den[ied] a large number of non-competing continuation awards." Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70,300, 70,316 (Aug. 29, 2024). "[I]f that d[id] happen, grantees [we]re often aware of the likelihood of the decision well in advance." *Id.*; *see also* Direct Grant Programs, 59 Fed. Reg. 30,258, 30,259 (June 10, 1994). And continuation decisions were made based on performance indicators on the grants already awarded. *See* 34 C.F.R. §§ 75.118(b),

75.253(b); 59 Fed. Reg. at 30,259 ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

### B.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiffs' Amended Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

In the 2022 and 2023 fiscal years, the Department of Education's FSCS grant application notices included certain criteria and priorities. *See* Applications for New Awards; Full-Service Community Schools Program, 87 Fed. Reg. 41,688, 41,689–93 (July 13, 2022); Applications for New Awards; Full-Service Community Schools Program, 88 Fed. Reg. 37,222, 37,224–28 (June 7, 2023). For example, the 2023 application notice expressed a priority preference for projects that create "education or work-based settings that are supportive, positive, identity-safe, and inclusive with regard to race, ethnicity, culture, language, and disability status, through developing trusting relationships between students (including underserved students), educators, families, and community partners." 88 Fed. Reg. at 37,225. The Department also published a notice in July 2022 detailing new priorities for future FSCS grant applications, including a preference for applicants who committed "to sustain the program beyond 2 years after the term of the grant." Final Priorities, Requirements, Definitions, and Selection Criteria—Full-Service Community Schools, 87 Fed. Reg. 41,675, 41,684 (July 13, 2022). And prior to 2026, under the Office of Management and Budget's interpretation of the General Education Provisions Act, applicants were required to file a form identifying barriers that could prevent equitable access to or participation in their federal grant projects, including but not limited to "barriers based on economic disadvantage, gender, race,

ethnicity, color, national origin, disability, age, language, migrant status, rural status, homeless status or housing insecurity, pregnancy, parenting, or caregiving status, and sexual orientation." Am Compl. ¶ 53 (quoting Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Control No. 1894-0005, Notice to All Applicants: Equity for Students, Educators, and Other Program Beneficiaries (expiration Feb. 28, 2026)).

On December 12, 2025, the Department of Education notified nearly a quarter of existing FSCS grant recipients "that they could not continue to expend the prior year's funding in support of their awards after December 31 . . . and that any unobligated funds that were paid out but not authorized to be retained would need to be 'promptly' refunded to the government." Am. Compl. ¶ 61, ECF No. 27. Recipients of the non-continuation notices were given seven days to file an appeal with the Department. Am. Compl. ¶ 64. On December 29, 2025, the Department adjudicated such appeals and all but one was denied. Am. Compl. ¶ 65.

The non-continuation notices stated that the Department had assessed whether the grants, among other things, "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education," and determined that the grants "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." Am. Compl. ¶ 62. The timing and process surrounding the non-continuation notices reflected a departure from past agency practice—where performance concerns were usually raised well in advance of non-continuation determinations and grantees were given the opportunity to engage with the Department to attempt to overcome those concerns. *See* Am. Compl. ¶ 59.

The Plaintiffs allege that the impetus for these non-continuations was a Department of Government Efficiency (DOGE) review of the grants "for ideas disfavored by the administration— using terms like diversity, equity, inclusion—and concepts associated with those values—like

race, culturally responsive teaching, social emotional learning, and restorative justice." Am. Compl. ¶ 55. The Plaintiffs further allege that the Department considered a DOGE-prepared spreadsheet flagging grants with such "DEI-related" terms and concepts in deciding to not continue these grants. Am. Compl. ¶ 56. And the non-continuation notices received by grantees "quoted language from grant applications—sometimes unrelated to project proposals themselves—that included DEI-related terms as support for" non-continuation. Am. Compl. ¶ 63.

The Plaintiffs in this case can be grouped into different categories: grantees, subgrantees, and organizations.

### *Grantee Plaintiffs*

*Paterson Public Schools* (PPS) is a public school district located in Passaic County, New Jersey. Am Comp. ¶ 14. PPS received two FSCS awards: a five-year capacity-building-and-development grant in 2022 for over $2 million and a five-year Multi-Local Educational Agency grant in 2023 for over $11 million. *Id.* These awards were continued by the Department in 2023 and 2024. Due to the Department's 2025 non-continuation decision, PPS did not receive over $7.9 million in FSCS funds from December 2025 onwards. *Id.*

*Sodus Central School District* (Sodus) is a public school district located in Wayne County, New York. Am. Compl. ¶ 15. Sodus received a five-year FSCS grant in 2022 for $15 million. *Id.* Sodus' award was continued by the Department in 2023 and 2024. *Id.* Due to the Department's 2025 non-continuation decision, Sodus did not receive over $6 million in FSCS funds from December 2025 onwards. *Id.*

*Prichard Committee for Academic Excellence, Inc.* (Prichard) is a non-profit organization whose "mission is to realize a path to a larger life for Kentuckians with education at the core." Am Comp. ¶ 16. Prichard received a five-year state-scaling FSCS grant award in 2022 for over $47

million dollars to fund an "evidence-based initiative to provide a continuum of services needed to support student and family well-being." *Id.* Prichard's award was continued by the Department in 2023 and 2024. *Id.* Due to the Department's 2025 non-continuation determination, Prichard will not receive over $21.8 million in funds from December 2025 onwards. *Id.*

*Subgrantee Plaintiffs*

*Brighton Park Neighborhood Council* (Brighton Park) is a non-profit organization that supports the underserved and impoverished neighborhood of Chicago's southwest side. Am. Compl. ¶ 11. To further its mission, Brighton Park provides various after-school and summer programming to public schools in Chicago's southwest side, including college mentoring and academic tutoring, STEM and robotics classes, civics and leadership development programs, financial literacy and adult nutrition courses, and workforce development programs. Am. Compl. ¶¶ 88, 90. The largest school that Brighton Park serves is Curie Metro High School, the third-largest public school in Chicago. Am. Compl. ¶ 89. Brighton Park's program at Curie Metro High School is dependent on a $500,000 contract that is funded by FSCS grants for the Metropolitan Family Services' Afterschool for Children and Teens Now initiative. Am. Compl. ¶¶ 67, 89. Due to the Department's 2025 non-continuation determination, those grants were discontinued. Am. Compl. ¶ 18(e)–(f).

*Paterson Education Foundation* (PEF) is a non-profit organization that seeks to advance educational equity and strengthen public education in Paterson, New Jersey. Am. Compl. ¶ 17. PEF receives a $10,000-per-year stipend from the Grantee Plaintiff PPS that is funded from FSCS grants. Am. Compl. ¶ 122. With these funds, PEF provides technical assistance to schools to support programs like a health clinic, school-based enrichment, after-school activities, and professional learning workshops. *Id.*

*Organizational Plaintiffs*

*National Education* Association (NEA) is a non-profit, professional association of educators that represents approximately three million members who work at every level of education—from pre-school to university graduate programs. Am. Compl. ¶ 13. NEA's mission is to advocate for education professionals and to ensure that public education prepares every student to succeed in a diverse and interdependent world. *Id.*

*American Federation of Teachers* (AFT) is a union representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. Am. Compl. ¶ 12. AFT's mission is to promote fairness, democracy, economic opportunity, high-quality public education, healthcare, and public services for students, their families, and communities. *Id.* It meets this mission by fighting for safe working conditions and ensuring that its members receive fair pay and benefits for their critical work. *Id.*

### C.    Procedural Background

The Plaintiffs' Amended Complaint challenges the Department of Education's non-continuation decision as (1) arbitrary and capricious and contrary to law under the Administrative Procedure Act, and (2) violative of the First Amendment of the U.S. Constitution. Am. Compl. ¶¶ 181–233. The Defendants move to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Mot., ECF No. 30. This motion is fully briefed and ripe for review. Opp'n, ECF No. 31; Reply, ECF No. 34; Sur-Reply, ECF No. 35-1.[1]

---

[1] The Plaintiffs seek to file a sur-reply on the basis that the Defendants raised arguments disputing associational standing for the first time in their Reply. Sur-Reply Mot. 2, ECF No. 35. The

**LEGAL STANDARD**

"A motion under Rule 12(b)(1) presents a threshold challenge to a court's [subject-matter] jurisdiction." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (cleaned up). A plaintiff bears the burden of establishing a court's jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). In evaluating whether a plaintiff has met that burden at the pleading stage, a court may "accept as true all of the factual allegations contained in the complaint." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)). "But [a] court is not limited to the allegations of the complaint and may consider such materials outside the pleadings as it deems appropriate." *New Mexico v. Musk*, ___ F. Supp. 3d ___, No. 25-cv-643, 2026 WL 799635, at *2 (D.D.C. Mar. 23, 2026) (cleaned up).

**DISCUSSION**

The Defendants raise two jurisdictional arguments. First, they contend that some Plaintiffs lack Article III standing. Second, they argue that the Plaintiffs' claims belong in the United States Court of Federal Claims under the Tucker Act because they sound in contract. The Court is not persuaded. The Plaintiffs have standing to proceed. And long-established precedent permits the Plaintiffs to bring their claims in this Court. The Defendants' Tucker Act arguments are novel and expansive and would result in no forum for the Plaintiffs to redress their grievances. That is not the law. Accordingly, the Court denies the Defendants' motion.

---

Defendants oppose, despite having spent only a single paragraph in their Motion to Dismiss addressing standing. *See* Sur-reply Opp'n, ECF No. 36; Mot. 4–5. The Court agrees that the Defendants raised new arguments in their Reply, and so it exercises its discretion to grant the Plaintiffs' motion. *Flynn v. Veazey Constr. Corp.*, 310 F. Supp. 2d 186, 188 (D.D.C. 2004).

### A.    Standing

Starting with Article III standing, the Defendants argue that the Subgrantee and Organizational Plaintiffs lack standing. Reply 7–8. "To establish Article III standing, a plaintiff must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendant's challenged action and (3) redressability by a favorable decision that is likely as opposed to merely speculative." *Am. Whitewater v. FERC*, 125 F.4th 1139, 1150 (D.C. Cir. 2025) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). An organization may demonstrate standing by either (1) asserting associational "standing solely as the representative of its members," or (2) identifying an organizational injury "in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). "[S]tanding is not dispensed in gross; . . . plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (cleaned up). "Only one plaintiff, however, needs standing in order for a particular claim to go forward. . . . That is, if constitutional standing 'can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim.'" *Whitman-Walker Clinic v. HHS*, 485 F. Supp. 3d 1, 18 (D.D.C. 2020) (citation omitted) (quoting *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017)).

Here, the Defendants do not challenge that the Grantee Plaintiffs have standing to pursue their claims, which means that four of the six claims in the Amended Complaint may proceed without any further analysis. *See id.* Nonetheless, in the interest of completeness, the Court

10

addresses the Subgrantee and Organizational Plaintiffs' standing for each claim. It concludes that

these Plaintiffs have established standing to proceed at this stage of the proceedings.[2]

### 1.    APA Claims

### a.    Subgrantee Plaintiffs

Recall that the Subgrantee Plaintiffs receive funding from FSCS grants awarded to other

organizations. The Defendants invoke the third-party standing doctrine to argue that the

Subgrantee Plaintiffs may not challenge "the downstream economic consequences of the

Department's decision to discontinue FSCS grants" to third parties. Reply 7. According to the

Defendants, those injuries are not cognizable under Article III. The Court disagrees.

The Defendants are correct that a party "generally must assert his own legal rights and

interests, and cannot rest his claim to relief on the legal rights or interests of third parties."

*Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). But the Subgrantee Plaintiffs are not merely

seeking to vindicate the interests or redress the injuries of others. They have alleged financial and

programmatic harms as a result of the respective non-continuation decisions. Specifically, they

---

[2] In what is growing to be a trend in the U.S. Attorney's Office for the District of Columbia, the Defendants do not analyze standing on a claim-by-claim basis. The Court assumes that the Government is familiar with *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and the Supreme Court's instruction to analyze standing for each claim presented in a complaint. The Government's approach to briefing, which ignores this instruction, does not aid the Court in resolving the issues presented.

This case presents a particularly egregious example of this practice. In their eight-page motion on this difficult and evolving area of law, the Defendants devote only one paragraph to challenging the standing of the Subgrantee Plaintiffs and the Organizational Plaintiffs respectively, without mention of the claims or relief involved. *See, e.g.*, Mot. 4–5. The Defendants' briefing also says nothing whatsoever about standing as it relates to the Plaintiffs' First Amendment claim. In fact, across two briefs, the Defendants spend approximately three pages in total briefing standing. Had the Defendants' motion addressed non-jurisdictional topics, they undoubtedly would have been subject to forfeiture. But of course, the Court must scrutinize its own jurisdiction, even without adequate briefing from the Government.

have alleged that the Department's decisions to discontinue the FSCS grants have "wreaked havoc on [their] programs, forcing them to cut staff, cancel contracts, and eliminate services." Opp'n 23; *see* Am. Compl. ¶¶ 91–93, 124. These harms are all "predictable effect[s]" of the challenged non-continuation decisions. *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019); *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (recognizing that a plaintiff need not show that agency action is the only step or the "last step in the chain of causation"). And a favorable decision would redress them. That is all that is needed to satisfy Article III. *See Hawkins v. Haaland*, 991 F.3d 216, 224–25 (D.C. Cir. 2021).[3]

### b.    Organizational Plaintiffs

The Defendants next challenge the associational standing of the Organizational Plaintiffs. Reply 8. To establish associational standing, an organization must show that: "(1) at least one of its members has standing to sue in her or his own right, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 (D.C. Cir. 2025). Here, the Defendants argue that the first factor is not satisfied. *See* Reply 8–9. But that is not the case.

The Organizational Plaintiffs have alleged that the Department's non-continuation decisions will eliminate the funding source for their bargaining unit members in various schools. *See* Am. Compl. ¶¶ 174–75 (AFT); Am. Compl. ¶¶ 173, 176 (NEA). And they have identified specific employees at specific school districts for whom the non-continuations will cause job loss,

---

[3] The Defendants truly take issue with whether the Plaintiffs "belong to the class of persons to whom the [APA] grants a right to sue." *FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025). But that "question is not one of [Article III] standing," *id.* at 232 n.3, so the Court will not address it here.

wage cuts, and job reassignments. *Id.* This level of specificity satisfies Article III standing at this stage; an organization need not identify injured members by name this early in a case. *See New Mexico*, 2026 WL 799635, at *6 (holding that although "an association must specifically identify members who have suffered the requisite harm," it need not "identify their injured members by name" at the pleading stage where "general allegations of injury are accepted as true" (cleaned up)); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) ("Naming union members adds no essential information bearing on the injury component of standing." (cleaned up)); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025) (same); *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 144–45 (2d Cir. 2006) (same). And "expos[ure] . . . to potential job loss, wage and hour cuts, and other competitive pressures" from agency action are cognizable Article III injuries, *Air Line Pilots Ass'n v. Chao*, 889 F.3d 785, 788–89 (D.C. Cir. 2018) (finding that a pilot union and professional association may challenge the denial of an air carrier permit via airline-based, employment-related harms to their members), that are fairly redressable, *see Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (recognizing that "the prospect of . . . funds" from grants at a "later" date satisfies redressability). Thus, the Organizational Plaintiffs have demonstrated associational standing to bring APA claims as representatives of their bargaining unit members.

### 2.    First Amendment Claims

The Court turns to the First Amendment associational and speech claims brought by the Subgrantee and Organizational Plaintiffs. "The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs. v. Davenport*, 608 U.S. ___, 146 S. Ct. 1114, 1122 (2026); U.S. Const. amend. I. When assessing standing for First Amendment claims, the Supreme Court has instructed

courts to be "quite forgiving," *Kowalski*, 543 U.S. at 130, and "make commonsense inferences . . . , including inferences about third party behavior," *Davenport*, 146 S. Ct. at 1125 (cleaned up). Applying these principles, the Court finds that the Subgrantee and Organizational Plaintiffs have established standing.

Starting with the associational claim, "a party suffering an 'objectively reasonable chill' to its First Amendment associational rights has an injury in fact sufficient to give rise to Article III standing." *Id.* at 1126. In making that determination, courts look to the "deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct." *Id.* at 1123 (cleaned up). When government conduct would reasonably "dissuade" individuals from "pursu[ing] [a] collective effort to foster beliefs" or "encourage groups and individuals to cease or modify protected First Amendment [activity that] the government disfavors," associational rights are implicated. *Id.* at 1123, 1125 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958)). An associational harm is shown "when the government seeks to intrude into the workings of groups that hold 'dissident beliefs' disfavored by those holding the reins of power" or "den[ies] benefits to an organization based on its message." *Id.* at 1122–23 (citation omitted).

The Subgrantee and Organizational Plaintiffs easily satisfy that standard. They allege that they suffer a "chilling effect created by Defendants' funding decisions." Sur-Reply 2. More specifically, they allege that the Department discontinued FSCS grants because of the Government's hostility to the Plaintiffs' views on issues like DEI, culturally responsive teaching, and restorative justice. *See* Am. Compl. ¶¶ 54–66 (alleging that the Defendants' reason for non-continuations was the use of "DEI-related terms" in grant applications that were sometimes "unrelated to project proposals themselves"). Looking to the "commonsense" result on "third party behavior" then, the Defendants' conduct would not only deter the grantees' own DEI advocacy,

14

but it would also "discourage" the grantees "from associating with" other DEI-oriented subgrantees or third-party organizations involved in delivering FSCS services. *Davenport*, 146 S. Ct. at 1125, 1130. Thus, the Subgrantee and Organizational Plaintiffs, like the grant recipients, face "an objectively reasonable chill" to their "collective effort[s] to foster" DEI and restorative justice. *Id.* at 1123, 1126; *id.* at 1130 ("It is enough [for Article III] to discourage groups from expressing dissident views."); *id.* at 1130–31 (finding that the government's non-self-executing and unenforceable subpoena for a group's donor information is an Article III injury, because the mere "pressure to avoid ties and speech which might displease" the government may chill third-party donors from affiliating with the group (cleaned up)). That is sufficient to confer standing.

Turning to the speech claim, the D.C. Circuit has recognized that a "chilling effect on protected expression" can constitute an Article III injury. *Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103, 1119 (D.C. Cir. 1969). But the Circuit requires First Amendment plaintiffs to show "some concrete harm (past or immediately threatened) apart from the 'chill' itself" to bring an action to redress a free-speech-chilling injury. *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). It is unclear if this precedent survives the Supreme Court's more recent instructions to make "reasonable inferences about third party behavior" when analyzing Article III standing in the First Amendment context. *Davenport*, 146 S. Ct. at 1126. And the Supreme Court has recently stressed that "[t]o state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *NRA v. Vullo*, 602 U.S. 175, 191 (2024).

Regardless, the Subgrantee and Organizational Plaintiffs meet either standard. Undoubtedly, the Defendants' non-continuation of FSCS grants with DEI-related language in the

applications could be "reasonably understood as a threat or inducement" to not engage in DEI-related speech or expression. *Id.* at 193. "Either" a threat or an inducement is "coercive" to First Amendment speech. *See id.* And the "determinative or coercive effect upon the action[s] of [others]" is clear. *Spear*, 520 U.S. at 169. When the Defendants display hostility to DEI-related activities in FSCS grant decisions, they necessarily chill DEI-favorable speech among those reliant on FSCS grant funding, which includes the Subgrantee Plaintiffs and members of the Organizational Plaintiffs. And such a chill is clearly cognizable under the First Amendment. *See Davenport*, 146 S. Ct. at 1127 (noting a chill exists if the plaintiff would be "reasonably . . . induced . . . to trim its protected advocacy knowing it now stands in the government's crosshairs"); *id.* ("[S]elf-censorship in response to a 'well-founded fear that the law will be enforced against them' is an injury in fact." (quoting *Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 393 (1988))); *Hershey*, 412 F.2d at 1118–21 (finding a policy that draft deferments would be denied to persons who engage in "illegal" protests created a cognizable Article III chilling injury). Combined with the other concrete financial, programmatic, and employment injuries discussed above, the Subgrantee and Organizational Plaintiffs have demonstrated standing. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (holding that publishers may bring cognizable First Amendment claims to challenge government notices sent to their distributors suggesting their publications are illegal based on economic harm).

*    *    *

In sum, Article III standing is not a barrier to the Plaintiffs' claims. The Defendants recognize as much as to the Grantee Plaintiffs. And the Court concludes that the Subgrantee Plaintiffs and Organizational Plaintiffs also have standing to bring this action.

16

B.        **Tucker Act Jurisdiction**

The Defendants also argue that the Tucker Act vests the United States Court of Federal Claims with exclusive jurisdiction over the Plaintiffs' claims. According to the Defendants, because the Plaintiffs are ultimately challenging grant non-continuation decisions, their claims are contract claims dressed up in APA and First Amendment garb. For their part, the Plaintiffs contend that their claims do not belong in the Court of Federal Claims because they are not seeking money damages from the federal government. They argue that federal district courts have long had jurisdiction over APA and First Amendment claims, and they urge this Court to decline the Defendants' invitation to recharacterize their claims.

The Court agrees with the Plaintiffs. Before it explains why, the Court will lay out the relevant background principles and address the Defendants' somewhat novel argument that all claims related to grants belong in the Court of Federal Claims. The Court will then return to the traditional test for assessing Tucker Act jurisdiction under *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), and separately determine whether the claims of the Grantee, Subgrantee, and Organizational Plaintiffs should be channeled to the Court of Federal Claims. The Court concludes that the Plaintiffs' claims are properly in federal district court.

1.        **Background of the APA General Waiver**

"The APA generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). But that waiver was not drawn on a blank slate. The term "relief other than money damages" in the APA stems from "the ordinary understanding of th[at] term as used in the common law for centuries." *Bowen v. Massachusetts*, 487 U.S. 879, 897 (1988). And "a judicial remedy [that] may require one party to pay money to

17

another" does not necessarily fit within the "ordinary meaning" of the term "money damages." *Id.* at 893, 895. Indeed, an APA action "'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quoting *Bowen*, 487 U.S. at 910).

When Congress enacted the APA's waiver, it was well-established that sovereign immunity did not bar personal-capacity claims to "recover damages" or equitable claims against "a Federal officer acting in excess of his authority or under authority not validly conferred." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687, 690–91 (1949).[4] "Because these 'actions are *ultra vires*,'" "there is no sovereign immunity to waive—it never attached in the first place." *Leopold v. Manger*, 102 F.4th 491, 494 (D.C. Cir. 2024) (first quoting *Larson*, 337 U.S. at 689; and then *Chamber of Comm. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (characterizing *Larson*)); *see United States v. Lee*, 106 U.S. 196, 220 (1882) ("No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it."). Nevertheless, courts recognized exceptions to this doctrine when an action did not seek general "damages" but rather "specific relief," like "the recovery of [a] specific property or monies." *Larson*, 337 U.S. at 687–88. When granting such specific relief would "'require action by the sovereign or disturb the sovereign's property,'" the government was still considered the "real party in interest" and immunity would attach even in suits against individual officers. *See Lewis v. Clarke*, 581 U.S. 155, 163 (2017) (quoting *Larson*, 337 U.S. at 687); *Larson*, 337 U.S. at 691 n.11.

---

[4] Today, the Westfall Act channels many damages suits against federal officers into the remedial mechanism established in the Federal Tort Claims Act. *See* 28 U.S.C. § 2679; *Hernandez v. Mesa*, 589 U.S. 93, 110–11 (2020).

18

The seminal case on this exception is the Supreme Court's decision in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949). In *Larson*, the plaintiff successfully won a contract bid for surplus coal being sold by the War Assets Administration. 337 U.S. at 684; *id.* at 706–07 (Douglas, J., dissenting). Soon thereafter, the Administration canceled that sale contract and instead contracted with others to sell the coal on different terms. *Id.* In response, the plaintiff sued the War Assets Administrator, seeking "an injunction prohibiting the Administrator from selling or delivering the coal to anyone other than the plaintiff and . . . a declaration that the sale to the plaintiff was valid and the sale to the second purchaser invalid." *Id.* at 684. The Court ruled that the action was barred by sovereign immunity. The Court explained that officer suits are permissible when "the relief sought . . . is . . . compensation for an alleged wrong" but not necessarily when the requested relief is "prevention or discontinuance . . . of th[at] wrong." *Id.* at 688. Because the former merely provides compensatory damages for an officer's unlawful acts but the latter requires specific action by the sovereign itself, the Court reasoned that the latter category, "specific relief," would be barred by sovereign immunity in some cases even if the suit is "nominally directed against the individual officer." *Id.* at 687–88. The Court recognized that specific relief would be available only in limited circumstances where: (1) the officer's alleged conduct is "in excess of his authority or under an authority not validly conferred," and (2) the requested relief requires only "ordering the cessation of th[at] conduct . . . but will [not] require affirmative action by the sovereign or the disposition of unquestionably sovereign property." *Id.* at 691 & n.11. Deeming the plaintiff's request for property due under a contract as specific relief that does not meet these criteria, the Court held that it lacked jurisdiction to entertain the suit. *See id.* at 705. In doing so, it recognized that its decision left the plaintiff without a remedy, as even in

the Court of Claims the plaintiff would only be permitted to bring suit "for damages, but, significantly, not for specific relief." *Id.*

In 1976, Congress amended the APA's general waiver in response to "critici[sm]" of the government's "reliance on sovereign immunity" as defined in *Larson*, which was viewed as a "technical" obstacle to the APA's provision permitting "judicial review" of "agency action." *Bowen*, 487 U.S. at 892–99 (cleaned up). The amendment clarified that no action "seeking relief other than money damages" should "be denied on the ground that it is against the United States or that the United States is an indispensable party." *Id.* at 892 (citation omitted). In doing so, Congress "eliminate[d] the sovereign immunity defense in all equitable actions for *specific relief* against a Federal agency or officer acting in an official capacity." *Maryland Dep't of Hum. Res. v. HHS* (*Maryland*), 763 F.2d 1441, 1447 (D.C. Cir. 1985) (emphasis added) (quoting S. Rep. No. 94–996, at 8 (1976), and H.R. Rep. No. 94–1656, at 4 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6129). The amendment removed *Larson*'s bar on "recovery of specific property or *monies*" and "authorize[d]," among other things, "judicial review of the administration of Federal grant-in-aid programs." *Bowen*, 487 U.S. at 893, 898 (emphasis in original) (cleaned up).

Relying on the canon "that Congress understands the state of existing law when it legislates," the Supreme Court and D.C. Circuit have thus interpreted "money damages" in the APA to refer only to "a sum of money used as compensatory relief." *Id.* at 895–96; *Maryland*, 763 F.2d at 1446. But that term does not extend to "specific relief[] not . . . in the form of damages." *Bowen*, 487 U.S. at 895–96 (quoting *Maryland*, 763 F.2d at 1446). The Supreme Court and D.C. Circuit have explained: "Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* at 895 (quoting *Maryland*, 763 F.2d at 1446). The

interpretation not only reflects the "plain" "meaning" of "damages" in the "statutory text" but is also supported by the APA's context and statutory history. *See id.* at 896, 900.

## 2.    Interaction between the Tucker Act and APA

Nevertheless, the APA's waiver "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought'" by the plaintiff. *California*, 604 U.S. at 651 (quoting 5 U.S.C. § 702). One such statute is the Tucker Act, which grants the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States" for over $10,000 "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or *upon any express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (emphasis added). Meanwhile, the Little Tucker Act grants the Court of Federal Claims and federal district courts concurrent jurisdiction over such claims when the amount in controversy is under $10,000. *Id.* § 1346(a)(2).

Importantly though, the Tucker Act does not "prevent an APA suit" when it "is not addressed to the type of grievance which the plaintiff seeks to assert." *Patchak*, 567 U.S. at 216 (quoting Letter from Antonin Scalia, Assistant Att'y Gen., Off. of Legal Counsel, to Edward M. Kennedy, Chairman, U.S. Senate Subcomm. on Admin. Prac. & Proc. (May 10, 1976)). Indeed, "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell*, 463 U.S. 206, 216 (1983). "The claim must be one for *money damages* against the United States, and the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating *compensation* by the Federal Government for the damages sustained." *Id.* at 216–17 (emphasis added) (cleaned up). "Unlike the district courts," the Court of Federal Claims also lacks "general power to provide equitable relief

21

against the Government or its officers." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011). Equitable relief under the Tucker Act is "limited" in type and must be "incidental to and collateral to a claim for money damages." *Bobula v. DOJ*, 970 F.2d 854, 859 (Fed. Cir. 1992) (citing 28 U.S.C. § 1491(a)(2)). And in Tucker Act post-award bid protest actions, "declaratory and injunctive relief" that also results in "monetary relief" is "limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

As a result, "a complex and not completely uniform body of case law" has developed to distinguish claims for "money damages" or "compensation" (that properly belong in the Court of Federal Claims under the Tucker Act) from claims seeking "specific relief" (that instead belong in federal district court under the APA). *Maryland*, 763 F.2d at 1449–50.

In *Maryland Department of Human Resources v. Department of Health & Human Services*, Judge Bork authored the seminal opinion on the interaction between the Tucker Act, the 1976 APA amendments, and Section 702's "expressly or impliedly forbids" bar. 763 F.2d 1441 (D.C. Cir. 1985). There, a Maryland agency challenged the Department of Health and Human Services' decision to disallow federal grants based on concerns that Maryland had improperly expended prior grant funds. *Id.* at 1443. The Circuit held first that the suit fell under the APA's sovereign immunity waiver, because the reversal of the grant terminations would be "specific relief, albeit monetary," since Maryland claimed entitlement to a specific grant of money currently withheld as opposed to compensation for past acts. *Id.* at 1448–49. And second, it held that the suit was not barred by the "expressly or impliedly forbids" limitation because the grant disallowance did not arise from an "'express or implied contract' as that phrase is used in the Tucker Act"; "'[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.'" *Id.*

22

at 1449 (alteration in original) (quoting *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985)). Accordingly, the Court determined that it had jurisdiction over the suit and dismissed on the merits. *Id.* at 1462.

In *Bowen v. Massachusetts*, the Supreme Court expressly adopted Judge Bork's *Maryland* reasoning. 487 U.S. 879 (1988). There, the Court held "that a State properly sued the HHS Secretary under the Administrative Procedure Act (not the Tucker Act) in district court (not the Court of Federal Claims) for failure to make statutorily required payments" under federal grant programs. *Maine Cmty. Health Options v. United States* (*Maine*), 590 U.S. 296, 326 (2020) (characterizing *Bowen*). The Supreme Court held that the action fell under the APA because it was one for specific relief "seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Bowen*, 487 U.S. at 900. It was not within the scope of the Tucker Act, the Court concluded, as it was not a suit for "*compensation* for the damage sustained by the failure of the Federal Government to pay as mandated." *Id.* The Court reasoned that the State's request for injunctive or declaratory relief seeking disbursement of the funds did not change the analysis because that remedy would still amount to "specific relief ([to] undo the Secretary's refusal to reimburse the State)," but not "money damages ([to] . . . provide relief that substitutes for that which ought to have been done)." *Id.* at 910.

Since its ruling in *Bowen*, the Supreme Court has repeatedly reaffirmed its understanding that APA actions for specific relief are not barred by the Tucker Act's remedial mechanism. *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) ("As *Bowen* recognized . . . . Congress employed this language to distinguish between specific relief and compensatory, or substitute, relief."); *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) ("We held in *Bowen* that the provision of the Administrative Procedure Act that precludes actions

23

seeking 'money damages' against federal agencies does not bar a State from seeking *specific relief* to obtain money." (emphasis added) (citation omitted)); *Maine*, 590 U.S. at 326 (*Bowen* recognized that the Tucker Act is limited to actions seeking "compensation for . . . past injuries or labors" (quoting *Bowen*, 487 U.S. at 901 n.31)).

Nevertheless, it is true that *Bowen* focused greatly on the "relief" available under the Tucker Act. *See Maine*, 590 U.S. at 326–27 (quoting *Bowen*, 487 U.S. at 905). And Section 702's "expressly or impliedly forbids" bar looks also to "the type of grievance" redressable under another statute and not "only to the kind of relief a plaintiff seeks." *Patchak*, 567 U.S. at 216 n.3. Indeed, *Maryland* recognized as much: "[T]he fact that a plaintiff's substantive claim is cognizable under the Tucker Act may, at least in some circumstances, bar the plaintiff from obtaining, under the APA, either the relief that would be available under the Tucker Act or alternative forms of relief." 763 F.2d at 1448. Other cases have explored the contours of this limitation on APA relief.

Then-Judge Scalia's opinion in *Sharp v. Weinberger* is one of them. 798 F.2d 1521 (D.C. Cir. 1986). There, an air force officer brought an APA suit to challenge his transfer to the reserve forces, alleging that the transfer (1) was inconsistent with the terms of his service contract, and (2) violated the Constitution, statutes, and regulations. *Id.* at 1521–23. The D.C. Circuit held that the Tucker Act "impliedly forbids" some of the bases for the relief the officer sought, *id.* at 1523–24 (quoting 5 U.S.C. § 702), as it provides the "sole remedy for an alleged breach of contract by the federal government," *id.*[5] Thus, the Court held that the availability of a Tucker Act claim barred

---

[5] "It is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims . . . . That assumption is not based on any language in the Tucker Act granting such exclusive jurisdiction to the Claims Court. Rather, that court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court. If, however, § 702 of the APA is construed to authorize a district court to grant monetary relief—other than traditional 'money damages'—as an incident to the complete relief

district courts from granting "specific performance" or other equitable relief that "compel[s] the United States to fulfill its contractual obligations" to not transfer the plaintiff. *Id.* But the Circuit found that the district court could still grant the plaintiff's requested relief, enjoinment of the plaintiff's transfer, based on the "complain[t] that [the] transfer would be contrary to regulations, statutes and the Constitution." *Id.* at 1523. "The lesson of *Sharp* . . . is straightforward [then]: under § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620–21 (D.C. Cir. 2017).

In *Knudson*, the Supreme Court seemingly endorsed *Sharp*'s interpretation of the APA in *dicta*. *See* 534 U.S. at 211–12. In an opinion by Justice Scalia, the Court noted that *Bowen* stood for the proposition that a suit claiming "that the Federal Government failed to reimburse . . . for past expenses pursuant to a statutory obligation" is not an action for "money damages" as that term is understood in the APA. *Id.* at 212. But the Court said that "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due." *Id.* Importantly, "*Knudson* did not displace the longstanding distinction between monetary compensation and specific relief for purposes of sovereign immunity under the APA." *Concert Inv., LLC v. SBA*, No. 21-cv-3150, 2026 WL 710211, at *3 (D.D.C. Mar. 13, 2026). "Indeed, the decision did not involve the APA's waiver of sovereign immunity at all, but instead concerned [an] entirely different question . . . under the Employee Retirement Income Security Act." *Id.*

---

that is appropriate in the review of agency action, the fact that the purely monetary aspects of the case could have been decided in the Claims Court is not a sufficient reason to bar that aspect of the relief available in a district court." *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988).

All in all, the rule of decision from *Bowen* and its progeny is that the APA permits claims "seeking funds to which a statute allegedly entitles the plaintiff," while the Tucker Act mainly concerns actions for "compensation for the losses" a plaintiff "has suffered by virtue of the withholding of those funds." *Id.* at *4 (citation omitted) (cleaned up).

### 3.    Defendants' Grant Argument

With these background principles in mind, the Court turns to the Defendants' argument that all suits challenging grant determinations must be brought in the Court of Federal Claims. In making this somewhat novel argument, the Defendants rely primarily on recent Supreme Court emergency dispositions staying injunctions in two grant cases. *See California*, 604 U.S. at 650, and *National Institutes of Health v. American Public Health Association* (*NIH*), 145 S. Ct. 2658 (2025). The Defendants argue that these emergency dispositions stand for the proposition that "grant agreements, and indeed all conditional grant awards, are contracts" and thus, "overrul[ing] the Department's grant non-continuations, continu[ing] funding under those agreements, and enjoin[ing] the Department from denying continuation funding moving forward" are all contractual remedies that are "subject to the exclusive jurisdiction of the Tucker Act." Mot. 5–6. But this contention runs head first into the Supreme Court's decision in *Bowen*, which held that "the statutory mandate of a federal grant-in-aid program directs the Secretary to pay money to the [grantee], not as compensation for a past wrong, but to subsidize future . . . expenditures"—which is distinct from contractual claims cognizable under the Tucker Act that instead further "laws [that] attempt to compensate a particular class of persons for past injuries or labors." 487 U.S. at 906 n.42. Indeed, the *Bowen* Court permitted challenges to "disallowances under grant-in-aid programs" that sought disbursement of federal funds to proceed in federal district court. *Id.* at 908–10.

26

Thus, the Defendants appear to be implying that the Supreme Court overruled *Bowen* and its progeny in summary dispositions on its emergency docket. Although there is tension between the *Bowen* line of cases and the Supreme Court's recent emergency dispositions, the Court is not convinced that the Supreme Court overruled those cases *sub silentio*. Indeed, both *California* and Justice Barrett's controlling concurrence in *NIH* cite *Bowen* in their rationale, providing a clue that the Court has not retreated from *Bowen*.[6] *See California*, 604 U.S. at 651 (citing *Bowen*, 487 U.S. at 910); *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (citing *Bowen*, 487 U.S. at 910). And in *NIH*, the Court did not rule that the APA *claims* there could not be heard in federal district court; only that the federal district court could grant only part of the *relief* that was ordered. *See* 145 S. Ct. at 2660.

It is true that some of the language in *California* and *NIH* could be read to be in tension with *Bowen*. *Contrast NIH*, 145 S. Ct. at 2660 ("The Administrative Procedure Act's limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." (cleaned up)), *with Bowen*, 487 U.S. at 898–900 (holding that APA "judicial review of an agency's disallowance" under "grant-in-aid programs" is permissible even if the suit "happens to be one for the payment of money"). And *California*, 604 U.S. at 651, cited Justice Scalia's *dicta* in *Knudson*, 534 U.S. at 211–12, which itself cited parts of Justice Scalia's dissent in *Bowen*, 487 U.S. at 918.

It is no surprise, then, that the proper construction of *California* and *NIH* is a point of contention in this Circuit. *Compare Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at \*6

---

[6] Assuming that likelihood-of-success dispositions of the Supreme Court on an emergency basis have precedential value, Justice Barrett's concurrence in *NIH* would be controlling under *Marks v. United States*, 430 U.S. 188, 193 (1977).

(D.C. Cir. May 3, 2025) (Pillard, J., dissenting), *with Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *2 (D.C. Cir. May 28, 2025) (en banc) (Katsas, J., dissenting), *with Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 817, 819, 824 (D.C. Cir.) (Rao, J.), *reh'g en banc granted and judgment vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025). And this Court is left to grapple with that confusion. Ultimately, the Court is guided by the Supreme Court's admonishment that "if a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). So with that instruction in mind, the Court will not throw *Bowen* out the window.

Indeed, as another judge in this District recently explained, the dispositions in *California* and *NIH* can be squared with *Bowen* and its progeny:

> Recent stay decisions from the Supreme Court about the proper forum in which to challenge grant cancellations do not change the calculus. To be sure, in *Department of Education v. California*, the Court held that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case. [604 U.S. at 651] (quoting *Knudson*, 534 U.S. at 212). But the Court simultaneously reaffirmed *Bowen* by reiterating that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). Given that *California* involved grants that were already in effect and could therefore be enforced as contractual agreements—which is not the case here—the government's cancellation of them implicated the Tucker Act.
>
> The Court's similar decision in *NIH v. American Public Health Ass'n* to stay judgments vacating the government's termination of research grants also does not alter the jurisdictional outcome. 145 S. Ct. [at] 2660 . . . . Indeed, in that case, several Justices wrote separately to explain that *California* turned on the fact that the termination of grants created contractual claims. *See, e.g., id.* at 2663 (Gorsuch, J., concurring in part and dissenting in part) ("*California* explained that suits based on any express or implied contract with the United States do not belong in district court under the Administrative Procedure Act (APA), but in the Court of Federal Claims under the Tucker Act." (citation and internal quotation marks omitted)); *id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part) ("The core of

28

plaintiffs' suit alleges that the Government unlawfully terminated their grants. That is a breach of contract claim.").

*Concert*, 2026 WL 710211, at \*5. Thus, *California* and *NIH* may stand for the proposition that APA challenges to grant determinations may only seek prospective rather than retrospective relief—an understanding not entirely at odds with *Bowen*'s "compensation" rationale. *Cf. New Mexico*, 2026 WL 799635, at \*3 (recognizing that *NIH* left open the availability of vacatur and possibly prospective relief in APA challenges to grant terminations).

As for Justice Scalia's reasoning in his *Bowen* dissent (cited in *Knudson*, which is cited in *California*), it does not support the Defendants' broad claim that federal district courts lack jurisdiction over "grant-based claims." Mot. 7. In fact, Justice Scalia endorsed the majority's reasoning that Tucker Act jurisdiction is limited to "money damages," while Section 702 of the APA extends to actions for "specific relief." *Bowen*, 487 U.S. at 915 (Scalia, J., dissenting) ("Otherwise, there would be a gap in the scheme of relief—an utterly irrational gap."). Although Justice Scalia dissented from the majority's treatment of retrospective relief, he agreed "that sovereign immunity does not bar . . . actions insofar as they seek injunctive or declaratory relief with prospective effect. An action seeking an order that will prevent the wrongful disallowance of future claims is an action seeking specific relief and not damages, since no damage has yet occurred." *Id.* at 921–22.[7]

---

[7] Justice Scalia's dissent did suggest that another provision of the APA, 5 U.S.C. § 704, may pose an obstacle to grant disallowance challenges should "complete relief" be available in the Court of Federal Claims. *Bowen v.* Massachusetts, 487 U.S. 879, 922, 926–27 (Scalia, J., dissenting). But the *Bowen* majority expressly rejected this proposition, *id.* at 903–04 (majority opinion), and neither *California* nor *NIH* relied on Section 704, *see Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (relying only on Section 702); *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (relying on the "Administrative Procedure Act's limited waiver of sovereign immunity" (cleaned up)).

Simply put, nothing supports the broad and intractable barrier to grant-based challenges that the Defendants ask this Court to adopt. As a lower court bound to faithfully apply Supreme Court precedent, this Court must apply *Bowen* and its progeny. And under that long line of binding jurisprudence, the Defendants' arguments fail.

### 4.    Grantee Plaintiffs – *Megapulse* Test

Turning to assessing whether the Grantee Plaintiffs' claims are properly in this Court, this Circuit interprets the Supreme Court's jurisprudence governing the interaction of Section 702 of the APA and the Tucker Act using the two-part test established in *Megapulse*. Under that test, an APA claim does not fail when its resolution "requir[es] some . . . incorporation of a contract," *Megapulse*, 672 F.2d at 967–68 (emphasis omitted), or could not exist "but-for" the existence of a contract, *Crowley Gov't Servs., Inc. v. GSA* (*Crowley*), 38 F.4th 1099, 1109–10 (D.C. Cir. 2022). Instead, the Court asks whether an APA suit is "at its essence" a contract action. *Crowley*, 38 F.4th at 1108 (quoting *Megapulse*, 672 F.2d at 967). To make this determination, the Court looks to (a) the source of the rights, and (b) the relief sought in the action. Since the Grantee Plaintiffs were in contractual privity with the Defendants, the Court examines their claims using the *Megapulse* two-part test and concludes that their claims are properly in this Court.[8]

### a.    Source of the Rights

Under *Megapulse*, courts ask whether the "source of the rights upon which the plaintiff bases its claims" are "'essen[tially]' contractual." *Crowley*, 38 F.4th at 1106. In making this determination, courts consider whether the "purported authority" underlying the claim "arise[s] from statute," "whether the plaintiff's rights exist prior to and apart from rights created under the

---

[8] Courts in this District have continued to apply *Megapulse* following *California* and *NIH*. *See, e.g.*, *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 52 (D.D.C. 2026).

contract," and "whether the plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts." *Id.* at 1107 (cleaned up). A claim does not fail merely because it "requir[es] some reference to or incorporation of a contract" to succeed. *Id.* (citation omitted). Rather, the question is whether the plaintiff is "disguising a claim for money damages as one for equitable relief, to avoid the jurisdictional consequences of the Tucker Act." *Id.* (cleaned up). Applying these principles, the Grantee Plaintiffs' claims survive.

*APA Arbitrary and Capricious Claims (Counts I and II).* The *Megapulse* analysis can be nuanced for arbitrary and capricious claims. Like with any other statute though, the question is whether the APA itself "creates the substantive right to the remedy." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Put differently, is the plaintiff's claim based on the substance of the APA itself? For instance, an arbitrary and capricious suit to resolve a "dispute [that is] entirely contained within the terms of the contract" is not cognizable. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) (holding an arbitrary and capricious claim challenging the government's termination of a contract for convenience not cognizable when the contract has a termination-for-convenience provision that would govern the outcome of such a dispute). But an arbitrary and capricious claim that the agency's "conclusions do not follow from the record evidence" is cognizable. *Maryland*, 763 F.2d at 1451 n.7. The Grantee Plaintiffs' claims fall in the latter category.

Most of the Grantee Plaintiffs' arbitrary and capricious claims are based on the change-in-position doctrine, Am. Compl. ¶¶ 184–85, 189–90, 192–93, which requires an agency that changes its position on an issue to "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests," *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up). Specifically, the Grantee Plaintiffs generally

aver that the Defendants' change in position on diversity, equity, and inclusion policy and the decisions regarding grant continuation were arbitrary and capricious. Am. Compl. ¶¶ 184–85, 189–90, 192–93. These claims undoubtedly spring from the APA itself.

The Grantee Plaintiffs' "rights" under the change-in-position doctrine "exist prior to and apart from rights created under the contract." *Crowley*, 38 F.4th at 1107 (cleaned up). Nothing in the grant agreements themselves require an agency to display awareness, consider reliance, or provide reasoned explanations whenever they make a change. *See, e.g.*, Prichard Grant Award, Ex. 6, ECF No. 30-6. The Court notes that the Grantee Plaintiffs may still need to demonstrate that any challenged policies are sufficiently discrete and final to fall under the APA. *See Luna Gutierrez v. Noem*, 811 F. Supp. 3d 133, 154–55 (D.D.C. 2025) (discussing the standard for unwritten policies to constitute final agency action). Courts have come out differently on these issues. *See Urb. Sustainability Dirs. Network v. USDA*, No. 25-cv-1775, 2025 WL 2374528, at *20–21 (D.D.C. Aug. 14, 2025) (collecting cases). But these are merits questions that do not go to jurisdiction. At bottom, the source of these rights is entirely the APA's reasoned decision-making requirement, not any grant.

*APA Contrary-to-Regulation Claims (Count III).* The Grantee Plaintiffs also bring APA challenges arguing that the Defendants' non-continuation decisions violate agency regulations. Am. Compl. ¶¶ 195–200. The Defendants argue that these claims are not cognizable because the relevant regulatory protections are contained in the grant agreements. *See* Reply 1–3. But an APA claim is not barred because of "the mere existence of . . . contract-related issues" or when it "requires some reference to or incorporation of [a] contract." *Crowley*, 38 F.4th at 1110 (cleaned up). A claim that "exists independently of [a] contract" may be brought regardless of its collateral implications. *Id.* at 1109 (cleaned up).

32

Here, the Grantee Plaintiffs' claim "is ultimately based, not on breach of contract, but on an alleged governmental . . . violation," *id.* (alteration in original) (quoting *Megapulse*, 672 F.2d at 969), namely that the Defendants acted "contrary to regulations," *Sharp*, 798 F.2d at 1523. Such a contrary-to-regulation claim is actionable "in the absence of the contract itself"—it does not in essence "vindicate [a] right . . . under [a] contract," *Crowley*, 38 F.4th at 1107, 1110 (quoting *Spectrum*, 764 F.2d at 894); rather "it asserts a grievance altogether different from the kind the [Tucker Act] concerns," *Patchak*, 567 U.S. at 216. Indeed, no Party argues that "Congress had particularly dealt with . . . 'claim[s]'" for regulatory violations when it enacted the Tucker Act. *Id.* at 216 n. 3 As the D.C. Circuit has explained:

> It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. It is quite another to claim . . . that an agency action may not be enjoined . . . simply because that same action might also amount to a breach of contract.

*Megapulse*, 672 F.2d at 971. Because the latter does not amount to "an injunction requiring [the defendants] to perform that contract," the Tucker Act does not bar it and so a plaintiff may bring an APA action for the same relief on the basis that the government "violate[d] federal regulations." *Sharp*, 798 F.2d at 1523–24. Since the Grantee Plaintiffs' contrary-to-regulation claims "[are] validly based on grounds other than a contractual relationship with the government," they may properly bring them in this Court. *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 967–68).

*APA Contrary to Statutory Procedure Claims (Counts III and IV)*. Next, the Grantee Plaintiffs bring statutory and regulatory notice-and-comment procedural challenges. *See* Am. Compl. ¶¶ 201–08. Specifically, they allege that the Defendants failed to comply with notice-and-comment requirements under the APA, 5 U.S.C. § 553, and the General Education Provisions Act, 20 U.S.C. § 1232(a)(2), (d). Am. Compl. ¶¶ 203–04. Such challenges that "turn on the

interpretation of statutes . . . rather than on the interpretation of an agreement negotiated by the parties" are clearly based on the APA and thus cognizable. *Maryland*, 763 F.2d at 1449.

*First Amendment Claims (Counts V and VI).* Finally, the Grantee Plaintiffs bring First Amendment challenges. There is no question that these challenges are based on the Constitution and not the relevant grant agreements. Indeed, the Court of Federal Claims does not "possess jurisdiction . . . over first amendment claim[s] . . . because the first amendment, standing alone, cannot be so interpreted as to command the payment of money." *Id.* at 1450 (cleaned up) (quoting *United States v. Connolly*, 716 F.2d 882, 886–87 (Fed. Cir. 1983)). And plaintiffs may bring APA actions complaining that agency action is contrary to the Constitution, notwithstanding the Tucker Act. *See Sharp*, 798 F.2d at 1523. Thus, the Grantee Plaintiffs' First Amendment challenges are rooted in the APA as well.[9]

### b.    Type of Relief

The second prong of *Megapulse* asks whether "the type of relief sought" by the plaintiff "effectively seeks to attain monetary damages in a suit." *Am. Acad. of Pediatrics v. HHS*, 816 F. Supp. 3d 27, 47 (D.D.C. 2026) (quoting *Crowley*, 38 F.4th at 1107). The Grantee Plaintiffs easily clear this hurdle, too. "Where a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages." *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000) (collecting cases). Because the Grantee Plaintiffs challenge the withholding of "specific property or monies," that ends the inquiry. *Bowen*, 487 U.S. at 899 (quoting *Larson*, 337 U.S. at 688).

---

[9] Because the Grantee Plaintiffs have a remedy under the APA, the Court does not address their argument that they are entitled to non-statutory review of constitutional claims. *See* Opp'n 8, 12–17.

\*        \*        \*

In sum, the Tucker Act does not deprive this Court of jurisdiction over the Grantee Plaintiffs' claims.

### 5.        Subgrantee and Organizational Plaintiffs

With respect to the Subgrantee and Organizational Plaintiffs, the inquiry is even clearer. Those Plaintiffs are not in contractual privity with the Defendants, *see* Mot. 9 (agreeing that the subgrantees are not in contractual privity with the Department), so they cannot bring their claims in the Court of Federal Claims, *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 938–39 (9th Cir. 2025) ("Subcontractors, who have not entered into contracts with the Government, generally have no right to sue under the Tucker Act, and the Court of Federal Claims has no jurisdiction to hear their suit."). And Section 702 does not bar APA claims when the underlying grievance cannot be brought under another statute, like the Tucker Act. *See Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) ("We categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims."); *Maryland*, 763 F.2d at 1450 n.5 ("[T]he APA is not precluded by the Tucker Act unless, at a minimum, a remedy is actually available under the Tucker Act."); *Bowen*, 487 U.S. at 907 n.43 (noting that when a cause of action "cannot always be adequately remedied in the Claims Court, as a jurisdictional, or threshold matter, these actions should proceed in the district court"); *Cmty. Legal Servs. in E. Palo*, 137 F.4th at 938–39 (holding that subcontractors can bring APA claims to challenge funding termination to providers that contracted them because they lack a cause of action in the Court of Federal Claims); *Patchak*, 567 U.S. at 216 ("When a statute 'is not addressed to the type of grievance which the plaintiff seeks to assert,' then the statute cannot prevent an APA suit." (quoting Letter from Antonin Scalia to Edward M. Kennedy)).

Accordingly, the Subgrantee and Organizational Plaintiffs' claims can proceed in this Court with little difficulty.

### 6. Relief

The Court ends with a brief observation about relief to provide the Parties with some direction as this case progresses. The dispositions in *California* and *NIH* could be read to bar some forms of relief in APA grant-based challenges like these. *Supra* Discussion B.3. But the Court is not barred from granting relief altogether. Justice Barrett's controlling concurrence in *NIH* is instructive—at the very least, vacatur is an available remedy in an APA challenge to grant termination or discontinuation. 145 S. Ct. at 2661 (Barrett, J., concurring). And the *NIH* majority recognized that an APA claim may proceed on such a theory. *See id.* at 2660 (vacating only some but not all of the order of the federal district court). Thus, since vacatur is available for each claim at issue here and the Plaintiffs requested vacatur in their Amended Complaint, *see* Am. Compl. ¶ 238, there is no jurisdictional barrier to the *claims* at issue.[10]

With respect to *relief*, it would be "premature for the Court to opine as to the hypothetical availability of these equitable remedies" now. *Chin-Teh Hsu v. New Mighty U.S. Trust*, No. 10-cv-1743, 2020 WL 588322, at *12 (D.D.C. Feb. 6, 2020). As this Court explained at the pleading stage in another case:

> [T]he Court considers Federal Rule of Civil Procedure 54(c) to be significant here. That rule provides that all final judgments other than default judgments "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). In other words, "the prayer for relief does not determine what relief ultimately will be granted." 10 Wright & Miller's Federal Practice & Procedure § 2664 (4th ed. Sept. 2025 Update).

---

[10] Of course, a different question arises "if the district court . . . is [not] asked to grant" the relief at issue. *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986).

*SEC v. Musk*, ___ F. Supp. 3d. ___, No. 25-cv-105, 2026 WL 279790, at *21 (D.D.C. Feb. 3, 2026). Since "the [Plaintiffs] ha[ve] sought some relief from the particular opposing party" that is cognizable under the APA, the Court need go no further to sort through each of the prayers of relief to determine whether they are permissible. *See NAACP, Jefferson Cnty. Branch v. U.S. Sugar Corp.*, 84 F.3d 1432, 1438 (D.C. Cir. 1996) (emphasis omitted). "The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy" in the first place. *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists*, 390 U.S. 557, 561 (1968). Once jurisdiction attaches, the Court merely becomes duty-bound to "to grant whatever relief is appropriate in the case on the facts proved." *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 28 (D.D.C. 1998) (quoting *Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716 (4th Cir. 1983)). Thus, although the Court may not be able to award all the relief the Plaintiffs ask for in their prayer for relief, Am. Compl. ¶¶ 234–43, no further inquiry is necessary at this time.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion to Dismiss. ECF No. 30. A separate order will issue.

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   June 12, 2026