**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRIGHTON PARK NEIGHBORHOOD COUNCIL, *et al.*, <br><br>      Plaintiffs, <br><br> v. <br><br> LINDA MCMAHON, <br> Secretary of Education, *et al.*, <br><br>      Defendants. | Case No. 25-cv-4523 (SLS) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
ON THEIR ADMINISTRATIVE PROCEDURE ACT CLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION....................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    A.   Congress's Creation and Funding of Full-Service Community Schools................... 2

    B.   The Department Awards Continuation Grants Non-Competitively, Based on
    Performance ............................................................................................................... 3

    C.   The Department's FSCS Priorities Included a Focus on Equity and Inclusion ..... 6

    D.   Prior to January 2025, Grants Were Awarded and Continued Based on the
    Process Outlined by Congress and Department Regulations ........................................... 8

    E.   The Department's Decision to Non-Continue Grants ............................................... 9

    F.   Impact of the Department's Grant Non-Continuations on Plaintiffs .................... 14

LEGAL STANDARD ............................................................................................................. 17

ARGUMENT............................................................................................................................ 17

  I.   Defendants' Change in Funding Priorities in the Middle of a Multi-year Grant
     Performance Period Violates the APA on Several Grounds. ....................................... 18

    A.   Defendants' decision to change funding priorities in the middle of a multi-year
    performance period is arbitrary and capricious................................................................. 18

        i.   The Department did not explain the changed priorities. ................................... 18

        ii.   The Department failed to consider important aspects of the problem and relied
          on factors that Congress did not authorize it to consider. ................................... 21

        iii.   The Department ignored serious reliance interests. ........................................... 22

        iv.   The Department failed to consider obvious alternatives to its new priorities.... 24

    B.   Defendants' adoption and application of new priorities violated governing law.. 24

        i.   Defendants' adoption and application of new priorities without notice-and-
          comment was without observance of legally required procedure. ....................... 24

        ii.   Defendants' use of new priorities to non-continue multi-year projects
          midstream was contrary to law. ......................................................................... 29

  II.   The Non-Continuation Decisions Are Arbitrary and Capricious............................... 33

    A.   The non-continuation decisions did not evaluate the grantees' performance or
    connect the policy reasons to the decision to end each award. ....................................... 34

    B.   The Department ignored directly contrary evidence. ............................................. 35

    C.   The non-continuation decisions fail to address reliance interests or alternatives. 38

  III.  The Court Should Enter a Permanent Injunction and Declare Unlawful and
      Vacate Defendants' Actions. ........................................................................................ 39

CONCLUSION .......................................................................................................................... 43

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
770 F. Supp. 3d 822 (D. Md. 2025) ...................................................................... 25, 27, 29

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D. Md. 2025) ................................................................................. 10

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) ....................................................................................... 41

*Bechtel v. F.C.C.*,
10 F.3d 875 (D.C. Cir. 1993) ......................................................................................... 33

*Butte Cnty., Cal. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ....................................................................................... 37

*Castaneira v. Noem*,
138 F.4th 540 (D.C. Cir. 2025) ...................................................................................... 24

*Cemex Inc. v. Dep't of the Interior*,
560 F. Supp. 3d 268 (D.D.C. 2021) ............................................................................... 17

*Chamber of Com. of U.S. v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023) .......................................................................... 40

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ...................................................................................................... 24

*Chula Vista City Sch. Dist. v. Bennett*,
824 F.2d 1573 (Fed. Cir. 1987) ................................................................................ 25, 26

*Coal. for Humane Immigrant Rts. v. Noem*,
805 F. Supp. 3d 48 (D.D.C. 2025) ................................................................................ 39

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*,
No. 25-cv-03491 (TSC), 2026 WL 120984 (D.D.C. Jan. 16, 2026) ..................... 25, 26, 28

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) ............................................................................................... 23, 24, 38

*Dickson v. Secretary of Defense*,
68 F.3d 1396 (D.C. Cir. 1995) .................................................................................. 34, 35

ii

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ................................................................................................ 41

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................................ 19

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................................................ 30

*FDA v. Wages & White Lion Invs., L.L.C.*,
    604 U.S. 542 (2025) ................................................................................................ 19

*Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*,
    495 U.S. 641 (1990) ................................................................................................ 24

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ................................................................................ 27

*Gordon Coll. v. SBA,*
    No. CV 23-614 (BAH), 2025 WL 1517208 (D.D.C. May 28, 2025) ....................... 24

*Greater Boston Television Corp. v. FCC*,
    444 F.2d 841 (D.C. Cir. 1970) ................................................................................ 19

*King v. Burwell*,
    576 U.S. 473 (2015) ................................................................................................ 30

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ........................................................................................... 30, 31

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 42

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................................................ 40

*Morall v. Drug Enf't Admin.*,
    412 F.3d 165 (D.C. Cir. 2005) ........................................................................... 37, 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................... 18, 20, 21, 22, 34, 38

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ............................................................................ 41

*Nat'l Council of Nonprofits v. OMB*,
    763 F. Supp. 3d 36 (D.D.C. 2025) .................................................................... 20

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ...................................................................... 39

*Ohio v. EPA*,
    603 U.S. 279 (2024) ........................................................................................ 18

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .......................................................................................... 29

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ................................................................ 41

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ........................................................................................ 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ................................................................. 39, 40

*Texas v. Cardona*,
    743 F. Supp. 3d 824 (N.D. Tex. 2024) ........................................................... 40

*United States v. Philip Morris USA, Inc.*,
    396 F.3d 1190 (D.C. Cir. 2005) ...................................................................... 32

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ...................................................................... 39

*Universal Camera Corp. v. N.L.R.B.*,
    340 U.S. 474 (1951) ........................................................................................ 37

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) .......................................................................... 42

*Washington v. U.S. Dep't of Educ.*,
    813 F. Supp. 3d 1222 (W.D. Wash. 2025) ....................................... 10, 27, 32, 33

*Washington v. U.S. Dep't of Education*,
    No. C26-2409-KKE, 2026 WL 2150222 (W.D. Wash. July 27, 2026) ........... 29, 40

*Washington v. U.S. Dep't of Homeland Sec.*,
    No. 2:25-cv-1401-BJR, 2026 WL 1469538 (W.D. Wash. May 26, 2026) ........... 40

*Washington v. United States Dep't of Educ.*,
    167 F.4th 1241 (9th Cir. 2026) ........................................................................ 10, 27

*Webster v. Doe*,
    486 U.S. 592 (1988) ................................................................................................. 24

**FEDERAL STATUTES**

5 U.S.C. § 553 ................................................................................................... 24, 25, 28

5 U.S.C. § 553(a)(2) ................................................................................................... 25

5 U.S.C. § 703 ............................................................................................................ 39

5 U.S.C. § 706(2) ................................................................................................... 39, 43

5 U.S.C. § 706(2)(A) ................................................................................................... 18

5 U.S.C. § 706(2)(D) ................................................................................................... 18

20 U.S.C. § 1221 .......................................................................................................... 3

20 U.S.C. § 1221(c)(1) ............................................................................................... 25

20 U.S.C. § 1221e-4 .................................................................................................... 25

20 U.S.C. § 1228a ....................................................................................................... 10

20 U.S.C. § 1228a(b) ........................................................................................... 3, 19, 22

20 U.S.C. § 1232(a) ............................................................................................. 4, 25, 26

20 U.S.C. § 1232(a)(2) ............................................................................................... 27

20 U.S.C. § 1232(d) ............................................................................................... 4, 25

20 U.S.C. § 7271(2) ................................................................................................. 2, 21

20 U.S.C. § 7272(1)(B) ................................................................................................. 3

20 U.S.C. § 7272(2) ..................................................................................................... 3

20 U.S.C. § 7272(3) ................................................................................................. 3, 21

20 U.S.C. § 7273(b) ..................................................................................................... 3

28 U.S.C. § 2201(a) ............................................................................................................ 39

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4
    (2025) ............................................................................................................................ 3

**FEDERAL REGULATIONS**

2 C.F.R. § 200.344(g) ........................................................................................................ 10

34 C.F.R. § 75.100 .............................................................................................................. 4

34 C.F.R. § 75.100(a)(3) ...................................................................................................... 4

34 C.F.R. § 75.100(a)(4) ...................................................................................................... 4

34 C.F.R. § 75.101 ............................................................................................................. 32

34 C.F.R. § 75.101(4) ......................................................................................................... 32

34 C.F.R. § 75.101(c) .......................................................................................................... 33

34 C.F.R. § 75.105(a) ................................................................................................... 29, 32

34 C.F.R. § 75.105(b) ......................................................................................................... 29

34 C.F.R. § 75.105(c) ................................................................................................ 5, 29, 30

34 C.F.R. § 75.118 ............................................................................................................... 8

34 C.F.R. § 75.118(b) ......................................................................................................... 18

34 C.F.R. §§ 75.200–75.227 ................................................................................................ 4

34 C.F.R. § 75.201(b)(1) ...................................................................................................... 5

34 C.F.R. § 75.217 ......................................................................................................... 5, 32

34 C.F.R. § 75.251 ......................................................................................................... 4, 18

34 C.F.R. § 75.251(b)(1) ...................................................................................................... 5

34 C.F.R. § 75.251(b)(2) ................................................................................................. 5, 31

34 C.F.R. § 75.253 ......................................................................................................... 4, 9

34 C.F.R. § 75.253(a)(5) ............................................................................................... 10, 33

34 C.F.R. § 75.253(b) ....................................................................... 5, 19, 30, 33, 34

34 C.F.R. § 75.253(c).................................................................. 6, 19, 30, 31, 33, 39

34 C.F.R. § 75.253(f) ...................................................................................... 33

34 C.F.R. § 75.253(f)(1) ................................................................................. 10

34 C.F.R. § 75.590 ........................................................................................... 8

Applications for New Awards; Full-Service Community Schools Program, 87 Fed.
     Reg. 41688 (July 13, 2022)................................................................ 2, 7, 22, 28

Applications for New Awards; Full-Service Community Schools Program, 88 Fed.
     Reg. 37222 (June 7, 2023) ................................................................ 7, 19, 22, 28

Direct Grants Programs, 59 Fed. Reg. 30258 (June 10, 1994) ................................. 4, 5, 19, 30, 31

Education Division General Administrative Regulations, 45 Fed. Reg. 22494 (Apr. 3,
     1980) ...................................................................................................... 6, 30

Education Department General Administrative Regulations, 89 Fed. Reg. 70300
     (Aug. 29, 2024) ........................................................................................ 4, 19, 31

Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and
     Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025)..................................................... 9

Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based
     Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025)..................................................... 9

Final Priorities and Definitions—Secretary's Supplemental Priorities and Definitions
     for Discretionary Grants Programs, 86 Fed. Reg. 70612 (Dec. 10, 2021)......................... 28

Final Priorities, Requirements, Definitions, and Selection Criteria – Full-Service
     Community Schools, 87 Fed. Reg. 41675 (July 13, 2022) ............................... 6, 19, 25, 26

Final Priority and Requirements – Full-Service Community Schools, 88 Fed. Reg.
     37218 (June 7, 2023).................................................................................... 26

Proposed Priorities, Requirement, Definitions, and Selection Criteria - Full-Service
     Community Schools Program, 87 Fed. Reg. 1709 (Jan. 12, 2022) ............................. 6, 25

**OTHER AUTHORITIES**

Dep't of Educ. *Overview of Department Grant Review Processes* (Last Reviewed: Sept. 8, 2025), https://perma.cc/FVV6-RKAM ................................................................. 11

Dep't of Educ., *U.S. Department of Education Investigates Five Medical Schools as Trump Administration Pushes to End Racial Discrimination in Admissions*, Press Release (July 22, 2026), https://perma.cc/LD4P-EA7Y ........................................... 9

Peter Tatian, Karin Scott, Ariella Meltzer, Travis Reginal, and Megan Gallagher, *Data Collection and Reporting Guidance for the Full-Service Community Schools Program*, U.S. Department of Education, https://perma.cc/E5GN-YZTK ................................................................................................................................. 8

U.S. Dep't of Educ., *Full Service Community Schools Program (FSCS)*: *FSCS Grant Awards*, OESE (June 3, 2026), https://perma.cc/U2P2-8UAD ...................................... 7, 8

U.S. Dep't of Educ., *Full Service Community Schools Program (FSCS)*: *Funding and Legislation*, OESE (June 3, 2026), https://perma.cc/G5B8-9CND ................................... 3

U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)*, OESE (July 16, 2025), https://perma.cc/V9VT-K3Y7 ........................................................................ 3

U.S. Department of Education, *Discretionary Grantmaking at ED* (2024), https://perma.cc/A48L-56FH .......................................................... 5, 6, 8, 9, 30, 31, 32, 38

**INTRODUCTION**

The Full-Service Community Schools (FSCS) program serves the neediest children in high poverty schools across the country by providing them a variety of academic and social supports. Beyond supplemental instruction and tutoring that is critical to helping disadvantaged students keep up with their classmates, the program addresses non-academic barriers to learning. FSCS grantees and subgrantees have filled food pantries; provided dental services, eyeglasses, and other basic preventative health care; and made clean clothes and school supplies available. And they have funded enrichment activities like after-school clubs that engage students and field trips to museums and parks that expand their horizons. Plaintiffs are FSCS grantees, FSCS sub-grantees, and professional associations representing educators who carry out and benefit from FSCS programs.

The Department awarded the FSCS grants in dispute here in 2022 and 2023 as five-year funding commitments to applicants whose applications were judged through a rigorous review process for projects that fulfilled criteria developed through a robust, public process. The grants are governed by generally applicable, long-standing Department regulations that favor continuation of funding from year to year.

By all accounts, the 13 grants at issue in this case were funding meaningful programming that was making a real difference in local communities—improving attendance rates, raising math and reading scores, and allowing students, families, and schools to thrive. Yet in December 2025, just weeks before the end of the budget year and without any time for grantees to plan, the Administration non-continued these awards. The Department did not allege that the grantees failed to comply with the terms of their awards or undertake the projects they proposed. Rather, the Department non-continued awards based on new priorities defined in opposition to the work and values of the prior presidential administration that had issued the grants.

1

While a new administration is expected to advance its own priorities, it must do so within the law. This, the Department did not do. Therefore, Plaintiffs move for summary judgment on their Administrative Procedure Act claims challenging the Department's adoption of new funding priorities for the FSCS grants and its decision to non-continue 13 FSCS grants at the end of 2025.[1] The Department's new continuation policy, and the grant-specific non-continuation determinations made under the policy, should be vacated and enjoined.

## BACKGROUND

### A.  Congress's Creation and Funding of Full-Service Community Schools

A full-service community school is "a public elementary or secondary school that uses established partnerships between schools and community organizations to provide well-rounded educational opportunities and meet the social, emotional, physical and mental health, and academic needs of students." Applications for New Awards; Full-Service Community Schools Program, 87 Fed. Reg. 41688 (July 13, 2022). Congress created the FSCS program to support the "planning, implementation, and operation of full-service community schools that improve the coordination and integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." 20 U.S.C. § 7271(2). Congress made clear the program's central purpose was to help schools and communities ensure that every child succeeds, including categories of disadvantaged students facing historic disadvantages like "low-income students, students of color, students with disabilities, and English learners." S. Rep. No. 114-231, at 2 (2016). In addition, Congress mandated that certain grant applications, including FSCS grant applications, address equity issues

---

[1] At this juncture, Plaintiffs are not moving for summary judgment on their First Amendment claims, Counts V and VI. Plaintiffs reserve the right to do so at an appropriate time.

2

and placed the responsibility for ensuring that equity is a core consideration of the FSCS program on the Department. General Education Provisions Act (GEPA) Equity Directive, 20 U.S.C. §§ 1221, 1228a(b).

The Elementary and Secondary Education Act (ESEA) requires the Department to administer the FSCS program by providing grants to entities, including institutes of higher education, non-profits, and Local Educational Agencies (LEAs), to participate in community-based efforts to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organizations and public and private partnerships. 20 U.S.C. § 7272(1)(B), (2); U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)*, OESE (July 16, 2025), https://perma.cc/V9VT-K3Y7. Schools provide "pipeline services," which deliver a "continuum of coordinated supports, services, and opportunities" to children in distressed communities, including through high-quality early childhood education programs; high-quality school and out-of-school-time programs and strategies; social, health, nutrition, and mental health services and supports; and more. 20 U.S.C. § 7272(3). Since 2013, Congress has continuously increased FSCS funding—from $25 million in 2020, to $30 million in 2021, $75 million in 2022, and $150 million per year in 2023, 2024, 2025, and 2026. *See* U.S. Dep't of Educ., *Full Service Community Schools Program (FSCS)*: *Funding and Legislation*, OESE (June 3, 2026), https://perma.cc/G5B8-9CND; Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 296..

### B.  The Department Awards Continuation Grants Non-Competitively, Based on Performance

The Department effectuates the requirements of the Full-Service Community Schools program through awards with multi-year performance periods to schools and non-profit organizations. *See* 20 U.S.C. § 7273(b). The awards allow for planning over several years. The

3

awards include single-year budget periods and multi-year performance periods. *See e.g.*, 34 C.F.R. § 75.251; AR0001702–08. Grantees receive a "continuation award" annually for each new budget period, absent a non-continuation of the award. 34 C.F.R. § 75.251. The Department has long represented that a non-continuation of multi-year award funding like the FSCS grants at issue is "extremely rare in practice." Direct Grants Programs, 59 Fed. Reg. 30258, 30259 (June 10, 1994). As the Department recently explained, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." Education Department General Administrative Regulations, 89 Fed. Reg. 70300, 70316 (Aug. 29, 2024). GEPA and the Department's own financial assistance regulatory framework govern the Department's administration of the FSCS program funds. GEPA generally requires that rules affecting the Department's provision of financial assistance—including grant programs—go through the APA's notice and comment process. *See* 20 U.S.C. § 1232(a), (d). The Department's financial assistance regulations fulfill these statutory requirements by publicly setting the rules for: (1) the Department's competitive grantmaking selection process for new grants; and (2) its process for determining whether to continue a grantee's multi-year project—a process that does not involve competition with other current or potential grantees. *See* 34 C.F.R. §§ 75.200–.227, 75.253.

When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things: how to apply for a new grant, 34 C.F.R. § 75.100; whether the Secretary plans to approve multi-year projects and those project periods, *id.* § 75.101(a)(3); priorities established for the selection of new grants for the program that year, *id.* § 75.101(a)(4); the selection criteria and factors used to decide which applications will be awarded new grants, and how these criteria will be weighed, *id.*

§ 75.201; and any program performance measurement requirements, *id.* § 75.110. Through a peer review process, independent experts outside of the Department who have expertise in areas pertinent to the grant program score the applications based on the selection criteria and competitive preferences. U.S. Department of Education, *Discretionary Grantmaking at ED* ("Discretionary Grantmaking"), 25–26 (2024), https://perma.cc/A48L-56FH.  The selection criteria are given point values up to the "total possible score for all of the criteria for a program" that the Department announced for that year's grant competition. 34 C.F.R. § 75.201(b)(1)–(2); Discretionary Grantmaking at 26–27. Applicants may earn additional points if they meet competitive preference priorities. *See* 34 C.F.R. § 75.105(c); Discretionary Grantmaking at 27. The applications are then ranked according to the selection criteria and preferences, and grant recipients are selected in the order in which their applications were ranked. *See* 34 C.F.R. § 75.217; Discretionary Grantmaking at 26–27.

When awarding multi-year projects, the Department "[m]akes a grant to the project for the initial budget period"—usually 12 months—and indicates its "intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b)(1)–(2). The Department is required to base decisions about whether to continue to fund subsequent years of multi-year awards on information relevant to a grantee's performance, which includes performance reports, performance measures, and certain financial information. *See id.* §§ 75.118(b), 75.253(b); *see also* Discretionary Grantmaking at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); Direct Grant Programs, 59 Fed. Reg. at 30259 ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as

5

specified by the Secretary, rather than on the submission of a continuation award application."). Based on the information included in grantees' annual performance reports, program officers make a determination as to whether to issue a continuation award for each grantee. *Id.*; Discretionary Grantmaking at 31–32. Finally, in selecting applicants for funding under a program, the Department is required under its own regulations and policies to "give[] priority to continuation awards over new grants." 34 C.F.R. § 75.253(c). The Department assigns a multi-year project priority in receiving funds over new grants. *Id.*; Discretionary Grantmaking at 45 ("A grantee does not have to compete with other applicants to receive [a continuation] award."); Education Division General Administrative Regulations, 45 Fed. Reg. 22494, 22559 (Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [§ 253(a)] and will not be subject to competition with other applications").

### C. The Department's FSCS Priorities Included a Focus on Equity and Inclusion

In 2022, the Department engaged in its statutorily-required rulemaking to set new priorities for FSCS competitions. Proposed Priorities, Requirement, Definitions, and Selection Criteria – Full-Service Community Schools Program, 87 Fed. Reg. 1709 (Jan. 12, 2022). In accordance with statutory requirements, the Department published a notice of proposed priorities, requirements, and definitions and invited the public to comment. *Id.* The Department then published a notice announcing the "[f]inal priorities, requirements, definitions, and selection criteria" for future FSCS grant competitions and addressing the public comments. Final Priorities, Requirements, Definitions, and Selection Criteria – Full-Service Community Schools, 87 Fed. Reg. 41675, 41675 (July 13, 2022). In that notice, the Department included a final selection criterion that grantees "demonstrate[] a history of effectiveness in working with a diverse range of stakeholders," *id.* at 41686, and noted in response to comments that "it is important for an applicant to include, or have a plan to include, the perspectives of racially diverse families, those that have been marginalized,

6

and other underserved individuals in the community," *id.* at 41682–83. At the same time, the Department also solicited applications for FSCS grants, due in September 2022. 87 Fed. Reg. 41688, 41688. Forty-two grantees were selected, and initial grant award notifications (GANs) were sent in December 2022. *See* AR0001706; U.S. Dep't of Educ., *Full Service Community Schools Program (FSCS)*: *FSCS Grant Awards*, OESE (June 3, 2026), https://perma.cc/U2P2-8UAD. In the initial GANs, the Department disbursed funds for the first year and stated that funds "were anticipated" annually for the next four years. *See* AR0001703–04.

The Department published a notice inviting applications for the Fiscal Year 2023 FSCS grant competition on June 7, 2023, which included priorities from the notice of final priorities, from other sections of the ESEA, and from a notice of supplemental priorities and definitions for discretionary grants programs previously published in the Federal Register. Applications for New Awards; Full-Service Community Schools Program, 88 Fed. Reg. 37222 (June 7, 2023). The first competitive preference priority was "Meeting Student Social, Emotional, and Academic Needs," for projects "that are designed to improve students' social, emotional, academic, and career development, with a focus on underserved students," including through "[c]reating education or work-based settings that are supportive, positive, identity-safe, and inclusive with regard to race, ethnicity, culture, language, and disability status." *Id.* at 37224–25. The notice also broadly characterized FSCS programs as "strategies that advance educational equity and excellence for all students," and included as one competitive preference priority criterion the creation of "education or work-based settings that are supportive, positive, identity safe, and inclusive with regard to race, ethnicity, culture, language, and disability status." *Id.* at 37222–23, 37225. Thirty grantees were selected, and initial grant award notifications (GANs) were sent in late November 2023. *See* AR0002098; U.S. Dep't of Educ., *Full Service Community Schools Program (FSCS)*: *FSCS Grant*

7

*Awards*, OESE (June 3, 2026), https://perma.cc/U2P2-8UAD. As in 2022, the Department disbursed funds for the first year and stated that funds "were anticipated" annually for the next four years. *See* AR0002095–96.

**D. Prior to January 2025, Grants Were Awarded and Continued Based on the Process Outlined by Congress and Department Regulations**

Plaintiffs Paterson Public Schools (PPS), the Prichard Committee for Academic Excellence (Prichard), Sodus Central School District (Sodus CSD), and other non-profits, institutes of higher education, and school districts employing American Federation of Teachers (AFT) and National Education Association (NEA) members nationwide, applied for and received FSCS grants, designing their proposed projects to align with the Department's announced priorities for the 2022 and 2023 funding cycles in order to ensure eligibility and strengthen their applications. Declaration of Brigitte Blom (Blom Decl.) ¶ 8; Declaration of Jay Roscup (Roscup Decl.) ¶ 4.

Prior to January 2025, the program office reviewed these grants for continuation decisions based on the process outlined by Congress and federal regulations. Discretionary Grantmaking at 31–32; Declaration of Stephen Kostyo (Kostyo Decl.) ¶¶ 13–18; Declaration of Elson Nash (Nash Decl.) ¶¶ 10–12. That process requires grantees to submit reports with detailed financial information and information about grantees' progress against performance measurements, effectiveness, and measured effects on program participants. Discretionary Grantmaking at 31–32; *see* 34 C.F.R. §§ 75.118, 75.590. The Department issued a guidance document in 2024 to assist grantees in their development, which provided detailed instructions on required and optional performance indicators to include in each grantee's annual report. *See* Peter Tatian, *et al.*, *Data Collection and Reporting Guidance for the Full-Service Community Schools Program*, U.S. Dep't of Educ., https://perma.cc/E5GN-YZTK (last visited Feb. 27, 2026). After reviewing the grantees' reports, meeting with grantees, and confirming that the grantees met the substantial progress

8

conditions necessary for continuation under 34 C.F.R. § 75.253, FSCS program staff recommended continuation of awards for the FSCS grantees each year. Kostyo Decl. ¶¶ 13–14; Discretionary Grantmaking at 31–32.

### E. The Department's Decision to Non-Continue Grants

In keeping with the Trump Administration's effort to end diversity, equity, and inclusion programs (DEI),[2] Defendants issued a series of internal directives aimed at DEI-adjacent grants in 2025. On February 5, 2025, Defendants issued a Directive on Department Grant Priorities, titled "Eliminating Discrimination and Fraud in Department Grant Awards" (February Directive), asserting that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education," and ordering staff to re-review grants that "fund discriminatory practices—including in the form of DEI," because such grants were "deemed inconsistent with these priorities." Decl. of Kathleen Beaudion, Ex. C, *Washington v. U.S. Dep't of Educ.*, No. 2:26-cv-02409-KKE (W.D. Wash. July 10, 2026), Dkt. No. 11-3. The Defendants then implemented the February Directive by discontinuing hundreds of grants in April of 2025. *Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1228, 1246 n.12 (W.D. Wash. 2025) ("*Washington I*").[3] Defendants memorialized the February Directive-based discontinuance process in a June 5, 2025

---

[2] *See, e.g.*, Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("EO 14173"); Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("EO 14151") (EO 14173 and EO 14151 collectively, the "DEI Executive Orders"); Dep't of Educ., *U.S. Department of Education Investigates Five Medical Schools as Trump Administration Pushes to End Racial Discrimination in Admissions*, Press Release (July 22, 2026), https://perma.cc/LD4P-EA7Y (citing the shuttering of DEI programs as evidence of "victories" in the education context).
[3] The February Directive was found unlawful in *Washington I*, 813 F. Supp. 3d at 1240. *See also Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1244 (9th Cir. 2026) ("*Washington II*") (denying stay pending appeal of *Washington I*).

9

internal directive titled "Non-Competing Continuation Discretionary Grant Award Review Policy" (June Directive). *Id.*; AR0000055–57. The June Directive directed Department staff to "review all grant awards to advance the Administration's priorities" and end funding for grants that were "inconsistent with" the Department's view of "Federal civil rights requirements." AR0000055.[4] The June Directive required staff to review "the approved grant application (inclusive of the GEPA 427 statement)," referring to the *Congressionally required* equity statements that grant applicants provide under the General Education Provisions Act (GEPA), 20 U.S.C. § 1228a.

On December 12, 2025, the Department notified a number of recipients of multi-year FSCS grants that their funding would not be continued. *E.g.*, AR0001000. The non-continuation notices also informed grantees that they could not continue to expend the prior year's funding in support of their awards after December 31 (a permission referred to as a "no-cost extension"), and that any unobligated funds that were paid out but not authorized to be retained would need to be "promptly" refunded to the government. *E.g.*, AR0001001 (citing 2 C.F.R. § 200.344(g)).

The notices were sent through form letters with identical language, but for a section describing the specific program activities which the Department identified as the basis for its determination. The Letters cited 34 C.F.R. § 75.253(a)(5) and (f)(1), and stated that the Department had

> determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are

---

[4] The Department's view of "Federal civil rights requirements," which was espoused in a February 2025 Dear Colleague Letter and April 2025 certification requirement imposed on state and local education agencies receiving federal funds, was vacated by a court in the District of Maryland on multiple grounds, including that the agency actions were arbitrary and capricious and unlawfully promulgated without notice and comment. *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 103, 108–09 (D. Md. 2025).

intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

*E.g.*, AR0001000.

This language appears to be form language the Department has implemented when non-continuing any Department of Education grant. Dep't of Educ., *Overview of Department Grant Review Processes*, https://perma.cc/FVV6-RKAM (last reviewed Aug. 11, 2026). Despite providing this disjunctive list of reasons as to how the grant conflicted with the current Administration's priorities, the letter went on to specifically only cite "the Department's policy of prioritizing merit, fairness, and excellence in education" as the specific reason for the determination that the project "would be in conflict with agency policy and priorities." *E.g.*, AR0001000.

Specifically, each letter stated that:

During the review process, Department staff identified that the applicant has *proposed project activities* that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education.

*E.g.*, *id.* (emphasis added).

As such, the Department explicitly bases the non-continuation decisions on "proposed project activities," not *actual* program activities. *Id.* Moreover, at no point do the letters reflect factual findings or analysis of the grantee's actual performance under the grant; rather each contains slight excerpts from individual grant applications and GEPA statements. For example:

- "Integrated student supports, such as social-emotional learning and physical and mental health services, professional development on equity and inclusion, and collaborative leadership practices will assist participating schools in building safe and inclusive spaces for all students, including those with disabilities." AR0004377 (quoting Metropolitan Family Services' grant application).

- "Providing district staff with ongoing, researched-based, professional learning and professional development on culturally responsive instructional practices[.]

11

Conducting program evaluations that focus on equity and address the academic outcomes and performance of all students on all indicators." AR0000314 (quoting United Way California Capital Region's grant application).

- "FCB offers case management, therapeutic support, financial assistance, and resource linkages. The team consists of Licensed Mental Health Clinicians and graduate level social work interns who provide services through an anti- racist and trauma responsive lens." AR0003280 (quoting Maryland's grant application).

Nearly every quote cited in the letters contains a word or phrase that has been singled out by the Administration in other contexts to identify "DEI"-related programs. *See* Decl. of Kyle A. McLorg, Ex. A–F, *Thakur et al v. Trump et al*, 3:25-cv-04737 (N.D. Cal., July 15, 2026), Dkt. 211.[5] The letter concludes by stating that "[a]s a result of the information identified above," referring to the application and GEPA excerpts, "the Department has determined that the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government." *E.g.*, AR0001000. Prior to receiving the letters, grantees were not given formal notice or an opportunity to cure any alleged deficiencies with their grant. *See, e.g.*, Declaration of Dr. Laurie W. Newell (Newell Decl.) ¶ 13; Blom Decl. ¶ 13; Roscup Decl. ¶¶ 9–10.

Grantees were only given seven calendar days to request reconsideration. *See, e.g.*, AR0001000. Grantees for all of the grants at issue in this litigation submitted reconsideration requests. *See* AR Index 4–8, Dkt. No. 42. Those requests encompassed more than 400 pages of material. *See id.* Many of the reconsideration requests informed the Department that the "proposed" activities to which the Department objected were never implemented. *See, e.g.*, AR0004380–85 (Metropolitan Family Services); AR0001273 (Prichard); AR0001693–98 (PPS);

---

[5] For example, words that appear in the list of terms used by other agencies and in the language identified in the non-continuation notices are: anti-racism, bias training, cultural competency, culturally responsive, diverse, equitable access, equity, implicit bias, inclusion, oppression, race, racial, racial justice, restorative justice, sexual orientation, social justice, and underrepresented.

AR0002418–22 (Sodus CSD). The Department rejected the reconsideration requests on December 29, 2025. *See, e.g.*, AR0000320. The reconsideration denials did not analyze or otherwise cite to the language in the reconsideration requests. *E.g.*, *id.* Nor did they contest grantees' claims that they never carried out the activities the Department identified. *E.g.*, *id.* Rather, they cited to additional statements taken from the grantees' applications and GEPA statements. *E.g.*, *id.*

In total, 18 grants representing more than $50 million in annual funding were non-continued. *See* Declaration of Daniel McNeil (McNeil Decl.) ¶ 20. The funds that were previously allocated to go to those grantees were redistributed to other grantees in late December 2025. *See* Decl. of Amy Yamashiro, Dkt. No. 17-1 ("As of 5:00 PM Eastern Time, on December 31, 2025, the entire amount [for FY 2025 grants] has been obligated.").

The administrative record of these decisions reflects no specific review or assessment of the grants. The record primarily consists of the original FSCS grant applications of the non-continued grantees, the non-continuation letters, the non-continued grantees' requests for reconsideration, and the letters denying those requests. *See* Dkt. No. 42. No grant-specific reports, reviews, or recommendations are part of the record. *Id.* The only document that appears to reflect any basis for the Department's unprecedented actions is a 3-page memo authored by Murray Bessette, a political appointee in the Office of Planning, Evaluation and Policy Development at the Department. AR0000055. This "Bessette memo" is addressed to the four major operational and policy making offices for K-12 and higher education and directs them to review all discretionary continuation grants to ensure that grant funds are not being used for "discriminatory activities." AR0000056. Despite the inclusion of this memo in the administrative record, the rationale of the non-continuation notices is divorced from the purported "discriminatory activities" review, as none of the notices states that the grantee is engaging in "discriminatory activities."

13

*Compare id.*, *with, e.g.*, AR0001000. Rather, the decisions are grounded in a divergence between "proposed project activities" and the new Administration's priorities. *See, e.g.*, AR0001000.

### F.  Impact of the Department's Grant Non-Continuations on Plaintiffs

Defendants' decision to non-continue awards has had and will continue to have devastating effects on Plaintiffs and associational Plaintiffs' members, as well as the students, families, schools, and communities that they serve.

Plaintiff Brighton Park Neighborhood Council's (BPNC) FSCS program at Curie High School in Chicago is dependent on a contract with Chicago Public Schools that is funded by an FSCS award to Metropolitan Family Services, the fiscal sponsor of the entity on whose two FSCS grants BPNC relies. Declaration of Patrick Brosnan (Brosnan Decl.) ¶¶ 6–10. The non-continuation of that grant has required BPNC to cut 50% of staff positions, back out of contractual obligations (harming its goodwill and reputation), and cancel 75% of its student and parent programs, including after-school and summer programming, college mentoring and academic tutoring, summer employment programs and more. Brosnan Decl. ¶¶ 16–26.

For Sodus CSD, the non-continuation of its FSCS funding has caused a $6 million funding shortfall for its Wayne County FSCS Project. The loss of funding has forced it to reduce its staff and staffing support from community partners, end contracts with key partners that support literacy training, and eliminate critical services including nutritional services for students. Roscup Decl. ¶¶ 4, 19, 21, 23.

Plaintiff Paterson Public Schools will likewise face a $7.9 million shortfall over the next three years as a result of the non-continuation of its FSCS grant, causing it to reduce or eliminate after-school and mentoring slots for students, reduce student access to health centers, and reduce staff for programs. Newell Decl. ¶ 16.

14

The non-continuation of Prichard Committee's FSCS grant has resulted in the loss of $21.8 million in anticipated funds, requiring programs that it funds in Kentucky to find another source of funding, potentially diverting funds away from other educational priorities, or else terminating their programs. Blom Decl. ¶¶ 11, 21–22. This caused school districts to eliminate critical services and positions, disrupted Prichard's long-term plan to build sustainable community schools in Kentucky, and forced Prichard to lay off staff members. *Id.* ¶¶ 18, 21–23.

Plaintiff Paterson Education Fund (PEF) receives a $10,000-per-year stipend from PPS that is funded by FSCS; as a result of the Department's decision to non-continue the PPS grant, PEF will no longer be able to provide high school students with services intended to remove non-academic barriers to learning. Declaration of Rosie Grant (Grant Decl.) ¶ 7.

The lack of notice for these non-continuation decisions has also caused these Plaintiffs significant hardship—making it impossible to secure stopgap funds the programs otherwise could have accessed, causing programs to spend hundreds of working hours attempting to address the shortfall, and causing stress to staff. *See, e.g.*, Brosnan Decl. ¶¶ 24, 27–28; Roscup Decl. ¶ 25. And in each case, the non-continuations harm the students and families that each Plaintiff serves, interrupting and reversing the demonstrated progress those programs have made towards attendance, academic achievement, suspension reduction and more. *See, e.g.*, Blom Decl. ¶¶ 17, 22–23; Brosnan Decl. ¶ 27; Newell Decl. ¶¶ 17, 19; Roscup Decl. ¶¶ 8, 14, 18–22; Declaration of Adriane Dorrington (Dorrington Decl.) ¶¶ 19–26; Grant Decl. ¶¶ 9–10; McNeil Decl. ¶¶ 20–22.

Educator unions AFT, NEA, and their affiliates have or will be imminently harmed in California, the District of Columbia, Illinois, Kentucky, Maryland, North Carolina, New York, and New Jersey. Dorrington Decl. ¶¶ 19–25; McNeil Decl. ¶¶ 17, 21–22. In each state, the loss of FSCS funds has required cuts to essential services for students and families, harming students and

15

undermining educational outcomes. Dorrington Decl. ¶¶ 19–25; McNeil Decl. ¶¶ 17, 21–22. The loss of FSCS support will harm AFT and NEA members in a variety of ways. For some union members, the non-continuation decisions mean that they will lose pay or lose their positions entirely.[6] For others, the loss of FSCS support means their ability to be successful at their jobs will be diminished,[7] while their workload will increase significantly as a result of the loss of personnel and programming that was benefiting students.[8] For some, that means spending their personal time[9] or their own funds in order to fill the gaps caused by the funding loss.[10]

Because the Department did not engage in a notice and comment process prior to changing its funding priorities and issuing non-continuation notices, none of the Plaintiffs had the opportunity to oppose the new policy or explain why any changes should not be applied to existing

---

[6] *See* Declaration of Dr. Amber Bradley (Bradley Decl.) ¶¶ 15, 23 (explaining that the school district was "forced to cut the Restorative Justice Coordinator position and reassign the NEA member who served in that role . . . to a new role" that he was not "hired to do" and did not "want[] to perform"); Declaration of Sophia Bill (Bill Decl.) ¶¶ 7, 14 (describing how teacher "w[as] forced to accept a substantial pay cut because of the lack of FSCS funds" that previously compensated her for contributing to an after-school program).

[7] *See* Declaration of Caitlin Sheehan (Sheehan Decl.) ¶ 18 ("[W]ithout the services the grants were providing, I will need to spend more of my class time trying to reinforce learning and dealing with disciplinary issues" and more out-of-class time "trying to engage parents so that my students can be successful."); Declaration of David Correa (Correa Decl.) ¶¶ 12, 14; Declaration of Kiesha Wilson (Wilson Decl.) ¶ 15; Bradley Decl. ¶¶ 20, 22, 24; Bill Decl. ¶¶ 16, 18.

[8] *See* Sheehan Decl. ¶ 19; Correa Decl. ¶ 15 ("My [teaching] job will certainly be harder without this grant—requiring me to put in extra hours out of my own free time."); Declaration of Nadia Casseus Torney (Torney Decl.) ¶¶ 23–25; Wilson Decl. ¶¶ 15–17 ("Students who are experiencing hunger, housing instability, utility shutoffs, or other unmet basic needs" will face "additional barriers to learning," resulting in "increase[d] burdens" on teachers, who will spend "less time in the classroom" and more time on family outreach and assistance).

[9] *See* Torney Decl. ¶¶ 24, 27 (noting that the lack of FSCS programming "will mean more extended days working with students, which takes away from my personal and family time")

[10] *See* Torney Decl. ¶ 26; Bradley Decl. ¶¶ 20–21 ("Without support from the FSCS program, I will be forced to pay for more of [food, menstrual products, and other supplies] out of my own pocket so that my students do not fall behind.").

16

grants. *See* Blom Decl. ¶ 17; Brosnan Decl. ¶ 21; Newell Decl. ¶ 20; Roscup Decl. ¶¶ 10, 26; McNeil Decl. ¶ 24; Dorrington Decl. ¶ 26.

## LEGAL STANDARD

Motions for summary judgment on the basis of APA claims "serve as mechanisms for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 277 (D.D.C. 2021) (quotation marks and citation omitted).

## ARGUMENT

Defendants' actions contravene the APA. *First*, the decision to adopt and apply new funding priorities to multi-year grants was arbitrary and capricious. The Department failed to justify its new priorities, did not consider the impact of the new priorities on the basic goals of the FSCS program, ignored the reliance interests of grantees and schools, did not consider obvious alternatives, and much more. *Second*, the adoption of new priorities violated governing statutes and regulations. Department grant priorities must be adopted through a standard rulemaking process, but the government imposed its priorities without notice and comment. And new priorities can only be used to make new grants—they cannot serve as grounds for non-continuing multi-year projects midstream. *Third*, the individual non-continuation decisions themselves were arbitrary and capricious. Among other deficiencies, the Defendants failed to address grantee performance, overlooked evidence that grantees were not engaging in the conduct that concerned the government, and again ignored reliance interests and obvious alternatives.

Plaintiffs are therefore entitled to summary judgment on their APA claims, Counts I through IV.

17

I. **Defendants' Change in Funding Priorities in the Middle of a Multi-year Grant Performance Period Violates the APA on Several Grounds.**

The APA requires reviewing courts to "hold unlawful and set aside agency action . . . found to be" "arbitrary [or] capricious," "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Defendants' adoption of a new policy changing funding priorities for the FSCS program and their application of that policy to the non-continuation determinations are unlawful under the APA.

A. **Defendants' decision to change funding priorities in the middle of a multi-year performance period is arbitrary and capricious.**

The Department replaced a settled, performance-based continuation framework with a new set of Administration policy preferences after grantees had entered multi-year projects and built programs around the terms on which those projects were approved. That change was not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). The Department did not acknowledge the prior framework, explain why it had become inadequate, connect the new policy to the FSCS statute or the grants' actual performance, account for reliance interests, or consider less disruptive alternatives. The policy therefore fails the APA's basic requirement of reasoned decisionmaking many times over. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

i. **The Department did not explain the changed priorities.**

The Department approved each FSCS award for a multi-year period, funded an initial budget period, and stated its intention to fund the remaining years through noncompetitive continuation awards. *See* 34 C.F.R. § 75.251; *see, e.g.*, AR0002095–96. Pursuant to binding Department regulations, continuation review was to focus on information relevant to a grantee's performance, including annual reports, performance measures, fiscal and management data, and compliance with award terms. *See* 34 C.F.R. §§ 75.118(b), 75.253(b). Continuation awards were

18

also to receive priority over new grants. *Id.* § 75.253(c). Consistent with that framework, the Department had long described denial of a noncompeting continuation award as "extremely rare in practice" and ordinarily preceded by advance notice and technical assistance. Direct Grants Programs, 59 Fed. Reg. at 30259; *see* 89 Fed. Reg. at 70316; Nash Decl. ¶¶ 14–15.

In 2022, the Department used notice-and-comment procedures to set FSCS priorities, requirements, definitions, and selection criteria, as required by law. 87 Fed. Reg. 41675. The 2022 and 2023 competitions required or encouraged applicants to address equity, inclusive educational settings, underserved populations, and community participation. *See* 88 Fed. Reg. at 37222–25; 20 U.S.C. § 1228a(b). Applicants designed their projects and drafted their applications to satisfy those announced criteria. Blom Decl. ¶ 8; Newell Decl. ¶ 8; Roscup Decl. ¶ 12. But in December 2025, the Department applied a different set of criteria to non-continue grants. The non-continuation letters stated that grants reflected "the prior Administration's priorities and policy preferences" and conflicted with the current Administration's preferences and priorities. This boilerplate language displaced the performance-based review that had governed the projects.

An agency may change policy, but it must "display awareness that it is changing position" and provide "good reasons" for the new approach. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It must also acknowledge the prior position and consider reliance interests created by it. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567–69 (2025). The Department failed to do so. The non-continuation letters did not identify the old framework, compare it with the new one, explain why performance-based review was inadequate, or reconcile the Administration's new criteria with priorities the Department had previously applied. A change in political leadership does not replace the agency's obligation to explain its own decision under the statute and program it administers. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841,

19

852 (D.C. Cir. 1970) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." (citations omitted)); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("Furthering the President's wishes cannot be a blank check for OMB to do as it pleases."). The Department's statement that the grants conflicted with the current Administration's preferences fails to justify the Department's decision to apply those preferences to mid-term awards.

The Bessette memo does not supply the missing reasoned standard. The memo directed Department staff to review non-competing continuation discretionary grants for "discriminatory activities," but it did not explain how reviewers should distinguish discriminatory activity from lawful efforts to serve underserved populations or comply with the Department's own equity requirements, or what degree of concern would warrant ending a multi-year award. More fundamentally, not a single document in the Administrative Record suggests that such findings were made. The Department's final notices did not base the challenged non-continuations on findings that any grantee had engaged in discriminatory activities. Rather, the Department invoked boilerplate language and a new policy of "prioritizing merit, fairness, and excellence in education" as the reason why the projects "would be in conflict with agency policy and priorities," and were being non-continued. A memo that neither establishes a discernible rule nor supplies the factual predicate for the decisions ultimately made cannot provide the "rational connection between the facts found and the choice made" that the APA requires. *See State Farm*, 463 U.S. at 43 (citation omitted).

20

### ii. The Department failed to consider important aspects of the problem and relied on factors that Congress did not authorize it to consider.

Agency action is arbitrary when the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Here, the Department did not grapple with multiple aspects of the decision to change priorities, including the basic purposes and operation of the FSCS program or grantees' performance under the old priorities.

Congress created FSCS to improve the coordination, accessibility, and effectiveness of services for children and families, particularly in high-poverty and rural schools. 20 U.S.C. § 7271(2). The grants support integrated services, such as academic enrichment, health supports, nutrition assistance, family engagement, and workforce development, through long-term school-community partnerships. *See id.* § 7272(3). Yet the Department's decisional materials did not assess how ending whole projects midstream would affect those statutory objectives, the continuity of services, or the infrastructure and partnerships that the grants were designed to create.

Nor did the Department address the projects' documented performance under the old priorities. The affected grantees had submitted detailed annual performance reports describing progress against required measures, financial performance, and outcomes for participating students. The policy-level decision did not analyze those reports, identify deficient outcomes, or explain why the value the projects were adding to students and communities was outweighed by the Department's generalized policy preferences.

The Department also relied on factors Congress did not intend it to consider. The relevant statutory and regulatory framework directs the Department to administer FSCS grants in furtherance of the program's objectives and to evaluate continuation based on grantee performance. Yet the Department displaced those considerations with whether a grant reflected the "prior Administration's priorities" or aligned with the current Administration's generalized

21

preferences. *E.g.*, AR0000314. Those political and ideological considerations bear no demonstrated relationship to whether a grantee was successfully carrying out an FSCS project. Indeed, treating equity-related language as a reason for non-continuation turns GEPA's command on its head. GEPA requires applicants to describe how they will ensure "equitable access to, and equitable participation in," federally assisted projects and overcome barriers based on characteristics including race, gender, national origin, disability, and age. 20 U.S.C. § 1228a(b). The Department's failure to evaluate how its changed priorities interacted with GEPA, among other factors, means that it acted arbitrarily and capriciously by "rel[ying] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

The Department's reasoning is also internally inconsistent. It treated language responsive to the 2022 and 2023 priorities as a reason for non-continuation, even though the Department itself required or rewarded applicants for addressing equity, underserved populations, inclusive settings, and community participation. *See* 87 Fed. Reg. at 41690; 88 Fed. Reg. at 37225. The Department never explained how a grantee's compliance with the criteria that governed selection became evidence that the same project no longer served FSCS's statutory purposes. An agency cannot rationally convert compliance with its announced criteria into a disqualifying fault without acknowledging and explaining that reversal. *See State Farm*, 463 U.S. at 43.

### iii. The Department ignored serious reliance interests.

The multi-year awards predictably induced substantial reliance. These multi-year grants were intended to permit scoping and capacity-building before implementation would begin and then allow several years of student and family services to permit evaluation over time. Grantees hired and trained staff, entered contracts, and formed long-term partnerships with schools and community organizations. *See, e.g.*, Blom Decl. ¶¶ 9, 18; Newell Decl. ¶¶ 6–7, 9; Roscup Decl. ¶ 7. Schools, educators, families, and students then relied on the resulting services. The abrupt

22

non-continuations caused layoffs, terminated contracts, eliminated programs, and disrupted ongoing school-year services. *See, e.g.*, Blom Decl. ¶¶ 17–18, 22–23; Newell Decl. ¶¶ 16–19; Roscup Decl. ¶¶ 19–21; Bradley Decl. ¶¶ 15, 22–23. For example, the Prichard Committee fully committed to the FSCS program; each and every person on the 26-person team was involved and partially funded by the FSCS grant, so the non-continuation has meant staff have been let go and capacity lost. Blom Decl. ¶¶ 17, 23. Paterson Public Schools had to reduce school-based health center services by 50% and laid off three employees, after losing FSCS funding. Newell Decl. ¶¶ 16, 18. Sodus CSD's program was forced to eliminate nutrition services, end contracts, cut staff, and move in-school coordinators to roles where they lack regular interaction with students. Roscup Decl. ¶¶ 18–21, 23.

Agencies must investigate the reliance interests their policies engendered, assess their significance, and weigh them against competing concerns before changing policy. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020). *Regents* is on point. There, DHS rescinded the deferred action program but did not consider retaining DACA's legally distinct forbearance policy or address the reliance interests created by the program. The Supreme Court held that DHS was not required to preserve DACA or adopt any particular policy, but it was required to assess whether reliance interests existed, determine their significance, and weigh them against the agency's competing concerns. *Id.* The Department likewise was required to consider the commitments made by grantees, schools, employees, community partners, and families and determine whether its asserted policy interests justified the resulting disruption. The record contains no meaningful assessment of the reliance interests here. Defendants did not determine whether and how grant recipients would compensate for lost funding and how students and other beneficiaries would cope

23

with the loss of crucial services. The Department's new policy must be set aside as arbitrary and capricious.

### iv. The Department failed to consider obvious alternatives to its new priorities.

Nor did the Department consider obvious alternatives such as applying its new FSCS conditions only prospectively; addressing new priority areas on a grant-by-grant basis through modifications, clarification, or corrective actions; or providing technical guidance to grantees. The Department's failure to consider those less disruptive options is particularly arbitrary because providing advance notice to grantees and technical assistance were the Department's customary responses to implementation concerns. *See Regents*, 591 U.S. at 30–33; *see also* Nash Decl. ¶¶ 14–15.

### B. Defendants' adoption and application of new priorities violated governing law.

Like statutes, "properly promulgated, substantive agency regulations have the 'force and effect of law,'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 & n.18 (1979), and "an agency must abide by" them, *Castaneira v. Noem*, 138 F.4th 540, 550–51 (D.C. Cir. 2025) (quoting *Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990)). Where an agency does not, its failure "can be challenged under the APA." *Gordon Coll. v. SBA*, No. CV 23-614 (BAH), 2025 WL 1517208, at *12 (D.D.C. May 28, 2025) (quoting *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988)), *appeal pending,* No. 25-5242. Defendants' adoption and application of new program priorities to non-continue existing multi-year grants violated both governing statutes and regulations.

### i. Defendants' adoption and application of new priorities without notice-and-comment was without observance of legally required procedure.

Under the APA, agencies wishing to amend agency rules must first follow a standard process of notice and public comment. *See* 5 U.S.C. § 553. Typically, "matter[s] relating to . . .

24

grants, benefits, or contracts" are exempt from this requirement. *Id.* § 553(a)(2). Under GEPA, however, that "exemption" is sharply limited: Grant regulations are excused from rulemaking requirements only where the regulations "govern the first grant competition under a new or substantially revised program authority" or in cases of "extreme hardship to the intended beneficiaries" of the affected program. 20 U.S.C. § 1232(d).

Thus, outside those two discrete scenarios—neither of which are present here— "regulations" for grants governed by GEPA "are . . . subject to the APA's notice and comment procedures." *Chula Vista City Sch. Dist. v. Bennett*, 824 F.2d 1573, 1582 (Fed. Cir. 1987); *see Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 854 (D. Md. 2025), *stayed pending appeal on other grounds*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025).[11] This requirement sweeps broadly: GEPA defines "regulation" to cover "any generally applicable rule, regulation, guideline, interpretation, or other requirement" that "is prescribed by the Secretary [of Education] or the Department [of Education]" and "has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program," including FSCS. 20 U.S.C. § 1232(a); *see id.* § 1221(c)(1) (defining "applicable program"). Unsurprisingly, when the Department of Education adopted new program priorities for future FSCS grant applications in 2022 and 2023, it complied with the statutory notice-and-comment requirement. *See* 87 Fed.

---

[11] Another provision of GEPA confirms this understanding. GEPA requires that before the Department publishes any "regulation affecting any institution of higher education in the United States," it must "publish[] . . . an educational impact assessment statement." 20 U.S.C. § 1221e-4. That statement, in turn, must be "based upon the record established under [5 U.S.C. § 553]," the notice-and-comment provision of the APA. *Id.* Thus, section 1221e-4 presumes, as section 1232 itself makes clear, that "regulations" subject to GEPA will be promulgated pursuant to notice and comment. *See Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 25-cv-03491 (TSC), 2026 WL 120984, at *13 (D.D.C. Jan. 16, 2026) (relying on section 1221e-4 to hold that "GEPA mandates, with few exceptions," that regulations affecting institutions of higher education "go through notice-and-comment rulemaking").

Reg. 1709; 87 Fed. Reg. 41675; Final Priority and Requirements – Full-Service Community Schools, 88 Fed. Reg. 37218 (June 7, 2023).

Yet here, Defendants adopted and applied new program priorities to existing multi-year grants without any public comment process at all. Specifically, Defendants "determined that the grant . . . provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration" and non-continued FSCS grants on that basis. *E.g.*, AR0000314; *see also* AR0000055 (confirming that the Department was "review[ing] all grant awards to advance the Administration's priorities" and "ensur[e] Federal funds do not support" certain types of objectionable "projects").

Even assuming Defendants may non-continue multi-year grants based on new "priorities and policy preferences," *but see infra* Section I.B.ii, they cannot do so without first engaging in rulemaking. "[P]riorities and other generally applicable criteria" that the Department uses to make grant decisions are "include[d]" within GEPA's ambit, and are thus subject to its notice-and-comment requirements. *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 25-CV-03491 (TSC), 2026 WL 120984, at *13 (D.D.C. Jan. 16, 2026). Defendants cannot credibly argue that they did not need to engage in notice-and-comment rulemaking here. First, the set of regulations governed by GEPA is "broadly construed," *Chula Vista*, 824 F.2d at 1582, and agency priorities used to determine FSCS eligibility are a type of "rule, regulation, guideline, . . . or other requirement" for the program, 20 U.S.C. § 1232(a). Second, the Department's new priorities are "generally applicable," *id*., because they apply to grantees throughout the FSCS program and beyond. *See* AR0000055 (Bessette memo). The scope of these priorities is further evidenced by the way they have been used—specifically, to non-continue a number of FSCS grants via boilerplate notices. *E.g.*, AR0000314; AR0000610; AR0001000.

Third, these priorities are "legally binding" under 20 U.S.C. § 1232(a)(2). "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citations omitted). Here, the Department has described its priorities in legally binding terms, making clear that it "*will* review all grant awards to advance the Administration's priorities of *ensuring* Federal funds do not support" certain specified projects. AR0000055 (emphasis added). And the Department relied on its updated priorities as the sole basis of its non-continuation decisions, so it has applied these new priorities as if they were binding also. *See Am. Ass'n of Colleges*, 770 F. Supp. 3d at 855 ("Under GEPA, 'department priorities' . . . are legally binding on the federal award recipient."). Thus, the agency's new priorities are legally binding and could only be enacted through regulation.

In similar circumstances, courts have rejected the Department's efforts to reverse course on program priorities without engaging in rulemaking. In *Washington v. United States Department of Education*, 167 F.4th 1241, 1245–47 (9th Cir. 2026) ("*Washington II*"), for instance, the Department of Education awarded plaintiffs multi-year grants to improve mental health services in elementary and secondary schools. *Id.* at 1244–45. Shortly after the Trump Administration took office, the Department non-continued the plaintiffs' awards without notice, citing to a new set of unpublished agency priorities. *Id.* at 1245. The district court granted summary judgment to the plaintiffs and the Ninth Circuit upheld the district court's conclusions, finding that the non-continuations were "based on generally applicable policy criteria that appear to implicate GEPA's rulemaking requirement." *Id.*; *see also Washington I*, 813 F. Supp. 3d at 1244–45. Other courts have agreed that GEPA and the APA demand notice and an opportunity for public comment before an agency may change policy priorities. *See Am. Ass'n of Colleges*, 770 F. Supp. 3d at 854 (holding

27

that, outside of the two exceptions recognized by GEPA, "[a]ll other Department regulations, including its 'agency priorities,' are subject to 5 U.S.C. § 553 notice and comment rule making"); *Council for Opportunity in Educ.*, 2026 WL 120984, at *13 (recognizing that "any priorities and other generally applicable criteria utilized in the TRIO grant selection process" must follow the APA's notice-and-comment procedures).

Defendants' violation of notice-and-comment requirements is especially glaring here because the Department's new priorities expressly contradict priorities that it previously adopted through rulemaking—priorities that in some cases led grant applicants to make the very statements to which the Department now objects. In its 2022 and 2023 notices inviting applications for FSCS funding, the Department included a competitive preference priority advantaging applicants that "creat[ed] education or work-based settings that are supportive, positive, identity-safe, and inclusive with regard to race, ethnicity, culture, language, and disability status." 87 Fed. Reg. at 41690; 88 Fed. Reg. at 37225. That priority had been adopted through notice and public comment. *See* Final Priorities and Definitions—Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs, 86 Fed. Reg. 70612, 70638 (Dec. 10, 2021). Yet after grantees responded to that competitive priority by stressing their commitment to equity, the Department turned around and used that same language against them. *See, e.g.*, AR0004055–56 (Metropolitan Family Services' request for reconsideration noting that the language the Department identified as objectionable, about gender and sexuality trainings and racial equity, responded to this competitive priority); AR0001693–94 (similar from PPS); AR0002419 (similar from Sodus CSD). Indeed, the Department concedes as much: It expressly non-continued FSCS grants *because* they "reflect[ed] the prior Administration's priorities and policy preferences." But if the Department wanted to "amend or repeal" the priority that the prior administration adopted through notice-and-comment,

28

it needed to "use the same procedures . . . [the Department] used to issue [that] rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). The Department made no attempt to do so here.

A change in presidential administration does not "entitle[]" the Department to "free [itself] from the constraints of GEPA and the APA." *Am. Ass'n of Colleges*, 770 F. Supp. 3d at 855. Because the Department failed to follow the appropriate procedures for changing program priorities, it has acted without observance of procedure required by law.

### ii. Defendants' use of new priorities to non-continue multi-year projects midstream was contrary to law.

In making the decision to non-continue FSCS grants, the Department did not consider any information about grantee performance. Instead, it reopened years-old grant applications, identified certain stray statements, and found those statements inconsistent with the current administration's policy agenda. *See, e.g.*, AR0000314 (basing non-continuation on "*proposed* project activities" (emphasis added)). But those grant applications were already approved and the grants were awarded under the priorities applicable for the lifespan of the grants. Department regulations forbid it from subjecting grantees to this kind of do-over: The Department cannot "discontinue" "approved multi-year Grantees by evaluating their original grant applications against new unpublished priorities not in effect at the time that the Grants were approved." *Washington v. U.S. Dep't of Education*, No. C26-2409-KKE, 2026 WL 2150222, at *3 (W.D. Wash. July 27, 2026) ("*Washington III*"). Agency regulations bar such action.

*First*, the regulatory text forbids consideration of policy priorities when making continuation decisions. At the front end of the grant selection process, the Secretary "establishes final annual priorities" for a grant program "by publishing the priorities in a notice in the Federal Register." 34 C.F.R. § 75.105(b). Those priorities are used to "select[] . . . applications" for grant

29

funding. *Id.* § 75.105(a); *see also id.* § 75.105(c) (describing different types of priorities and their legal effect). But after a multi-year project is approved and the first 12-month grant is awarded, current policy priorities fall out of the picture. Rather, in future years, the Secretary must "give[] priority to continuation awards over new grants," so long as the grantee meets the criteria for continuation. *Id.* § 75.253(c); *see also* 45 Fed. Reg. at 22559 ("[C]ontinuation award[s]" are not "subject to competition with other applications.").

That understanding is confirmed by 34 C.F.R. § 75.253(c), which addresses what "[i]nformation" can be "considered in making a continuation award." In making that determination, the Secretary is to "consider any relevant information *regarding grantee performance.*" 34 C.F.R. § 75.253(b) (emphasis added). Information found in multi-year grantees' original grant applications cannot measure "grantee performance," as a grantee could not have begun "perform[ing]" at the time it applied. By contrast, no provision of law authorizes the Department to consider information unrelated to grantee performance. *See Direct Grant Programs*, 59 Fed. Reg. 30258, 30259 (June 10, 1994) ("[T]he continuation award decision" is to be made "based entirely on the submission of [performance] reports"—not based on "award application[s]."); Discretionary Grantmaking at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions.").

*Second*, the authority the Department asserts—to non-continue grants based purely on changes in policy whims—is incompatible with the regulatory scheme governing multi-year awards—and, indeed, would upend that scheme. *See King v. Burwell*, 576 U.S. 473, 486 (2015) (courts must read "words 'in their context and with a view to their place in the overall statutory scheme'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)); *Kisor*

30

*v. Wilkie*, 588 U.S. 558, 575 (2019) (endorsing use of the whole "legal toolkit" to interpret regulations, including an analysis of the "structure . . . and purpose of a regulation").

The regulations here are designed to ensure stability for grantees by providing them with reasonable assurance that they will continue to be funded through the multi-year project period. To that end, the Department has sought to avoid projecting "an 'enforcement' mentality" to grantees and instead has adopted a different "paradigm whereby performance reporting" for multi-year grants is "tied . . . less to the cut-off in funding." 59 Fed. Reg. at 30259. As the Department has repeatedly represented, it "do[es] not deny a large number of non-competing continuation awards." 89 Fed. Reg. at 70316. And it provides plenty of notice of potential problems; when continuations are denied, "grantees are often aware of the likelihood of the decision well in advance." *Id.*

In line with the understanding that non-continuation is exceptional, not the norm, when the Secretary approves a multi-year grant, she must "[i]ndicate[] . . . her intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b)(2); *see also Discretionary Grantmaking* at 49 ("When ED makes a multiyear award, it usually obligates funds for the first budget period and *commits* to fund subsequent budget periods under certain conditions[.]" (emphasis added)). So long as the grantee satisfies the criteria for continuation, it is entitled to "priority . . . over new grants" in the application selection process. *Id.* § 75.253(c).

Construing the regulations to allow non-continuation based solely on policy disagreements would undermine these objectives and would be inconsistent with the rules the Department chose to adopt. Interpreting the regulations in this manner would undercut the predictability necessary for investment in a multi-year project, because it would place grantees at peril of non-continuation every time the administration changes its mind—or changes hands. It "would frustrate the

31

regulations and agency guidance that uniformly encourages grantees to tailor their grant applications to address published priorities and . . . make progress toward the program goals and objectives identified in the application." *Washington I*, 813 F. Supp. 3d at 1243 (emphasis omitted). And it would "sabotage grantees' efforts to plan for a successful project." *Id.*

*Third*, giving the Department the unfettered authority to abandon multi-year grants based on changed priorities is impossible to square with the Department's comprehensive rules for determining grant priorities and selecting grants in the first instance. For new grants, priorities must be published in the Federal Register. 34 C.F.R. § 75.105(a)–(b). The Secretary must follow carefully drawn rules about how and when to consider each priority, along with other selection criteria. *See, e.g.*, *id.* §§ 75.105(c), 75.201, 75.217; *Discretionary Grantmaking* at 14–15, 26–27, 46. These processes "help[] . . . applicant[s] apply" by notifying them of the standards on which their application will be judged. 34 C.F.R. § 75.101; *see also id.* § 75.101(4). By contrast, the regulations include no provision authorizing the Department to announce new grant priorities at the continuation stage and use those new priorities to assess past applications—much less any rule laying out procedures for that determination.

The conspicuous absence of any such provision is strong evidence that the regulations do not authorize the Department to non-continue grants solely based on changed priorities. If the regulations were meant to do so, they would surely establish some procedural framework for those decisions—just as they do for new grants. *Cf. United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005) ("Where a statute has a 'comprehensive and reticulated' remedial scheme, we are reluctant to authorize additional remedies."). The alternative understanding would produce backwards and nonsensical results. It is implausible that awardees of multi-year grants,

32

who are entitled to priority over new applicants, *see id.* § 75.253(c), are entitled to *fewer* procedural guardrails than those applying for the first time.

*Finally*, nothing about the fact that the Secretary must make "a determination . . . that continuation of the project is in the best interest of the Federal Government" before continuing a grant affects this analysis. 34 C.F.R. § 75.253(a)(5); *see also id.* § 75.253(f). That provision is not an open-ended authorization to non-continue a grant for any reason whatsoever. Rather, as section 75.253(b) makes clear, in making the "best interest" determination, the Secretary is limited to considering "grantee performance." *Id.* § 75.253(a)(5), (b). Were the law otherwise, the Department "could entirely disavow the published priorities selected at the outset of a grant competition and re-evaluate multi-year grantees on the basis of new, unpublished objectives under the guise of a 'best interest' determination." *Washington I*, 813 F. Supp. 3d at 1244. But "[t]he Department is not at liberty to use the continuation process to establish new grant priorities and apply them retroactively without the procedural protections Congress expressly applied to Department grant programs." *Id.*

## II.   The Non-Continuation Decisions Are Arbitrary and Capricious

Each non-continuation decision implemented the policy challenged in Count I, and that policy served as the sole ground for the non-continuation decisions. If that policy is set aside under the APA, the decisions resting on it must also be set aside. *See Bechtel v. F.C.C.*, 10 F.3d 875, 887 (D.C. Cir. 1993) (plaintiff is entitled to proceed "free of" a "policy [that] is arbitrary and capricious"); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (where the "grounds invoked by the agency . . . are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis"). But even if the policy change were permissible and in accordance with the APA and other law, the Department's decisions to non-continue the awards held by Plaintiffs and from which Plaintiffs benefited were

33

independently arbitrary and capricious. The Department had to rationally apply any new priorities to each grant based on the relevant evidence. Instead, the notices used boilerplate conclusions and application excerpts while ignoring actual performance, implementation, and the evidence submitted on reconsideration.

### A. The non-continuation decisions did not evaluate the grantees' performance or connect the policy reasons to the decision to end each award.

The non-continuation decisions are arbitrary and capricious because the Department failed to consider whether the grantees were effective in carrying out the requirements of their grants. *See State Farm*, 463 U.S. at 43. The Department had current performance reports, fiscal data, implementation records, and program-office assessments for each grant—indeed, the Department collected this information precisely to use it to make continuation decisions. *See, e.g.*, 34 C.F.R. § 75.253(b). Yet the non-continuation notices did not reference this material and instead exclusively quoted application materials submitted years earlier and did not determine whether the quoted materials had been implemented, funded, or associated with any performance deficiency. The Department therefore failed to consider an important aspect of a continuation decision.

The Department also failed to provide an explanation sufficient to reveal its reasoning, because the non-continuation notices did not connect the new priorities to the agency's decision to non-continue awards. *See Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404–05 (D.C. Cir. 1995). The Department failed to explain how the proposed project activities it listed in the notices failed to prioritize merit, fairness, and excellence or why ending an entire award was a proportionate response. Nor did they address the evidence that the projects were improving attendance, grades, student health, family engagement, and access to essential services. *See, e.g.*, AR0001273–77 (Prichard); AR0001693–98 (PPS); AR0002084–90 (PPS); AR0002418–24 (Sodus CSD); AR0004055–61 (Metropolitan Family Services); AR0004380–87 (Metropolitan

34

Family Services). The Court should hold that the non-continuation decisions were arbitrary and capricious because it cannot determine the path the Department followed to reach them. *Dickson*, 68 F.3d at 1404–05.

This case is like *Dickson*, where the D.C. Circuit reviewed the Army's decisions not to upgrade former service members' discharge status. For each plaintiff, the Army had briefly discussed the circumstances of their dishonorable discharge and concluded that a waiver of the three-year statute of limitations for review was not warranted. But the Army "omitted the critical step—connecting the facts to the conclusion." *See id.* at 1405. The Department has done the same here: after detailing a grantee's current award and certain materials in their applications, the Department failed to identify how the award violated the new criteria for continuation. This failure renders the non-continuation decisions arbitrary and capricious.

## B. The Department ignored directly contrary evidence.

The non-continuation decisions are also arbitrary and capricious because the Department failed to consider evidence that the grantees provided. In many instances, grantees presented the Department with evidence that the allegations in the non-continuation determinations were untrue and that the grantees' programs were in line with the Administration's stated priorities. Among the evidence that the Department ignored:

- Metropolitan Family Services explained that the gender, sexuality, racial-equity, cultural-competency, and implicit-bias activities quoted in its notices had not been provided through the FSCS grants and had not been incorporated into the grant curriculum. AR0004056; AR0004380–85. It also explained that its use of poverty and demographic data responded to statutory and application requirements and documented meaningful project progress. AR0004380–85.

35

- Prichard explained that the cited trainings and race-equity assessment were examples of possible activities that were never implemented, funded, or incorporated into the scope of work. AR0001273. Its records also showed substantial progress, including lower chronic absenteeism, gains in math and reading, and expanded community partnerships. AR0001274–76.

- PPS explained that the quoted language responded to application requirements, reflected organizational values rather than FSCS expenditures, and had not been implemented with FSCS funds. AR0001693–98; AR0002084–85.

- Sodus CSD showed that the cited activity was not funded by FSCS and that the quoted language responded to priorities in effect when it applied. AR0002418–22.

- United Way California Capital Region explained that the language identified in its notice described culturally responsive practices required by the application, rather than unlawful preferences, and submitted information concerning the project's actual implementation and performance. AR0000317–19.

- Oakland Promise likewise disputed the Department's characterization of application language and explained how its activities served students according to educational need and the purposes of the FSCS program. AR0000612–19.

- The University Center of Lake County explained that it never implemented a program mentioned in its application and it presented evidence that its programming improved students' outcomes. AR0001002.

- District of Columbia Public Schools explained that the Department had taken application language out of context, that the District was not implementing some

36

activities described in the application, and that the District's programs were aligned with the Administration's priorities. AR0002690–95.

- The University of Maryland, Baltimore explained that the Department's quotations described programming to ensure fair treatment of all people regardless of race, not discriminatory programming, and submitted materials concerning the project's actual services and implementation. AR0003282–87.

- Duke University likewise explained that the Department incorrectly noted that Duke had contracted with a certain partner, and the University provided information about its services to local students. AR0003687–92.

None of the Department's denial letters addressed those explanations or the projects' current performance reports, but instead continued to quote the old applications while ignoring measurable gains in attendance, academic performance, school safety, food security, and student access to services. *E.g.*, AR0001390–91; AR0004443.

The Department acted arbitrarily and capriciously by ignoring evidence that undercut its non-continuation decisions. It is well-settled that "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action." *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010); *see Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

The Department's failures are like those of the DEA in *Morall v. Drug Enf't Admin.*, 412 F.3d 165 (D.C. Cir. 2005). There, the DEA revoked a physician's ability to prescribe controlled substances based in significant part on the agency's determination that the physician had lied and failed to cooperate. But the physician had produced contrary evidence that was "precisely on

37

point," and DEA failed to consider that evidence. The D.C. Circuit held that an agency cannot "ignore[] relevant evidence" to reach a preferred outcome. *Id.* at 178–80 (emphasis omitted). The Department's non-continuation determinations were likewise blind to the evidence that grantees submitted about their use of FSCS funds. The non-continuations, therefore, were arbitrary and capricious and should be set aside.

**C.  The non-continuation decisions fail to address reliance interests or alternatives.**

The non-continuation decisions also failed to consider the grant-specific reliance interests and alternatives before the Department. Each grantee had hired personnel, entered agreements with community partners, and committed resources to schools and services in reliance on the approved multi-year award. *See, e.g.*, Newell Decl. ¶¶ 5–7, 9; Roscup Decl. ¶¶ 19, 24–25; Blom Decl. ¶¶ 17, 21–23. Yet nothing in the AR, not even the notices, identified those commitments, which renders the Department's actions arbitrary and capricious. *Regents*, 591 U.S. at 30–33.

Likewise, the Department failed to consider whether its asserted concerns could be addressed through clarification, modification, corrective action, or continuation of the many undisputedly lawful components of each project. Failure to do so here stands in contrast to the historical Department approach, which has been to work with grantees to bring them into compliance with grant terms and agency priorities. *See* Discretionary Grantmaking at 32, 36–37; Nash Decl. ¶ 14 ("in the extremely rare circumstance in which a grantee was not making adequate yearly progress, the Department would notify [them] and provide opportunities to correct their performance deficiencies"); Kostyo Decl. ¶¶ 14–17. Instead, the Department ended each award in its entirety without explaining why a narrower response would be inadequate. The failure to consider these obvious alternatives means that the Department's non-continuation awards were arbitrary and capricious. *State Farm*, 463 U.S. at 43.

38

### III. The Court Should Enter a Permanent Injunction and Declare Unlawful and Vacate Defendants' Actions.

Because the Defendants' adoption of changed priorities for the FSCS program and non-continuation of FSCS grants violate the APA, this Court should vacate those actions, declare them unlawful, *see* 28 U.S.C. § 2201(a), and award permanent injunctive relief preventing the government from imposing the changed funding priorities or substantially similar criteria to the relevant FSCS grants. These remedies—which do not require this Court to order the payment of any money—will put grantees back in continuation status and allow Plaintiffs to again benefit from the FSCS program.[12]

"[V]acatur of the agency action" is "the normal remedy under APA section 706," and is appropriate here to remedy Defendants' APA violations. *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 103 (D.D.C. 2025) (citing *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 985 F.3d 1032, 1050 (D.C. Cir. 2021) ("'The ordinary practice' . . . 'is to vacate unlawful agency action.'" (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)); 5 U.S.C. § 706(2) ("The reviewing court shall . . . hold unlawful and set aside agency action" that violates the APA.).

Injunctive relief is also warranted to prevent Defendants from applying their new funding priorities to FSCS grantees from the FY 2022 and FY 2023 competitions. While vacatur is the default remedy, courts in APA lawsuits may also hear actions for "declaratory judgments," "mandatory injunction[s]," and other similar "form[s] of legal action." 5 U.S.C. § 703. Where the

---

[12] Because Defendants have not identified any legitimate basis for non-continuing the FSCS grants at issue, and because, absent a legitimate ground for non-continuation, the Department must "give[] priority to continuation awards over new grants," 34 C.F.R. § 75.253(c), Plaintiffs anticipate that the requested relief will ensure that they will benefit from the program moving forward.

plaintiff establishes that an injunction has a "meaningful practical effect independent of its vacatur" and that "an injunction *should* issue under the traditional four-factor test," the court may issue an injunction in addition to the weaker remedy of vacatur. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158, 165 (2010); *see also Standing Rock*, 985 F.3d at 1054 (similar).

Here, an injunction both is necessary to fully redress Plaintiffs' injuries and satisfies the traditional test for equitable relief. As to complete relief, courts have recognized that "a broader injunction is necessary to provide complete relief" where an agency "may attempt" to take "similar" action "again as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). Such an injunction is appropriate where it simply "restrain[s] agency officials from" engaging in "conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs); *Washington v. U.S. Dep't of Homeland Sec.*, No. 2:25-cv-1401-BJR, 2026 WL 1469538, at *11 (W.D. Wash. May 26, 2026) (vacating a grant termination and ordering the government not to "re-terminate [the] award based on the grounds held unlawful in this Order").

Absent an injunction, it is likely that Defendants will attempt to impose their priorities to again stop funding the FSCS grants at issue in this case. Indeed, in 2026 alone, the Department has already sought—at least twice—to cut off grants even after a court has found non-continuation of those grants to be unlawful. *See Washington III*, 2026 WL 2150222, at *2 (describing how the Department non-continued mental health grants, those non-continuations were enjoined, and the Department subsequently sought to terminate those same grants); Pl.'s Expedited Mot. Enforce Prelim. Inj., *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 1:25-cv-3491-TSC

40

(D.D.C. June 9, 2026), Dkt. No. 47 at 1, 5–10 (explaining how, after its non-continuation decisions were enjoined, the Department "doubled down" and "issued, in effect, the same unlawful decisions").

Plaintiffs likewise satisfy the traditional test for a permanent injunction. Under that four-factor test, a party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "When the defendant is the government, factors (3) and (4) merge." *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023)

Without an injunction, Plaintiffs will experience irreparable harm. As explained above, the grantee and subgrantee Plaintiffs have lost out on much-needed funding to support their community schools programs, forcing them to cut staff and cancel programming. *Supra* at 14–15. NEA and AFT members have lost jobs, lost pay, been forced to cover the funding gap themselves, and experienced additional hardship at work. *Supra* at 15–16. Plaintiffs have also been irreparably harmed due to Defendants' failure to engage in notice and comment before implementing its new funding priorities. *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 16–17 (D.D.C. 2009). Nor is it clear how Plaintiffs could obtain monetary relief—particularly because, as the Court previously found, Plaintiffs' claims do not arise from any contract. *See* Dkt. No. 37, at 31–35; *cf. Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 178 (D.D.C. 2025) (holding that, where "plaintiff's monetary damages" are "unrecoverable," financial harm is "sufficient to

41

establish irreparable harm" and collecting cases), *appeal filed* No. 25-5241 (D.C. Cir. July 2, 2025).

The balance of the equities and the public interest also point in favor of injunctive relief. The FSCS grants that the Department non-continued have a proven track record of success— improving academic results and attendance rates, providing essential services like food and health care, and more. *See, e.g.*, Wilson Decl. ¶¶ 10–12; Newell Decl. ¶ 10; Brosnan Decl. ¶¶ 12–13; Grant Decl. ¶ 8; Roscup Decl. ¶ 8; Dorrington Decl. ¶¶ 9–10; McNeil Decl. ¶¶ 13–15, 18. For example, with support from FSCS, Prichard's Kentucky Community Schools Initiative has generated 9% and 10% gains in reading and math, respectively, and decreased absenteeism in 34 out of 36 schools—an 8% drop overall. Blom Decl. ¶ 19. In just two-and-a-half years, operating in one of the poorest states in the country, Prichard built a model program that "even other grantees pointed to" when national leaders asked about success stories. *Id.* ¶ 20.

Defendants have no similar interest in their non-continuation decisions. For the reasons given above, *supra* Sections I–II, those actions were unlawful, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). More fundamentally, the government has yet to provide even the most minimal explanation for why it needed to non-continue the FSCS grants at issue here. Among other deficiencies, the government has not explained why it needed to adopt new priorities for the FSCS program, why its new priorities were important enough to displace the traditional performance-based review process for making continuation decisions, why the grants at issue violated the new priorities—especially in light of

42

grantees' objections that they did not engage in the activities that the government identified—and why any benefits of the new priorities outweighed the substantial reliance interests they disrupted, *see supra* at 22–23, 38. Under these circumstances, the government's interest in perpetuating these unlawful non-continuation decisions cannot outweigh Plaintiffs' interest in preventing the government from unlawfully imposing its policy priorities to stop funding FSCS grants—grants that benefit students, families, educators, schools, and communities alike.

## CONCLUSION

For these reasons, the Court should declare that Defendants' decisions to change funding priorities was unlawful, in violation of the Administrative Procedure Act (Count I); declare that Defendants' non-continuation decisions and actions to effectuate them were unlawful in violation of the Administrative Procedure Act (Counts II–IV); vacate, pursuant to 5 U.S.C. § 706(2), the Defendants' decisions to change funding priorities, the non-continuation decisions, and actions to effectuate them (Counts I–IV); and permanently enjoin application of the changed funding priorities to FSCS grantees from the FY2022 and FY2023 competitions, and enjoin the application of changed funding priorities to any future determination regarding the continuation of Plaintiffs' FY2022 and FY 2023 FSCS grants (Counts I–IV).

Dated: August 12, 2026                                   Respectfully submitted,

43

*s/ Kali Schellenberg*
Kali Schellenberg (DC Bar No. 198422)
Victoria S. Nugent (DC Bar No. 470800)
Robin F. Thurston (DC Bar No. 1531399)
Louis Katz (DC Bar No. 90003861)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kschellenberg@democracyforward.org
vnugent@democracyforward.org
rthurston@democracyforward.org
lkatz@democracyforward.org


Daniel F. Jacobson (DC Bar No. 1016621)
Lynn D. Eisenberg (DC Bar No. 1017511)
Brian C. Rosen-Shaud (DC Bar No. 90042065)
Nina C. Cahill (DC Bar No. 1735989)
Jacobson Lawyers Group PLLC
5100 Wisconsin Ave N.W., Suite 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com
nina@jacobsonlawyersgroup.com

[+] Admitted *pro hac vice*


*Counsel for Plaintiffs*

44