**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| BRIGHTON PARK NEIGHBORHOOD COUNCIL, *et al.*, <br><br> Plaintiffs, <br><br> **v.** <br><br> LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education, *et. al.*, <br><br> Defendants. |

**Civil Case No. 25-cv-4523**

**DECLARATION OF STEPHEN KOSTYO**

I, Stephen Kostyo, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2. I worked as a Federation of American Scientists Impact Fellow detailed to the Department of Education to work with the Full Service Community School and Promise Neighborhood programs between January 16, 2023 and October 5, 2025. In that position I served as a Program Officer and provided additional support for the Full-Service Community Schools (FSCS) and Promise Neighborhood (PN) programs. I helped manage $241 million in annual appropriations across both programs supporting around a hundred grants over 3 years.

1

3. My day-to-day tasks included communicating with grantees and technical assistance providers, putting together in-person and virtual events, updating documents and creating resources to support implementation of the grant programs, and running grant competitions. Additional tasks included, reviewing grantee budgets, reviewing annual performance reports, and supporting grantee data collection and reporting. Each year, I also organized and facilitated webinars, and organized and facilitated an annual multi-day meeting for our grantees.

4. While at the Department I became well-versed in the statutory and regulatory frameworks governing the Department's grantmaking. As part of my position, I helped to write a guidance document on data collection reporting for the FSCS program. *See* Data Collection and Reporting Guidance for the Full-Service Community Schools Program, U.S. Department of Education (Exp. Dec. 31, 2026), https://perma.cc/E5GN-YZTK (Reporting Guidance).

**Full Service Community School Program Prior to January 2025**

5. In 2022 and 2023, the Department invited applications for FSCS grants.

6. When I started at the Department in February of 2023, the Department was in the midst of onboarding a new cohort of FSCS grantees. I became the Program Officer and primary Department of Education contact for many 2022 grantees. I worked with their staff to ensure they reported the appropriate information to the Department and spent funds in a way that followed statutory and regulatory guidelines. I also helped launch the 2023 FSCS grant competition, editing documents, webinars, and connecting with potential grantees. I then supported the peer review process for these grants, overseeing panels of external peer reviewers. The process of developing the 2023 FSCS competition, conducting the peer reviews, and awarding the grants took over six

months. Once grantees were chosen, I again helped onboard the 2023 grantees and became the Program Officer for several grants in this cohort. The grants I served as the Program Officer for shifted from year to year as our program staff changed.

7.    It takes a lot of money and effort to peer review the grant applications. The Department invested time into that process on the front end to make sure that the funds are going to applicants that are best able to implement the respective grants. The process is highly competitive, with around 10%-30% of applicants receiving awards.

8.    Once the grantees received their awards and became part of the FSCS program, the typical practice of the Department was to have a post-award phone call. During that call, program staff would go over the program and review the grantee's initial budget. Because of the gap in time between the writing of applications, which would typically happen in the late spring and early summer, to the time the awards were announced in December, changes and adjustments often needed to be made. The grantee and the Department would work in tandem to ensure what the grantee planned to do was in line with the statute and the guidance.

9.    To comply with Department guidance, grantees were required to undertake an extensive data collection and evaluation process. They had to often learn new data submission and reporting systems. The Department would take an active role, walking grantees through the process so that they could complete the reports and share the required information. When grantees were having difficulty, we would often meet with them and connect them with other successful grantees or technical assistance providers for support.

10.    Once a grant was being implemented, we rarely referred to the initial application. When we did turn back to the application, it would be to gather data about basic facts in the

operation, such as how many grantees were partnering with national or local nonprofits, what the initial scope of work consisted of, and how the grantee described its theory of action, in an effort to help us engage with the program.

11.     It was expected that grantees might change their programming from what was initially described in their applications. The FSCS program was meant to be responsive to the needs of the schools, and those needs were subject to change. For example, the grantee may realize that students are not taking advantage of offered mental health services because of lack of transportation, leading the program to adjust its planning to offer a bus. Or a grantee may realize a particular program or planned training is no longer useful and could decide not to use funds for that purpose.

12.     If the Department wanted to understand what a grantee was doing with the grant, program staff could look at the budget and reports that were put into the grant G6 system, the Department of Education's online grant system. These documents submitted through that system would give a picture of the actions taken by a grantee and others involved in the grant. I, and other program staff, might also speak directly with grantees to make sure that nothing was missed.

13.     Every year, I reviewed the FSCS grants for continuation. As part of that process, grantees submitted an initial report in March and an Annual Performance Report in August. Together, these reports included detailed financial information, as well as information concerning the grantee's progress against performance measurements, effectiveness, and measured effects on program participants. *See* 34 C.F.R. §§ 75.118, 75.590. The reports were specifically focused on furthering the purposes of the FSCS program, including whether the grant was "improv[ing] the coordination and integration, accessibility, and effectiveness of services for children and families,

4

particularly for children attending high-poverty schools, including high-poverty rural schools." 20 U.S.C. § 7271; *see also id.* § 7275(g). To assist grantees in developing these reports, the Department of Education issued a guidance document in 2024, which I helped to write. *See* Reporting Guidance, supra ¶ 4. The document provides detailed instructions on required and optional performance indicators to include in each grantee's annual report.

14.     After grantees submitted these reports, program staff would review the narrative responses from the grantees along with detailed financial information, grantee budgets, any proposed changes to the grantee's scope of work, community and student impact data, and implementation data. In March, program officers used the initial data to see whether grantees were making adequate annual progress toward meeting the grant objectives in line with federal statute and departmental guidance. Program staff would assess whether federal funds were being spent in an appropriate manner, at a pace to spend down the grant over the grant period, and assess the impact and implementation data. Program officers would then meet with each grantee to discuss potential changes to programming, spending draw downs, or additional data collection needs. If a grantee was struggling on any of these items, we would take action to support them. For example, recommending appropriate ways to spend down grant funds, providing access to technical assistance providers, and inquiring about challenges presented in the data. Grantees experiencing similar challenges were often connected, and we created and shared resources about ways to address common implementation obstacles such as overcoming high rates of chronically absent students or improve school climate.

15.     Prior to January 2025, issues with the FSCS programs were rare. When issues arose, generally, the problem was with implementation or execution of the planned grant activities.  For

instance, a grantee might fail to find staff or vendors capable of implementing a program and thus not spend the grant funds as expected. In such an instance, the FSCS program officers would talk to the grantees to see if they needed support to fulfill the goals of the program and connect them with the resources they needed to improve. Officers would spend time working directly with grantees to fix the issues before considering grant discontinuation. In my time working on the FSCS program before January 2025, we never non-continued a FSCS grant or even considered doing so.

16.    The closest parallel to non-continuation that I experienced occurred if a grantee was not spending money at the appropriate level or had not been corresponding regularly with the Department. If working closely with the grantee was not improving the situation, the Department could institute "route payment" in which all money spent had to first be approved by the program officer. Another option was for the Department to give a nominal amount as a continuation award. I only observed this in relation to one other grant program and never through the FSCS grant program.

17.    If a program report revealed that funds were spent on an unallowable use, the Department would ask for the money back. Even then, though, non-continuation was not part of the discussion.

18.    At the end of the review process, continuation recommendations were made and stored on review forms that were kept in the program office's files, and the recommendations were then sent to senior Department of Education officials who used them to make continuation awards. In my time at the Department, all FSCS grantees received continuation awards, and the senior

Department of Education officials trusted the professional judgment of the program office in making these determinations.

**Changes to the Full Service Community School Grant Program after January 2025**

19. In the wake of the administration change in January 2025, the FSCS and PN offices experienced major changes. As an initial matter, staffing changed dramatically. Previously, I worked on both the FSCS program and the PN program, in addition to a team of three staff members working on the FSCS program, and three working on the PN program. By spring 2025, I was the only remaining staff member on the FSCS program. Another staff member, who had previously only been the lead for the PN program, was assigned to also lead FSCS. The rest of the team had left or retired. Two other program officers remained from PN programs. They were asked to assist with the FSCS program in addition to their original duties. What had been the work of 7 people was now spread across a team of 4.

20. Between March – October of 2025 we proceeded with the typical process of evaluating the grants for continuation determinations, described above.

21. That process took an unexpected turn when, in early June, our program received an email message from a previously unknown federal employee informing us that the program office was tasked with doing a separate and additional review process, unrelated to the non-continuation determination process outlined in Departmental regulations. As I recall, the email instructed the program staff, when reviewing for continuation awards, to review grants for "discriminatory activities." The email provided a list of potentially discriminatory activities related to race, sex, and gender, like allowing males into female-only sports. After reviewing the June 5, 2025 memo

from Murray Bessette that has recently become public, I understand that the information communicated to the staff in that email was drawn from that memorandum.

22.    In December 2025, I became aware that the Department had non-continued 18 grants. Many of the grants that were non-continued were some of the highest performing grants. Part of the job of the FSCS Program Staff was to track certain indicators of grant success–such as the number of students, families, and community members served, teacher retention rates, graduation rates, and rates of chronic absenteeism, rates of expulsions and suspensions. Many of the non-continued grants were overperforming on the indicators the Department was tracking. For example, certain programs had seen drastic reductions in rates of chronic absenteeism, expulsions, and suspensions, including decreases of 10% or more in a single year. Similarly, the grants were showing incredible success in the number of people served by the grant, increasing every year. If the Department's goal with the FSCS program is to provide funding that helps kids and families, it would ensure these programs were funded.

23.    The progress and positive impact these grant programs were having was thrown out of the window when the Department non-continued the grants.

August 11, 2026

_____
Stephen Kostyo

9